## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **PDVSA PETROLEO S.A.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 2:09-CV-00038** |
| | § | |
| **TRIGEANT, LTD. and** | § | |
| **BTB REFINING, LLC.,** | § | |
| | § | |
| **Defendants.** | § | |

## TRIGEANT, LTD.'S RESPONSE IN OPPOSITION TO BTB REFINING, LLC'S MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Trigeant, Ltd. ("Trigeant"), and makes this its Response to BTB Refining, LLC's ("BTB") Motion for Preliminary and Permanent Injunction. As good and sufficient grounds therefore, Trigeant respectfully shows the Court the following:

## I.    BTB'S MOTION IS MOOT; BTB IS IN BANKRUPTCY.

On July 28, 2014, an involuntary bankruptcy petition was filed against BTB in the United States Bankruptcy Court for the Southern District of Florida, Case Number 14-26919-EPK. *See* **Exhibits A** and **B** attached hereto. As a result of that filing, in accordance with 11 U.S.C. 362, the automatic stay provisions of the United States Bankruptcy Code came into effect. The stay precludes any party, including Trigeant, from taking any action to prosecute any claim against BTB. The stay, therefore, precludes Trigeant from prosecuting its Petition to Quiet Title presently pending in the

347th Judicial District Court for Nueces County, Texas (the "Nueces County Lawsuit").

Accordingly, any request for a temporary injunction has been rendered moot. As this

motion is, in essence, a request to determine the Petition to Quiet Title in this Court under

the guise of a motion to prevent Trigeant from pursuing litigation, this motion may also

be the subject of the automatic stay.

Nevertheless, in an abundance of caution, Trigeant, Ltd. files this response to the

Motion of BTB.

## II.   BTB'S FACTUAL POSITIONS ARE NOT BASED ON THE RECORD.

In addition to BTB's Motion being moot, Trigeant further asserts that BTB's

Motion blatantly disregards both black letter law prohibiting the relief sought, while

taking liberties with respect to the relevant facts. The verbatim language within BTB's

Motion even makes this clear at Paragraphs 2 and 3, which state:

> 2.   In the Final Judgment, this Court declared that the loan transaction
> documents pursuant to which BTB foreclosed were "in full force and
> effect" as of January 14, 2013, the date of the Final Judgment. **The Court
> also recognized that BTB could again exercise its remedies under the
> loan transaction documents,** but enjoined BTB from foreclosing prior to
> exhaustion of all appeals.
>
> 3.   **Although Trigeant was a party to this lawsuit, it never once
> challenged the propriety of the foreclosure sale or raised any defense to
> its underlying indebtedness to BTB.** Trigeant did not object [to] the
> Court's findings of fact and conclusions of law. Neither did Trigeant
> appeal the Court's Final Judgment on any grounds. (Emphasis added).

Implicit particularly in paragraph 3 and underlying all of BTB's claims in its

Motion, is the assumption that at the foreclosure sale and in the trial of this case, Trigeant

was a separate, independent party, acting in accordance with its own judgment and for its

own interest.  BTB ignores that underlying this Court's Judgment and the Findings of Fact and Conclusions of Law (Document 239) to the effect that there was only one party to the foreclosure sale in March 2008, and that party was Harry Sargeant, III ("Harry").  The Court's findings of fact 103 through 117 establish that at the time of the fraudulent transfer, Harry served as the manager of Trigeant Holdings, LLC, the general partner of Trigeant Holdings, Ltd., which controlled Trigeant, LLC, which is the general partner of, and exercised 100% control over, Trigeant.  In addition, the Court found that Harry had ultimate managerial responsibility for Trigeant operations and thus, exerted control over Trigeant.  Harry was also the 100% owner and member of BTB and had ultimate managerial control over BTB.  Thus, Harry sat on both sides of the transfer of the refinery from Trigeant to BTB at the fraudulent foreclosure sale.

Until February 2013, there was no change in the relationship of these three entities; BTB, Trigeant and Harry.  At that time, Harry was removed or resigned from all Trigeant related positions. *See* Notice attached hereto as **Exhibit C**.  Prior to February 2013, that is, at the time of the fraudulent conveyance and during the pendency of this lawsuit, Trigeant was under the full control of Harry/BTB.  This Court should not allow BTB to use actions taken or not taken by Trigeant when it was under the domination and control of Harry/BTB, to determine the outcome of issues not actually litigated in this suit before this court.

Moreover, the fact-based uncontestable flaws in BTB's above allegations, which are foundational to its Motion, and demonstrate why the Motion must be denied include:

1.      Despite having the opportunity to "exercise its remedies under the loan transaction documents," as BTB states in paragraph 2 of its Motion, BTB has failed to do so.  It has done nothing since the appeal of this Court's final judgment was affirmed to re-foreclose its Note and Mortgage acquired from American Capital (the "Loan Documents").[1]  So what is BTB complaining about?

2.      BTB willfully has **not** taken any steps to exercise its remedies under the Loan Documents because it knows that Trigeant has significant defenses, monetary offsets and counterclaims to enforcement of those documents and indeed, has already asserted them in two separate lawsuits, including the Nueces County Lawsuit brought by Trigeant to quiet title that BTB complains about in its Motion.

3.      Trigeant also sued BTB **over a year ago** in Palm Beach County, Florida, where that court has personal and subject matter jurisdiction, seeking significant damages for torts committed by BTB, Harry and Kevin Kirkeide ("Kevin") on claims related to the Corpus Christi refinery, the fraudulent conveyance that was the subject of this case, the American Capital ("American Capital") transaction and prior related fraudulent events (the "Palm Beach County Action").  A copy of that Amended Complaint is attached as **Exhibit D**.  In fact, admissions of:  (a) Harry made during a preceding Palm Beach County trial where he was found guilty by a jury of committing a $28.8 million fraud, which was sustained on appeal, and (b) Kevin, who the Court will recall is Harry and

---

[1]  Actually, BTB brought a lawsuit in state court in Maryland over a year ago seeking to enforce certain pledge agreements, where presently, the case has languished, appropriately, without comment by the presiding judge. Trigeant believes it is because we raised virtually the same arguments there, as stated in the Palm Beach County Action, among others.

BTB's key employee, making damaging admissions at trial, support Trigeant's present damage model that BTB owes Trigeant at least a net $50 million, and probably closer to $100 million.

4.      Additionally, now that all other Sargeant family members have taken control of Trigeant after having realized what Harry did to Trigeant, it has also pled in the Palm Beach County Action, again based on trial admissions made by Harry and Kevin, that the money BTB used to pay off the Trigeant/AmCap loans were funds stolen from Trigeant as part of a fraud perpetrated against it by Harry and Kevin, related to certain "Jet Fuel Contracts," that this Court has not yet heard about.  The tracing of funds is clear - - BTB became Trigeant's lender using money stolen from Trigeant by BTB!  Trigeant respectfully refers this Court to Amended Complaint paragraphs 34 – 47 and Count VII which describes these circumstances and cites to this Court's Findings of Fact and Conclusions of Law, and where Trigeant seeks declaratory relief to deem the BTB/AmCap Loan Documents null and void as having been procured by fraud.

5.      BTB's statement in paragraph 3 of its Motion that Trigeant "never once challenged the propriety of the foreclosure sale or raised any defense to its underlying indebtedness to BTB" during the course of this lawsuit is technically correct.  Why?  Because as pointed out above, this Court found and BTB ignores, Harry controlled both BTB and Trigeant at the time of the fraudulent transfer foreclosure.  There was no independent person acting in good faith for Trigeant who could interpose valid defenses in either BTB's fraudulent foreclosure proceeding or PDVSA's litigated fraudulent transfer claim before this court.  The argument is also irrelevant because the initial BTB

foreclosure of the Corpus Christi refinery was fraudulent, proven by this Court's now uncontestable Findings of Fact and Conclusions of Law.

6.     BTB's paragraph 3 also completely ignores that this lawsuit was limited and focused only on a limited fraudulent transfer claim brought by PDVSA against BTB, Trigeant and Harry.  The record in this lawsuit could not be more clear that it was never the forum where any claims or defenses could be or were asserted as between Trigeant and BTB respecting enforcement of the AmCap loan documents by BTB, notwithstanding Harry's control over both entities.  Nor can BTB remotely assert Trigeant could have set forth defenses to the initial foreclosure of the Trigeant Refinery, again notwithstanding Harry's control over both entities, since that orchestrated foreclosure and sale was set aside as being a fraudulent transfer.  There is no issue preclusion or fact determination whatsoever between BTB and Trigeant, except as to what was litigated in the fraudulent transfer trial and stated in the Court's Findings of Fact and Conclusions of Law.  In essence, all that is really settled is that Harry perpetrated a fraudulent transfer using BTB and Trigeant, and not much more.  Trigeant and BTB each have a fresh start in any claims BTB believes it has to enforce the AmCap loan documents, and similarly, Trigeant has every right to assert defenses and bring its own claims against BTB, which it has already done.

7.     Finally, as to paragraph 3 of the Motion, first, it is irrelevant that a questioned claim could have been asserted.  In *Texas Commerce Bank Nat'l Ass'n v. State of Florida*, 138 F.3d 179, 182 (5th Cir. 1998), a Fifth Circuit case involving fraud claims, the court rejected the argument that "the relitigation exception to the Anti-

Injunction Act applies equally to claims that could have been raised before the federal court, but were not in fact litigated there." The court instead concluded that "[t]here can be no federal injunction against state proceedings, based on the claim-preclusive or issue-preclusive effect of a federal judgment, unless the judgment has actually decided the claim or issue in question....The prerequisite to reliance on the third exception is strict and narrow. It requires an assessment of the precise state of the record and of what the earlier federal order actually did....Therefore, the Anti-Injunction Act bars an injunction on the fraud claims, since they were not actually litigated in the Original Action." *Id.*

Second, BTB's argument cuts against it's own position because it acknowledges that the limitations claim in the Nueces County Lawsuit was never actually litigated or actually decided by this Court.

8.     The Petition to Quiet Title in the Nueces County Lawsuit has been amended. Attached hereto as **Exhibit E** is a true and correct copy of the Amended Petition. The Nueces County Lawsuit and the Palm Beach County Action both are based on admissions made by Harry and Kevin during the fraud trial against Harry in Florida which resulted in the $28.8 million adverse judgment. Harry and Kevin admitted that the money used by BTB to pay off the American Capital indebtedness and arrange for a Transfer of Liens (dated effective December 28, 2007, and filed in the Official Public Records of Nueces County, Texas), was actually money owed to Trigeant. Harry, BTB and Kevin used Trigeant funds under their control from the Jet Fuel Contracts to pay the Trigeant indebtedness in full and to obtain a transfer of American Capital liens. Harry and BTB should not be allowed to use Trigeant funds to pay Trigeant's indebtedness to

American Capital and then foreclose on the refinery for failing to pay BTB the amount of the indebtedness.

Whether Trigeant, Ltd. had any defense to foreclosure on the refinery in March of 2008 was not litigated at the time of the foreclosure sale and was not actually litigated during the trial of this case in this Court.  In any event, as is pointed out by BTB Refining, LLC, the judgment of this Court voided the foreclosure sale of March 4, 2008 and ordered that the documents, including the Transfer of Liens December 27, 2007, are reinstated as of March 4, 2008 and declared in full force and effect as of the date of the judgment.

The question presented by the Motion is whether BTB can take advantage of the fact that it controlled Trigeant at the time of the conveyance in March 2008, through the entry of final judgment, to prevent Trigeant as a real party in interest, from challenging the propriety of Harry and BTB using Trigeant funds to pay off Trigeant's debt to American Capital and then enforce the debt by foreclosing on Trigeant's refinery.  BTB requests this Court to allow Harry and BTB to accomplish that result by issuing an order that stays an action in state court in Texas (and presumably, the Palm Beach County Action), by this Motion, purporting to enforce this Court's judgment.

## III.  THE ANTI-INJUNCTION ACT BARS THIS COURT FROM ENJOINING THE NUECES COUNTY LAWSUIT.

The Anti-Injunction Act bars the injunction sought by BTB.  The Act's relitigation exception, which allows federal courts to enjoin claims which have been actually decided

by the federal courts, does not apply here, because, as discussed above, the issues actually decided by this Court are different from those pending in the Nueces County Lawsuit.

The only issues actually decided by this Court in the prior litigation were fact-based findings with related conclusions of law regarding (i) how the AmCap transaction came about and (ii) how the fraudulent transfer was effected. PDVSA was the plaintiff on a fraudulent transfer action and neither its Complaint, nor any other issue based pleading, nor the record, ever defined issues pertaining to BTB enforcing the Loan Documents or Trigeant asserting defenses to their enforceability. The parties were not even aligned by the pleadings in this case to address these issues. If the Loan Document enforcement issues were litigated, then there would have been a Complaint asserting causes of action by BTB against Trigeant, with a corresponding Answer and Affirmative Defenses and Counterclaim. This Court never decided the merits of the enforcement of the Loan Documents and the record is devoid of evidence on these issues.

Trigeant presumes that BTB omitted discussion of the Palm Beach County Action to avoid having to address the facts discussed and serious issues raised in Trigeant's complaint against BTB, Harry and Kevin; all of which assert what would be affirmative defenses, as well as a counterclaim to any action BTB would bring to enforce the Loan Documents. Regardless, nothing pled in the Nueces County Lawsuit or the Palm Beach County Action and that either court may respectively decide, will affect THIS Court's judgment in any way. The Nueces County Lawsuit does not threaten this Court's ability to protect or effectuate its judgment. Because the relitigation exception to the Anti-Injunction Act does not apply, as discussed below, this Court should not enjoin the

Nueces County Lawsuit. And even if it could, considerations of comity and equity weigh against such an injunction.

### 1.    The Anti-Injunction Act.

The Anti-Injunction Act precludes federal courts from granting injunctions to stay state court proceedings, with three narrowly circumscribed exceptions:

> A court of the United States may not grant an injunction to stay proceedings in a State court except [1] as expressly authorized by an Act of Congress, or [2] where necessary in aid of its jurisdiction, or [3] to protect or effectuate its judgments.

28 U.S.C. § 2283. The Anti-Injunction Act's prohibition against enjoining state court proceedings is grounded in federalism and thus "on the fundamental constitutional independence of the States and their courts." *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Eng'rs,* 398 U.S. 281, 287 (1970). Section 2283 "is a necessary concomitant of the Framers' decision to authorize, and Congress' decision to implement, a dual system of federal and state courts" and its prohibitions are "[d]ue in no small part to the fundamental constitutional independence of the States." *Chick Kam Choo v. Exxon Corp.,* 486 U.S. 140, 146 (1988). The Fifth Circuit has recognized "the hands-off doctrine expressed in Section 2283 ... as a pillar of federalism." *T. Smith & Son, Inc. v. Williams,* 275 F.2d 397, 407 (5th Cir. 1960).

"Any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy…." *Atlantic Coast Line,* 398 U.S. at 297.

## 2. The Relitigation Exception to The Anti-Injunction Act Allows a Court to Enjoin Only Issues Actually Decided in a Prior Federal Court Litigation.

The third exception, relied on by BTB, often referred to as the "relitigation exception," was "designed to permit a federal court to prevent state litigation of an issue that *previously was presented to and decided by the federal court*." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147 (1988) (emphasis supplied); *Royal Ins. Co. of Am. v. Quinn-L Capital Corp.*, 960 F.2d 1286, 1293 (5th Cir. 1992). The relitigation exception to the general prohibition against anti-suit injunctions found in the Anti-Injunction Act is quite narrow in its application.

A district court can enjoin the prosecution of a state court action based on the relitigation exception only if the claims raised in the state court action were "actually litigated" and "actually decided" in the prior federal action. *Chick Kam* Choo, 486 U.S. at 147. *Next Level Communications. L.P. v. DSC Comm. Corp.*, 179 F.3d 244, 249-50 (5th Cir. 1999). The "actually decided" prerequisite to application of the relitigation exception has been described by the Supreme Court as being "strict and narrow." *Chick Kam Choo*, 486 U.S. at 148.

To determine what claims were "actually decided" in the prior federal action, the court is limited in its review to "the precise state of the record and what the earlier federal order *actually* said; it [does] not permit the District Court to render a *post hoc* judgment as to what the order was *intended* to say." *Id.* at 148 (emphasis in original); *see also Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 290 (1970). It is also irrelevant that a questioned claim *could have been* asserted. *Texas*

- 11 -

*Commerce*, 138 F.3d at 82. If the record discloses that those claims were not actually litigated and actually decided in the prior federal action, they cannot be enjoined. *Id.* Any doubt as to whether the prior order precludes any claims raised in the state court proceeding "must be resolved in favor of allowing the state court claims to proceed." *Royal Ins. Co.*, 960 F.2d at 1294.

The Fifth Circuit has defined a four-part test to determine whether the exception is generally applicable:

> First, the parties in a later action must be identical to (or at least in privity with) the parties in a prior action. Second, the judgment in the prior action must have been rendered by a court of competent jurisdiction. Third the prior action must have concluded with a final judgment on the merits. Fourth, the same claim or cause of action must be involved in both suits.

*New York Life Ins. Co. v. Gillispie*, 203 F.3d 384, 387 (5th Cir. 2000) (citing *United States v. Shanbaum*, 10 F.3d 305, 310 (5th Cir.1994)). The fourth prong of this test embodies the claim and issue preclusion roots of the relitigation exception.

The exception is "grounded in principles of res judicata and collateral estoppel," but the scope of the exception is not as broad as the preclusive effect provided by those principles. *See Chick Kam Choo*, 486 U.S. at 147-48; *see also Texas Commerce*, 138 F.3d at 181-82. Thus, the simple fact that a claim might be subject to the defense of res judicata or collateral estoppel is insufficient to support an injunction. *Chick Kam Choo*, 486 U.S. at 148.

The "actually decided" prerequisite distinguishes the relitigation exception and the significantly broader concepts of *res judicata* and collateral estoppel. *Texas Commerce Bank*, 138 F.3d at 182. The court must assess "the precise state of the record and what

the earlier federal order *actually* said; it [does] not permit the District Court to render a *post hoc* judgment as to what the order was *intended* to say."  *Chick Kam Choo*, 486 U.S. at 148; *Atlantic Coast Line R. Co.*, 398 U.S. at 290; *Royal Ins. Co. of Am.*, 960 F.2d at 1294.  Any doubt as to whether the prior order precludes any subsequent claims "must be resolved in favor of allowing the state court claims to proceed."  *Royal Ins. Co. of Am.*, 960 F.2d at 1294.

The Fifth Circuit, following *Chick Kam Choo*, have held that the relitigation exception to the Anti-Injunction Act permits an injunction against state court proceedings only when the issues have actually been decided by the federal court, and not where they merely could have been decided and are barred by res judicata principles.  *See Blanchard 1986, Ltd. v. Park Plantation LLC,* 553 F.3d 405, 409-410 (5th Cir. 2008) (upholding refusal to enjoin ongoing Louisiana state court proceedings because it was not "unequivocally clear" that Louisiana suit raised issues already decided in prior federal suit:  "They are different claims focusing, at least based on the initial state court pleadings, on different issues.  As the claims unfold, the state court will be in a better position to consider collateral estoppel and res judicata."); *Assurance Co. of America v. Kirkland,* 312 F.3d 186, 189 (5th Cir. 2002) (district court should not enjoin state court action because "an essential prerequisite for applying the relitigation exception is that the claims and issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court"); *St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 448 (5th Cir. 2000) (vacating injunction that exceeded the scope of claims actually litigated because "[t]o apply the exception, the parties to the

original action must have actually disputed the issue and the trier of fact must have actually resolved it"); *Next Level Communications*, 179 F.3d at 249-50 ("essential prerequisite for applying relitigation exception" is that "claims or issues which federal injunction insulates from relitigation in state proceedings actually have been decided by federal court"); *Texas Commerce*, 138 F.3d at 182 (relitigation exception does not apply to claims that could have been raised but were in fact not actually litigated: "'There can be no federal injunction against state proceedings, based on the claim-preclusive or issue-preclusive effect of a federal judgment, unless the judgment has actually decided the claim or issue in question. The prerequisite to reliance on the third exception is strict and narrow. It requires an assessment of the precise state of the record and of what the earlier federal order actually did.'") (*quoting* Wright, Miller & Cooper, Federal Practice & Procedure § 4226 (Supp. 1997)); *Royal Ins. Co. of Am. v. Quinn-L Capital Corp.*, 960 F.2d 1286, 1294 (5th Cir. 1992) (relitigation exception analysis "requires us to compare the issues 'actually decided' by the district court in the first federal declaratory judgment action with the issues raised" in the state court action; court reversed grant of injunction to extent it exceeded what was specifically decided by the federal court), *cert. denied,* 511 U.S. 1039 (1994); *Texas Employers Ins. Assoc., v. Jackson,* 862 F.2d 491, 501 (5th Cir. 1988) (*en banc*) (injunction that rests on res judicata, a doctrine broadly barring any claims that are part of the same transaction or series of transactions raised in a previous action, "appears to be inconsistent with *Chick Kam Choo's* admonishment that the relitigation exception is 'strict and narrow' so that only 'claims or issues which ...

actually have been decided' in the prior proceeding ... are protectible thereunder."), *cert. denied,* 490 U.S. 1035 (1989).

The relitigation exception leaves to the state courts the question of whether res judicata bars the litigation of issues that were not, but might have been, decided in the original federal action. In its most recent decision on the relitigation exception, the Supreme Court stated:

> This case involves the last of the Act's three exceptions, known as the relitigation exception. That exception is designed to implement "well-recognized concepts" of claim and issue preclusion. *Chick Kam Choo,* 486 U.S. at 147, 108 S.Ct. 1684. The provision authorizes an injunction to prevent state litigation of a claim or issue "that previously was presented to and decided by the federal court." *Ibid.* But **in applying this exception, we have taken special care to keep it "strict and narrow."** *Id.,* at 148, 108 S.Ct. 1684. **After all, a court does not usually "get to dictate to other courts the preclusion consequences of its own judgment**." 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4405, p. 82 (2d ed.2002) (hereinafter Wright & Miller). **Deciding whether and how prior litigation has preclusive effect is usually the bailiwick of the *second* court** (here, the one in West Virginia). **So issuing an injunction under the relitigation exception is resorting to heavy artillery. For that reason, every benefit of the doubt goes toward the state court,** see *Atlantic Coast Line,* 398 U.S., at 287, 297, 90 S.Ct. 1739; **an injunction can issue only if preclusion is clear beyond peradventure**.

*Smith v. Bayer Corp.*, ___ U.S. ___, 131 S. Ct. 2368, 2375-76, 180 L.Ed.2d 341 (2011).

(Emphasis in bold added).

### 3.    The Issues Before The Nueces County Lawsuit Were Not "Actually Decided" in This Case.

The relitigation exception does not apply and injunctive relief should be denied. As discussed above at length, in fact, there were no claims even presented, much less "actually decided" between BTB and Trigeant in this underlying fraudulent conveyance

- 15 -

lawsuit. Further, the parties were not even aligned in this case as BTB and Trigeant were both defendants (and each was controlled by Harry), thus, simply as a matter of logic, the existing claims between them could not have been decided. At paragraph 22 of the Motion, BTB frivolously states: "Finally, the same claim or cause of action is involved in both this lawsuit and the Nueces County Lawsuit." This is remotely not the case. The complaint in this lawsuit involved a claim by PDVSA, a judgment creditor of Trigeant, seeking to reverse BTB's real property foreclosure of its lien on Trigeant's Corpus Christi as a fraudulent conveyance. BTB asserted no affirmative claims whatsoever in this case, much less any against Trigeant. The Nueces County Lawsuit seeks to quiet title on its property on issues not litigated before this court.

BTB relies upon *Regions Bank of Louisiana v. Rivet,* 224 F. 3d 483 (5th Cir. 2000) as support. In *Regions Bank,* the Court went through the same analysis that Trigeant provided the Court above. However, the Court expressly found that it was "indisputable" that the continuing validity of a second mortgage holders' inferior mortgage on a Chapter 7 debtor's leasehold interest was not just actually litigated, but was the "precise question resolved by the bankruptcy action." *Id.* at 492. No such finding is remotely possible in this case, and certainly, BTB has not pointed to specific language in this Court's Findings of Fact and Conclusions of Law to support application of *Regions Bank* or the re-litigation exception to the Anti-Injunction Act. *Regions Bank* is also distinguishable because unlike in this case, the first court (the bankruptcy court), approved the sale of the subject leasehold estate **and ordered all liens, mortgages, and encumbrances against the property erased from the public records.** Here, this Court did not order all liens,

- 16 -

mortgages and encumbrances against the property erased or otherwise rule on any other issue respecting the Loan Documents; nor was the limitations issue in the Nueces County Lawsuit raised. (*See* BTB's motion, para. 26: "Trigeant did not allege that the Reinstated Documents were unenforceable during the pendency of this lawsuit on statute of limitations grounds….") This Court reinstated the loan documents after finding the foreclosure was a fraudulent transfer. Similarly, all of the other cases cited by BTB also were instances where the same issue had been litigated.

Paragraph 6 of BTB's Motion states: "A state court ruling in Trigeant's favor would effectively eviscerate this Court's Final Judgment and the remedy it provides, which both BTB and PDVSA relied upon in reaching a settlement of the case and dismissing their Fifth Circuit appeals." However, BTB's proposed argument is dismissive of the "actually decided" legal standard for the relitigation of the Anti-Injunction Act.

Further, Paragraph 6 states: "The Court's finding that BTB's lien on the Refinery was valid was at the heart of the Court's Final Judgment and the basis for the Court's decision to reinstate the loan transaction documents, including BTB's lien." BTB misstates this Court's Final Judgment, which simply reinstates the loan documents and provides BTB the opportunity to re-foreclose the Loan Documents, which it has failed to do. To determine what claims were "actually decided" in the prior federal action, the Supreme Court has limited the relitigation exception to the precise language of the district court's prior order, and not to how the district court may have subsequently interpreted it. *Chick Kam Choo*, 486 U.S. at 147-48.

BTB then argues in Paragraph 27 of the Motion that the relitigation exception to the Anti-Injunction Act applies because, according to BTB, the statute of limitations matter in the Nueces County Lawsuit is not a not a new "claim or issue", but a new "legal argument." BTB's semantics and attempt to recharacterize the Nueces County Lawsuit is of no consequence. It cannot be seriously disputed that the quiet title claim in the Nueces County Lawsuit was never actually litigated and never actually decided. Moreover, the statute of limitations is clearly an "issue." An "issue" is defined as "a single, certain, and material point, deduced by the allegations and pleadings of the parties, which is affirmed on the one side and denied on the other. A fact put in controversy by the pleadings; such may either be issues of law or fact. Black's Law Dictionary, 831 (6th ed. 1990).

The cases relied upon by BTB are distinguishable *Secs. Industries Ass'n v. Bd. of Governors of Fed. Reserve Sys.,* 900 F.2d 360, 364-65 (D.D.C. 1990), was not a case decided under the Anti-Injunction Act or the relitigation exception. *Thomas v. Powell*, 247 F.3d 260, 263-66 (D.C. Cir. 2001), involved claims and issues that were actually decided (unlike the present case), namely the federal court's determinations that a class was properly certified as non-opt out and that a settlement was fair, adequate and reasonable). *United States v. District of Columbia*, 654 F.2d 802, 809-10 (D.C. Cir. 1981) involved an injunction by the federal court because state court lawsuits were filed to block implementation of a federal court order under the Clean Water Act.

BTB has failed to meet its burden by demonstrating that preclusion is "clear beyond peradventure" (*Smith v. Bayer Corp.*, 131 S. Ct. at 2376). It is "unequivocally clear" that the Nueces County Lawsuit is based on issues not actually raised and decided

in this Court (*Blanchard*, 553 F.3d at 409-410).  To be sure, Trigeant did not even know about most of the facts pled in the Nueces County Lawsuit until well after conclusion of this Court's trial.  BTB's motion should be denied.

### 4.     Considerations of Comity Also Require Denial of Injunctive Relief.

Even when allowed by the letter of the relitigation exception, the grant of an injunction remains permissive at the discretion of the federal court, which discretion should be "exercised in the light of the historical reluctance of federal courts to interfere with state judicial proceedings."  *Southern Cal. Petroleum Corp.,* 273 F.2d at 718.  Declining an injunction as a matter of discretion is appropriate here.  The Nueces County Lawsuit does not involve issues already decided.  The state court will be in a better position to consider collateral estoppel and res judicata, as suggested by the United States Supreme Court precedent cited above.  There is no reason to presume the state court will not appropriately apply those doctrines to protect litigants from duplicative litigation if warranted by facts which have yet to be developed.  Even if the state court mistakenly rejects BTB's claim of res judicata, this does not justify the highly intrusive remedy of a federal court injunction.  Challenges to the correctness of a state court's determination as to the conclusive effect of a federal judgment can be pursued by way of appeal through the state court system.  *See Parsons Steel, Inc. v. First Alabama Bank,* 474 U.S. 518, 525 (1986).

The Fifth Circuit has been equally clear in showing the respect to be given to state court actions and the Anti-Injunction Act, citing to United States Supreme Court precedent in *Mitchum v Foster,* 407 U.S. 225, 243, 92 S. Ct. 2151, 2162 (1972):

> We take the view that a complainant must make a strong and unequivocal showing of relitigation of the same issue in order to overcome the federal courts' proper disinclination to intermeddle in state court proceedings. If we err, all is not lost. A state court is as well qualified as a federal court to protect a litigant by the doctrines of res judicata and collateral estoppel.

*Regional Properties, Inc. v. Financial and Real Estate Consulting Company,* 678, F.2d 552, 566 (5th Cir. 1982.)

## IV. BTB FAILS TO DEMONSTRATE THE EQUITABLE FACTORS REQUIRED TO OBTAIN INJUNCTIVE RELIEF.

Nor do well-established principles of equity support the granting of BTB's motion to enjoin the state court proceedings. To obtain an injunction, BTB must establish (1) a substantial likelihood of success on the merits; (2) that failure to grant the injunction will result in irreparable injury to BTB; (3) that such injury to BTB outweighs any damage that the injunction will cause Trigeant; and (4) that the injunction will not disserve the public interest. *Fiber Systems Intern., Inc. v. Roehrs,* 470 F.3d 1150, 1159 (5th Cir. 2006). Injunctive relief is "an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *Holland America Ins. Co. v. Succession of Roy,* 777 F.2d 992, 997 (5th Cir. 1985) (injunction vacated absent clear showing of irreparable harm; matters at issue could be adequately and fairly adjudicated in state court).

- 20 -

When a movant fails to establish any one of the four elements required to obtain an injunction, the inquiry ends and the motion fails. *DFW Vending, Inc. v. Jefferson County Tex.,* 991 F. Supp. 578, 587 (E.D. Tex. 1998) (denying injunctive relief); *Kern River Gas Transmission Co. v. Coastal Corp.,* 899 F.2d 1458, 1465 (5th Cir.) (court found that movant failed to establish one element, and denied injunction without considering whether movant satisfied remaining elements), *cert. denied,* 498 U.S. 952 (1990). In this case, BTB's inability to meet its burden under the equitable requirements provides multiple grounds upon which to deny injunctive relief.

### 1. BTB Has Not Demonstrated a Substantial Likelihood of Success on The Merits.

BTB faces a "heavy burden" to demonstrate a substantial likelihood of success on the merits, with respect to a "strict and narrow" relitigation exception that it may satisfy only upon a "strong and unequivocal showing" sufficient to overcome "any doubts." *Southern California Petroleum Corp. v. Harper*, 273 F.2d 715, 719 (5th Cir. 1960).

BTB cannot demonstrate a substantial likelihood of success on the merits because the relitigation exception permits injunctive relief only when "the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court." *Chick Kam Choo,* 486 U.S. at 148. The issues currently before the state court were not "actually decided" in this Court.

- 21 -

### 2. BTB Has Failed To Demonstrate an Irreparable Injury For Which There Exists No Adequate Remedy At Law.

Injunctions are an extraordinary remedy, to be granted only when a party is threatened with injury for which it cannot obtain a sufficient legal remedy. *DSC Communications v. Next Level Communications,* 107 F.3d 322, 328 (5th Cir. 1997) (denying injunction; adequate legal remedy ensured that movant would suffer no irreparable harm). Mere litigation expense, even at substantial and unrecoverable cost, does not constitute irreparable injury. *Renegotiation Board v. Banner Craft Clothing Co., Inc.,* 415 U.S. 1, 24 (1974) (rejecting injunction due to available legal remedies). BTB has not met its burden to show irreparable harm without adequate legal remedy, thus precluding injunctive relief.

The Supreme Court and the Fifth Circuit reject the notion that state courts cannot provide parties with an adequate legal remedy, even when faced with relitigation concerns. *Smith v. Bayer*, 131 S. Ct. at 2375-76 (deciding whether and how prior litigation has preclusive effect is usually the bailiwick of the second court); *Blanchard*, 553 F.3d at 408 ("a state court is as well qualified as a federal court to protect a litigant by the doctrines of res adjudicata and collateral estoppel."); *Southern Cal. Petroleum Corp. v. Harper,* 273 F.2d 715, 719 (5th Cir. 1960) ("a complainant must make a strong and unequivocal showing of relitigation of the same issue in order to overcome the federal courts' proper disinclination to intermeddle in state court proceedings. If we err, all is not lost. A state court is as well qualified as a federal court to protect a litigant by the doctrines of res adjudicata and collateral estoppel.")

These holdings are consistent with the Supreme Court's rationale that state court proceedings should normally continue unimpaired by federal court intervention, because state appellate courts, and ultimately, the United States Supreme Court, provide relief from any error. *Atlantic Coast Line,* 398 U.S. at 287.

BTB's assertion that this Court should simply presume irreparable harm and the absence of adequate remedy at law runs contrary to the authorities stated above, as well as the recent Supreme Court guidance and the specific facts of this case.

Given that the claims in the Nueces County Lawsuit were not actually litigated in this Court, irreparable harm cannot be presumed and does not exist here. The state court provides a more than adequate forum to enable BTB to present its arguments regarding this Court's orders and their preclusive effects. And, should BTB wish to challenge the state court's rulings, the appellate system provides a forum in which to do so.

### 3.    The Balance of Hardships Does Not Favor Injunctive Relief.

In balancing the potential harms of each party, Trigeant asserts that BTB has failed to show this is clearly a situation in which relitigation of a federal court's judgment is taking place. On the other hand, Trigeant is faced with the potential harm of not having an opportunity to litigate certain claims, especially when the state court is as capable as this court of adjudicating matters of res judicata and collateral estoppel. Thus, the balance of harm weighs in favor of Trigeant.

### 4. The Requested Injunctive Relief Would Adversely Affect The Public Interest.

A long-standing, strong public interest exists in protecting state courts' sovereignty against federal injunctions. Although BTB has not demonstrated that the relitigation exception applies to the Nueces County Lawsuit, the public interest would weigh against injunctive relief even had BTB done so. Trigeant recognizes the public interest in finality of judgments and the preservation of judicial resources. However, the state court is capable of protecting these interests in ruling on the preclusive effect of any prior judgment rendered by this Court. Accordingly, the public interest considerations weight in favor of protecting the independence of state court proceedings and denying the injunction.

## V. BOND.

Should the Court reject all of Trigeant's arguments as set forth herein, BTB must still post a bond pursuant to Rule 65(c), which provides: "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." The plain language of Rule 65(c) indicates that, when the court issues a restraining order or a preliminary injunction, it must require the movant to give security. *Id.; see also*, *Continuum Co., Inc. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir.1989) ("Fed.R.Civ.P. 65(c) provides that a bond must be posted before a federal court may issue

an interlocutory injunction," and "failure to require the posting of a bond or other security constitutes grounds for reversal of the injunction").

The waiving of the bond requirement is unwarranted in this case where Trigeant would be harmed by not being able to protect its property rights in the subject Corpus Christi refinery. Therefore, should the Court grant BTB's motion, Trigeant requests that the Court require BTB to post a bond in an amount equal to the fair market value of the refinery.

**VI.    CONCLUSION.**

The bankruptcy automatic stay renders this matter moot. Notwithstanding, because the Anti-Injunction Act bars this court from enjoining the Nueces County Lawsuit (and the Palm Beach County Action), and for the other reasons stated above, the Motion should be denied.

Respectfully submitted,

**HARTLINE DACUS BARGER DREYER LLP**

By:    */s/ Michael G. Terry*
        Michael G. Terry
        State Bar No. 19799800
        Federal ID No. 926
        800 N. Shoreline Blvd.
        Suite 2000, North Tower
        Corpus Christi, TX 78401
        Phone: (361) 866-8000
        Fax: (361) 866-8039
        E-mail: mterry@hdbdlaw.com
        Attorney-in-charge

- 25 -

AND

BERGER SINGERMAN LLP
Charles H. Lichtman
Florida Bar No. 501050
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, FL 33301
Phone: (954) 712-5138
Fax: (954) 523-2872
Email: clichtman@bergersingerman.com

**ATTORNEYS FOR DEFENDANT,
TRIGEANT, LTD.**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been filed pursuant to the electronic filing requirements of the United States District Court for the Southern District of Texas on this 4th day of August, 2014, which provides for service on counsel of record in accordance with the electronic filing protocols in place.

Mark T. Mitchell
Frederick W. Sultan, IV
600 Congress Avenue, Suite 3000
Austin, Texas 78701
mmitchell@gardere.com
fsultan@gardere.com

Deirdre B. Ruckman
3000 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201
druckman@gardere.com

Jonathan J. Walsh
101 Park Avenue
New York, New York 10178-0061
jwalsh@curtis.com

                                        /s/ *Michael G. Terry*
                                    Michael G. Terry

5860856-1

B 5 (Official Form 5) (12/07)

<table>
<tr>
<td colspan="2"><strong>UNITED STATES BANKRUPTCY COURT</strong><br>Southern District of Florida</td>
<td><strong>INVOLUNTARY PETITION</strong></td>
</tr>
<tr>
<td colspan="2">IN RE (Name of Debtor – If Individual: Last, First, Middle)<br><br><strong>BTB Refining LLC</strong></td>
<td>ALL OTHER NAMES used by debtor in the last 8 years (Include married, maiden, and trade names.)</td>
</tr>
<tr>
<td colspan="2">Last four digits of Social-Security or other Individual's Tax-I.D. No./Complete EIN (If more than one, state all.): <s>8400</s> 26 1548150</td>
<td></td>
</tr>
<tr>
<td colspan="2">STREET ADDRESS OF DEBTOR (No. and street, city, state, and zip code)<br><br>925 S. Federal Highway, suite 375, Boca Raton 33432</td>
<td>MAILING ADDRESS OF DEBTOR (If different from street address)</td>
</tr>
<tr>
<td colspan="2">COUNTY OF RESIDENCE OR PRINCIPAL PLACE OF BUSINESS<br>Palm Beach<br>ZIP CODE 33432</td>
<td>ZIP CODE</td>
</tr>
<tr>
<td colspan="3">LOCATION OF PRINCIPAL ASSETS OF BUSINESS DEBTOR (If different from previously listed addresses)</td>
</tr>
<tr>
<td colspan="3">CHAPTER OF BANKRUPTCY CODE UNDER WHICH PETITION IS FILED<br><br>☑ Chapter 7 ☐ Chapter 11</td>
</tr>
</table>

### INFORMATION REGARDING DEBTOR (Check applicable boxes)

<table>
<tr>
<td><strong>Nature of Debts</strong><br>(Check one box.)<br><br>Petitioners believe:<br><br>☐ Debts are primarily consumer debts<br>☑ Debts are primarily business debts</td>
<td><strong>Type of Debtor</strong><br>(Form of Organization)<br>☐ Individual (Includes Joint Debtor)<br>☑ Corporation (Includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities, check this box and state type of entity below.)</td>
<td><strong>Nature of Business</strong><br>(Check one box.)<br>☐ Health Care Business<br>☐ Single Asset Real Estate as defined in 11 U.S.C. § 101(51)(B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☑ Other</td>
</tr>
</table>

<table>
<tr>
<td><strong>VENUE</strong></td>
<td><strong>FILING FEE (Check one box)</strong></td>
</tr>
<tr>
<td>☑ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in the District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.<br><br>☐ A bankruptcy case concerning debtor's affiliate, general partner or partnership is pending in this District.</td>
<td>☑ Full Filing Fee attached<br><br>☐ Petitioner is a child support creditor or its representative, and the form specified in § 304(g) of the Bankruptcy Reform Act of 1994 is attached. <em>[If a child support creditor or its representative is a petitioner, and if the petitioner files the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.]</em></td>
</tr>
</table>

<table>
<tr>
<td colspan="2"><strong>PENDING BANKRUPTCY CASE FILED BY OR AGAINST ANY PARTNER OR AFFILIATE OF THIS DEBTOR</strong> (Report information for any additional cases on attached sheets.)</td>
<td></td>
</tr>
<tr>
<td>Name of Debtor</td>
<td>Case Number</td>
<td>Date</td>
</tr>
<tr>
<td>Relationship</td>
<td>District</td>
<td>Judge</td>
</tr>
</table>

<table>
<tr>
<td><strong>ALLEGATIONS</strong><br>(Check applicable boxes)</td>
<td><strong>COURT USE ONLY</strong></td>
</tr>
<tr>
<td>1. ☑ Petitioner (s) are eligible to file this petition pursuant to 11 U.S.C. § 303 (b).<br>2. ☑ The debtor is a person against whom an order for relief may be entered under title 11 of the United States Code.<br>3.a. ☑ The debtor is generally not paying such debtor's debts as they become due, unless such debts are the subject of a bona fide dispute as to liability or amount;<br><br>or<br><br>b. ☐ Within 120 days preceding the filing of this petition, a custodian, other than a trustee receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.</td>
<td></td>
</tr>
</table>

EXHIBIT A

B 5 (Official Form 5) (12/07) – Page 2

Name of Debtor___BTB Refining LLC_____

Case No._____

| TRANSFER OF CLAIM |
|---|
| ☐ Check this box if there has been a transfer of any claim against the debtor by or to any petitioner.  Attach all documents that evidence the transfer and any statements that are required under Bankruptcy Rule 1003(a). |

| REQUEST FOR RELIEF |
|---|
| Petitioner(s) request that an order for relief be entered against the debtor under the chapter of title 11, United States Code, specified in this petition.  If any petitioner is a foreign representative appointed in a foreign proceeding, a certified copy of the order of the court granting recognition is attached. |

Petitioner(s) declare under penalty of perjury that the foregoing is true and correct according to the best of their knowledge, information, and belief.

x_____ OWNER

Signature of Petitioner or Representative (State title)

SARGEANT TRADING LTD    7/24/14
Name of Petitioner              Date Signed

Name & Mailing      DANIEL SARGEANT
Address of Individual
Signing in Representative   3020 N MILITARY TRAIL
Capacity        SUITE 100
            BOCA RATON, FL 33431

x_____
Signature of Attorney                    Date

Name of Attorney Firm (If any)

Address

Telephone No.

x_____
Signature of Petitioner or Representative (State title)

Name of Petitioner              Date Signed

Name & Mailing
Address of Individual
Signing in Representative
Capacity

x_____
Signature of Attorney                    Date

Name of Attorney Firm (If any)

Address

Telephone No.

x_____
Signature of Petitioner or Representative (State title)

Name of Petitioner              Date Signed

Name & Mailing
Address of Individual
Signing in Representative
Capacity

x_____
Signature of Attorney                    Date

Name of Attorney Firm (If any)

Address

Telephone No.

| PETITIONING CREDITORS | | |
|---|---|---|
| Name and Address of Petitioner<br>3020 N MILITARY TRAIL<br>SARGEANT TRADING LTD SUITE 100 BOCARATON, FL 33431 | Nature of Claim<br>UNPAID<br>ASPHALT | Amount of Claim<br>$ 5,264,002.72 |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Note:   If there are more than three petitioners, attach additional sheets with the statement under penalty of perjury, each petitioner's signature under the statement and the name of attorney and petitioning creditor information in the format above. | | Total Amount of Petitioners' Claims |

_____ continuation sheets attached

B 5 (Official Form 5) (12/07) – Page 2      **Name of Debtor** BTB Refining LLC

Case No._____

| TRANSFER OF CLAIM |
|---|
| ⊔ Check this box if there has been a transfer of any claim against the debtor by or to any petitioner. Attach all documents that evidence the transfer and any statements that are required under Bankruptcy Rule 1003(a). |

| REQUEST FOR RELIEF |
|---|
| Petitioner(s) request that an order for relief be entered against the debtor under the chapter of title 11, United States Code, specified in this petition. If any petitioner is a foreign representative appointed in a foreign proceeding, a certified copy of the order of the court granting recognition is attached. |

Petitioner(s) declare under penalty of perjury that the foregoing is true and correct according to the best of their knowledge, information, and belief.

x _Rex J. McDonnell_ _Proprietor_
Signature of Petitioner or Representative (State title)
_Rex G. McDonnell III_
Name of Petitioner      _7/24/14_ Date Signed

x_____
Signature of Attorney      Date

Name of Attorney Firm (If any)

Name & Mailing Address of Individual _REX G. MCDONNELL III_
Signing in Representative Capacity _P.O. Box 2193_
_GEORGETOWN, TX 78627_

Address_____

Telephone No._____

x_____
Signature of Petitioner or Representative (State title)

x_____
Signature of Attorney      Date

Name of Petitioner      Date Signed

Name of Attorney Firm (If any)

Name & Mailing Address of Individual
Signing in Representative Capacity

Address_____

Telephone No._____

x_____
Signature of Petitioner or Representative (State title)

x_____
Signature of Attorney      Date

Name of Petitioner      Date Signed

Name of Attorney Firm (If any)

Name & Mailing Address of Individual
Signing in Representative Capacity

Address_____

Telephone No._____

| PETITIONING CREDITORS | | |
|---|---|---|
| Name and Address of Petitioner _P.O. Box 2193_ _REX G. MCDONNELL III_ _GEORGETOWN, TX 78627_ | Nature of Claim _UNPAID_ _PROFESSIONAL_ _SERVICES_ | Amount of Claim _$14,566.97_ |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Note: If there are more than three petitioners, attach additional sheets with the statement under penalty of perjury, each petitioner's signature under the statement and the name of attorney and petitioning creditor information in the format above. | | Total Amount of Petitioners' Claims |

_____ continuation sheets attached

B 5 (Official Form 5) (12/07) – Page 2

**Name of Debtor** BTB Refining LLC

**Case No.**_____

| TRANSFER OF CLAIM |
|---|
| ⒈ Check this box if there has been a transfer of any claim against the debtor by or to any petitioner. Attach all documents that evidence the transfer and any statements that are required under Bankruptcy Rule 1003(a). |

| REQUEST FOR RELIEF |
|---|
| Petitioner(s) request that an order for relief be entered against the debtor under the chapter of title 11, United States Code, specified in this petition. If any petitioner is a foreign representative appointed in a foreign proceeding, a certified copy of the order of the court granting recognition is attached. |

Petitioner(s) declare under penalty of perjury that the foregoing is true and correct according to the best of their knowledge, information, and belief.

| | |
|---|---|
| x_____ | x_____ |
| Signature of Petitioner or Representative (State title) | Signature of Attorney                     Date |
| COX TANK CONST. INC.        7-25-14 | |
| Name of Petitioner          Date Signed | Name of Attorney Firm (If any) |
| | |
| Name & Mailing         J DON COX SR (Pres) | Address |
| Address of Individual | |
| Signing in Representative     P.O.Box 147 | Telephone No. |
| Capacity | |
| TAFT TX 78390 | |

| | |
|---|---|
| x_____ | x_____ |
| Signature of Petitioner or Representative (State title) | Signature of Attorney                     Date |
| | |
| Name of Petitioner          Date Signed | Name of Attorney Firm (If any) |
| | |
| Name & Mailing | Address |
| Address of Individual | |
| Signing in Representative | Telephone No. |
| Capacity | |

| | |
|---|---|
| x_____ | x_____ |
| Signature of Petitioner or Representative (State title) | Signature of Attorney .                   Date |
| | |
| Name of Petitioner          Date Signed | Name of Attorney Firm (If any) |
| | |
| Name & Mailing | Address |
| Address of Individual | |
| Signing in Representative | Telephone No. |
| Capacity | |

| PETITIONING CREDITORS | | |
|---|---|---|
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| COX TANK CONST. INC  P.O.Box 147 TAFT TX | Unpaid Tank Repair | $28,000.00 |
| Name and Address of Petitioner          78590 | Nature of Claim | Amount of Claim |
| | | |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| | | |
| Note:      If there are more than three petitioners, attach additional sheets with the statement under penalty of perjury, each petitioner's signature under the statement and the name of attorney and petitioning creditor information in the format above. | | Total Amount of Petitioners' Claims |

_____ continuation sheets attached

B 5 (Official Form 5) (12/07) – Page 2        Name of Debtor **BTB Refining LLC**

Case No._____

| TRANSFER OF CLAIM |
|---|
| ☐ Check this box if there has been a transfer of any claim against the debtor by or to any petitioner. Attach all documents that evidence the transfer and any statements that are required under Bankruptcy Rule 1003(a). |

| REQUEST FOR RELIEF |
|---|
| Petitioner(s) request that an order for relief be entered against the debtor under the chapter of title 11, United States Code, specified in this petition. If any petitioner is a foreign representative appointed in a foreign proceeding, a certified copy of the order of the court granting recognition is attached. |

Petitioner(s) declare under penalty of perjury that the foregoing is true and correct according to the best of their knowledge, information, and belief.

x_____ Vice President    x_____

Signature of Petitioner or Representative (State title)      Signature of Attorney      Date

MARY ROSE RODRIGUEZ    7/28/2014

Name of Petitioner      Date Signed      Name of Attorney Firm (If any)

Name & Mailing      Address

Address of Individual

Signing in Representative      Telephone No.

Capacity

x_____ PRESIDENT    x_____

Signature of Petitioner or Representative (State title)      Signature of Attorney      Date

DAVID RODRIGUEZ    7/28/2014

Name of Petitioner      Date Signed      Name of Attorney Firm (If any)

Name & Mailing      Address

Address of Individual

Signing in Representative      Telephone No.

Capacity

x_____    x_____

Signature of Petitioner or Representative (State title)      Signature of Attorney      Date

Name of Petitioner      Date Signed      Name of Attorney Firm (If any)

Name & Mailing      Address

Address of Individual

Signing in Representative      Telephone No.

Capacity

| PETITIONING CREDITORS | | |
|---|---|---|
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| American Insulation | un paid | $13,315.49 |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| 615 Upper Broadway Ste 150 | | |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Corpus Christi Tx 78401 | | |
| Note: If there are more than three petitioners, attach additional sheets with the statement under penalty of perjury, each petitioner's signature under the statement and the name of attorney and petitioning creditor information in the format above. | | Total Amount of Petitioners' Claims |

_____ continuation sheets attached

Form CGFI5 (8/1/11)

# United States Bankruptcy Court

## Southern District of Florida

**www.flsb.uscourts.gov**

**Case Number: 14-26919-EPK**
**Chapter: 7**

**In re:** (Debtor(s) name(s) used by the debtor(s) in the last 8 years, including married, maiden, and trade)

BTB Refining LLC
925 S Federal Hwy #375
Boca Raton, FL 33432
EIN: 26-1548150

## AMENDED SUMMONS TO DEBTOR IN INVOLUNTARY CASE

**To the above named debtor:**

A petition under title 11, United States Code was filed against you in this bankruptcy court on **July 28, 2014**, requesting an order for relief under chapter 7 of the Bankruptcy Code (title 11 of the United States Code).

**YOU ARE SUMMONED** and required to file with the clerk of the bankruptcy court a motion or answer to the petition within 21 days after the service of this summons. A motion to convert by the debtor in an involuntary chapter 7 proceeding shall be deemed a consent to entry of an order for relief under the chapter to which the case is being converted (Local Rule 1013−1(B)).   A copy of the petition is attached.

Address of the clerk:
**US Bankruptcy Court**
**Flager Waterview Building**
**1515 N. Flagler Dr. #801**
**West Palm Beach, FL 33401**

At the same time, you must also serve a copy of your motion or answer upon the petitioner's attorney.

Name and Address of Petitioning Creditors:

Sargeant Trading LTD
3020 N Military Trail #100
Boca Raton, FL 33431

Rex G. McDonnell II
P.O. Box 2193
Georgetown, TX 78627

Cox Tank Const. Inc.
P.O. Box 147
Taft, TX 78390

American Insulation
615 Upper Broadway #150
Corpus Christi, TX 78401

If you make a motion, your time to answer is governed by Federal Rules of Bankruptcy Procedure 1011(c).
If you fail to respond to this summons, the order for relief will be entered.

**Dated: 7/29/14**

**CLERK OF COURT**
By: Melva Weldon
Deputy Clerk

*Page 1 of 2*
**\*\*Summons Amended to add the name and addresses of the petitioning creditors\*\***

EXHIBIT  B

# CERTIFICATION OF SERVICE

I, _____ (name), certify that on _____ (date), I served
this summons and a copy of the involuntary petition on _____ (name), the
debtor in this case, by:

☐ Mail Service: Regular, first class United States mail, postage fully pre–paid, addressed to:

☐ Personal Service: By leaving the process with debtor or with an officer or agent of debtor at:

☐ Residence Service: By leaving the process with the following adult at:

☐ Certified Mail Service on an Insured Depository Institution: By sending the process by certified
mail addressed to the following officer of the debtor at:

☐ Publication: The debtor was served as follows: [Describe briefly]

☐ State Law: The debtor was served pursuant to the laws of the State of
_____, as follows: [Describe briefly]

If service was made by personal service, by residence service, or pursuant to state law, I further certify that
I am, and at all times during the service of process was, not less than 18 years of age and not a party to
the matter concerning which service of process was made.

Under penalty of perjury, I declare that the foregoing is true and correct.

Date: _____     Signature: _____

| Print Name: | | |
|---|---|---|
| Address: | | |
| City: | State: | Zip: |

*Page 2 of 2*

**GARDERE**

*attorneys and counselors ▪ www.gardere.com*

Direct: 214-999-4250
Direct Fax: 214-999-3250
druckman@gardere.com

February 27, 2013

*Via Email: CLichtman@bergsingerman.com*

Mr. Charles H. Lichtman
Berger Singerman
350 E. Las Olas Boulevard
Suite 1000
Fort Lauderdale, FL 33301

   Re:  Trigeant Holdings, LLC

Dear Mr. Lichtman:

  This firm represents Harry Sargeant, III. This letter is in response to your e-mail to Mr. Sargeant dated February 22, 2013, wherein you state that Mr. Sargeant was removed as Manager of Trigeant Holdings, LLC as of February 22, 2013.

  Mr. Sargeant received no notice of a meeting of the members of Trigeant Holdings, LLC regarding the removal of him as Manager. Proper notice of and the holding of a meeting of the members of Trigeant Holdings, LLC are required under paragraph 5.10 of the Trigeant Holdings Operating Agreement, which were not done. Consequently, the "Action By Members of Trigeant Holdings, LLC" attached to your e-mail is void and not effective. However, Mr. Sargeant has decided to resign as Manager of Trigeant Holdings, LLC and his written resignation is enclosed.

       Sincerely,

       Deirdre B. Ruckman

DBR:gln
Enclosure

<div style="border:1px solid red; color:red; text-align:center;">EXHIBIT C</div>

Gardere01 - 6290120v.1
GARDERE WYNNE SEWELL LLP
3000 Thanksgiving Tower, 1601 Elm Street, Dallas, Texas 75201-4761 ▪ 214.999.3000 Phone ▪ 214.999.4667 Fax
Austin ▪ Dallas ▪ Houston ▪ Mexico City

February 27, 2013

To the members of Trigeant Holdings, LLC
   Mr Harry Sargeant
   Mr. Daniel Sargeant
   Mr. James Sargeant

In accordance with paragraph 5.9 of the Operating Agreement of Trigeant Holdings, LLC,  I hereby resign as Manager of Trigeant Holdings, LLC effective February 27, 2013 . This resignation shall not affect my rights as a Member of Trigeant Holdings, LLC.

Harry Sargeant III

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY,
FLORIDA

CASE NO. 2013 CA 015262 Div. AA

SARGEANT TRADING, LTD., a Bahamian
company, TRIGEANT, LTD., a Florida limited
partnership, LATIN AMERICAN INVESTMENTS
LIMITED, an Isle of Man company, TRIGEANT
HOLDINGS, LLC, a Florida limited liability company;
and TRIGEANT HOLDINGS, LTD.;

      Plaintiffs,

v.

HARRY SARGEANT III, MUSTAFA
ABU-NABA'A, KEVIN KIRKEIDE, INTERNATIONAL
OIL TRADING COMPANY, LLC, a Florida
limited liability company, BTB REFINING,
LLC, a Texas limited liability company,
SARGEANT MARINE, SA; a Dominican
Republic company;

      Defendants.

_____/

## AMENDED COMPLAINT

Plaintiffs, SARGEANT TRADING, LTD., TRIGEANT LTD., LATIN AMERICAN

INVESTMENTS LIMITED; TRIGEANT HOLDINGS, LLC. and TRIGEANT HOLDINGS,

LTD., through their undersigned attorneys, hereby file this Amended Complaint against

Defendants HARRY SARGEANT III; MUSTAFA ABU-NABA'A; KEVIN KIRKEIDE;

INTERNATIONAL OIL TRADING COMPANY, LLC; BTB REFINING, LLC; and

SARGEANT MARINE, SA and state:

EXHIBIT D

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301 Telephone 954-525-9900 Facsimile 954-523-2872

## THE PARTIES

1.      Plaintiff Sargeant Trading, Ltd. ("Sargeant Trading") is a Bahamian company organized under the International Business Companies Act 2000.  Sargeant Trading is authorized to conduct business in the State of Florida as a foreign entity, and it maintains an administrative office in Palm Beach County, Florida.

2.      Plaintiff Trigeant, Ltd. ("Trigeant") is a duly authorized Florida limited partnership, which conducts business in the State of Florida through an office located in Palm Beach County, Florida.   Trigeant is authorized to conduct business in the State of Florida as a foreign entity, and it maintains an administrative office in Palm Beach County, Florida.

3.      Plaintiff Latin American Investments Limited ("LAIL") is an Isle of Man company organized under the Companies Act 1931.  The torts complained of below against LAIL occurred through activity directed by the defendants while located in Florida.

4.      Plaintiff Trigeant Holdings, LLC is a duly authorized Florida limited liability company, which conducts business in the State of Florida through an office located in Palm Beach County, Florida.   Trigeant Holdings, LLC is authorized to conduct business in the State of Florida as a foreign entity, and it maintains an administrative office in Palm Beach County, Florida.

5.      Plaintiff Trigeant Holdings, Ltd. is a duly authorized Florida limited partnership, which conducts business in the State of Florida through an office located in Palm Beach County, Florida.   Trigeant Holdings, Ltd. is authorized to conduct business in the State of Florida as a foreign entity, and it maintains an administrative office in Palm Beach County, Florida.  Trigeant Holdings, LLC is the general partner of Trigeant Holdings, Ltd., which owns 99% of Trigeant.

2

Trigeant Holdings, LLC and Trigeant Holdings, Ltd. are nominal plaintiffs in this case for purpose of obtaining the declaratory relief sought in Count VII below.

6.     Defendant Harry Sargeant III ("Harry") is a Florida citizen, residing in Palm Beach County, Florida, and is *sui juris*.

7.     Defendant Mustafa Abu-Naba'a ("Mustafa") is a citizen of the Dominican Republic.  Mustafa is subject to the jurisdiction of this court pursuant to Fla. Stat. §48.193, the Florida Long Arm Statute, by reason of his: (a) operating and conducting a business in this state with an office located in this state, being defendant IOTC, identified below, and (b) committing a tortious act within this state.  Further, on information and belief, Mustafa owns real property in Florida and regularly visits and stays in Florida.  All of the substantial and not isolated activity which submits Mustafa to this Court's jurisdiction is described in detail below.  Further, Mustafa's contacts with the State of Florida, particularly as they pertain to the allegations of this lawsuit, principally occurred in Palm Beach County.   Plaintiffs incorporate by reference all matters related to a certain lawsuit filed against IOTC identified below in paragraph 41 to further establish the nexus between Mustafa and his personal jurisdiction in this state.

8.     Defendant Kevin Kirkeide ("Kevin") is a Florida citizen, residing in Broward County, Florida, and is *sui juris*.

9.     Defendant International Oil Trading Company, LLC ("IOTC") is a Florida limited liability company, with its principal place of business located in Palm Beach County, Florida, with its office at 925 S. Federal Highway, Suite 375, in Boca Raton.  IOTC was formed with its Articles of Organization filed with the Florida Secretary of State on July 12, 2006.  At all times relevant hereto, IOTC was owned and operated by Harry and Mustafa.

BERGER SINGERMAN
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

10.    Defendant BTB Refining, LLC ("BTB") was initially formed as a Florida limited liability company and then subsequently changed its corporate registration to a Texas limited liability company.  This change was effected, as described below, as a means to prevent a judgment creditor from exercising collection rights against BTB.  BTB's principal place of business is located in Palm Beach County, Florida, with its office at 925 South Federal Highway, Suite 375 in Boca Raton.

11.    Defendant Sargeant Marine, SA is a corporation formed pursuant to the laws of the Dominican Republic.  Sargeant Marine, SA is owned by Harry and Mustafa.  Sargeant Marine, SA maintains an office in Palm Beach County at 925 South Federal Highway, Suite 375 in Boca Raton.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this civil action as the amount in controversy exceeds $15,000, exclusive of attorneys fees, interest and costs.

13.    Venue is appropriate in Palm Beach County as all parties either reside or do business here.  Moreover, most of the acts, occurrences and omissions that gave rise to the claims asserted herein, principally occurred in or emanated out of Palm Beach County.

## FOUNDATIONAL BACKGROUND FACTS

14.    Harry Sr., the patriarch of the Sargeant family, is a family man of stature and strong character, who joined the Navy at a young age and stayed in the military for 27 years. After he left the Navy in 1977 and was employed by an asphalt shipping company, Harry Sr. started his own company in 1984, now known as Sargeant Marine, Inc. ("Sargeant Marine"). That business, which continues to operate today, concentrated initially on shipping asphalt from Venezuela (which produces the heavy crude oil necessary to make asphalt), to the east coast of

4

the United States. Harry Sr. innovatively changed the model of how asphalt was shipped and sold. Previously, customers were responsible for purchase of the entire asphalt inventory carried on a ship. Harry Sr.'s successful new model chartered larger ships and filled them on a requirements basis for numerous customers who paid the same price, so that no customer would have a competitive edge. Sargeant Marine has grown today to include in its fleet some of the largest asphalt freighters in the world.

15. In 1989, Harry Sr. founded Sargeant Bulktainers, Ltd. ("Bulktainers") while inventing a new and practical method to deliver asphalt to end users, being 19 metric ton heated cylinder containers that look like oil trucks. Bulktainers supplied these containers to its customers at no charge, subject to them buying their asphalt from Bulktainers. This opened new markets in the Carribean and other places that were without asphalt terminals, because end users now had an easier method to transport hot asphalt where it was ultimately to be used, which usually was for road and airport construction.

16. On January 1, 1997, in order to become more competitive worldwide, Harry Sr. formed Sargeant Trading, a new Bahamian company, also to trade and ship asphalt. The low tax structure in the Bahamas enabled Sargeant Trading to reinvest income and grow the business by expanding into new markets.

17. Harry Sr. initially caused the Sargeant Trading stock to be issued equally to his four children, Harry, Daniel ("Dan"), James ("Jim") and Cathy, although some years later, Cathy's shares were purchased back by Harry Sr. By that time, Harry, Dan and Jim were all working in the Sargeant family asphalt businesses. By 1998, Harry and Dan already each assumed major work responsibility. Further, by this time, the Sargeant brand had gained worldwide notoriety for its dependability and success in supplying asphalt for major international

5

infrastructure projects, including Ascension Island for the U.S. government and the Hong Kong airport.

18.     In about 2000, Harry met Mr. Sandy Brass ("Brass"), who built and owned an asphalt refinery in Corpus Christi, Texas (the "Refinery").  In June 2001, Brass sold the Refinery to a newly created Sargeant family entity, plaintiff Trigeant, Ltd.  Brass's son, A.J. Brass, became a 25% shareholder, and the balance of the Trigeant shares were indirectly owned by Harry Sr., Harry, Dan and Jim, through Trigeant Holdings, LLC and Trigeant Holdings, Ltd.  At that time, in a corporate restructuring, the Sargeant family members surrendered their stock in Sargeant Trading, which was rolled up into Trigeant Holdings, which then became the owner of Sargeant Trading.

19.     As of late 2002, Sargeant family members got along well and worked cohesively in their various related asphalt businesses.  Harry had become the Manager of Trigeant and Sargeant Trading, and the Manager of the general partnership, Trigeant Holdings, Ltd. that owns 100% of Trigeant.  By Harry holding these positions, it assured his indisputable control over Trigeant's operations and finances at the Refinery.  In April 2004, however, Harry announced that Trigeant would start a new venture obtaining military contracts for the supply of jet fuel in Iraq.  After a bidding process, Trigeant began in this business in July 2005, until Harry fraudulently transferred the business from Trigeant to his and Mustafa's company, defendant IOTC, as described below.  Later, Harry and Mustafa, with the substantial assistance of Kevin, transferred IOTC profits from the jet fuel contracts into BTB, as its capitalization, as also described below.

20.     For a number of years, a high level of communication, cooperation and trust remained between Harry Sr. and Dan on one hand, and Harry on the other, especially as it

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

pertained to Trigeant, which Harry continued to operate. However, as time went on, red flags about Harry's business conduct slowly emerged, that began to financially prejudice Sargeant family businesses, especially Sargeant Trading and Trigeant.

21.     Then, in 2011, final judgments were entered in two separate lawsuits against Harry that found that he had committed fraud. These significant fraud judgments served as the wake up call to Harry Sr., Dan and Jim, that Harry was not the son and brother they thought he was. Further, those lawsuits made Harry Sr., Dan and Jim realize that Sargeant Trading and Trigeant were also victims of Harry's fraudulent conduct, which as pled below, turned out to be a long pattern of continuing fraud by Harry. Indeed, the predicate facts of those lawsuits serve as relevant foundational history to the resulting factual events and claims pled below by Sargeant Trading and Trigeant against Harry and the other party defendants.

22.     The two fraud based lawsuits and tortious acts committed against plaintiffs by Harry directly and through defendant corporate entities that he owned, controlled and dominated, damaged Sargeant family business interests. This ultimately resulted in Harry being terminated from all management positions he held in Sargeant family owned companies, including the plaintiffs, Sargeant Trading, Trigeant and LAIL.

23.     The first lawsuit, filed in Palm Beach County and referenced above, involved Harry and Mustafa procuring a Department of Defense contract to supply jet fuel to the military during the Iraq War. Harry's other partner in those transactions, a Jordanian, sued him, Mustafa and IOTC, and obtained a $28.8 million jury trial fraud verdict against Harry and Mustafa on September 19, 2011, which was affirmed on appeal.

24.     The second lawsuit, filed in federal court in Corpus Christi, Texas, involved Harry orchestrating the fraudulent transfer of the Refinery, to avoid paying an entity known as

7

PDVSA on a $47 million arbitration judgment creditor, and further, to keep the Refinery out of reach of his Jordanian ex-partner (judgment-creditor) on the defense contract jet fuel deal. As Plaintiffs later learned, the facts involving those two cases directly and proximately relate to Harry engaging in the tortious acts against Plaintiffs, as described below, resulting in and necessitating this lawsuit.

## THE GENESIS OF THE PROBLEMS START IN VENEZUELA, WITH THE FAILED CHAVEZ COUP

25.     Going back to about 1983, Harry Sr. had created and enabled Sargeant Marine to maintain a strong purchasing relationship with PDVSA Petroleo S.A. ("PDVSA"), the Venezuelan government controlled crude oil and petroleum products distributor. In June 2001, the Sargeants formed Trigeant to acquire and operate the Refinery. By 2002, Trigeant had become a party to a Supply Contract with PDVSA for the supply of crude oil to the Refinery.

26.     By then, Harry was the Manager of Trigeant Holdings, LLC, which was the general partner of and in control of Trigeant Holdings, Ltd., which owned Trigeant, Ltd. In all respects, without Sargeant family involvement or interference, Harry managed all affairs of the Trigeant entities, including all issues pertaining to the PDVSA Supply Contract. As it turned out and as pled below, Harry grossly mismanaged Trigeant and its PDVSA relationship. In fact, during this time, even if Harry Sr. or Dan knew that Harry, while managing and controlling Trigeant, was committing the business torts and breaches of contract described below, and they did not, Harry Sr. and Dan were nevertheless legally powerless to stop Harry. At all relevant times, A.J. Brass, a 25% owner of Trigeant, remained close to Harry, and Harry Sr. and Dan did not control the 70% vote of Trigeant owners necessary to dismiss Harry under Trigeant's bylaws.

27.     By early 2002, Hugo Chavez, the president of Venezuela had enacted a series of laws that brought PDVSA's oil revenues under state control, which was met with opposition by

8

PDVSA's directors and managers. In early April 2002, PDVSA challenged Chavez, including instigating a national strike, an oil production slowdown, newspaper blackouts, anti-Chavez television ads and massive public marches in support of PDVSA. Ultimately, there was a brief attempted unsuccessful coup of Chavez in mid-April 2002, which has been partially attributed to the CIA. Chavez remained in power in Venezuela until his death.

28.     By December 2002, PDVSA sold Trigeant four cargos of Boscan crude oil under the Supply Contract. On December 2, 2002, private sector business interests and the unions initiated what became known as the "Oil Strike" and a few days later, PDVSA employees joined the strike. PDVSA then declared *force majeure* on all Supply Contracts, with Chavez firing management and most employees of PDVSA, which operated under an emergency plan with the employees who did not join the strike. Trigeant then purchased three more cargos through the "spot market" or open commodities exchange and obtained letters of credit ("LC's") to cover all seven of its crude oil cargos. However, PDVSA was operating understaffed and did not call on the banks holding the Trigeant LC's for payment during the six month period that they were in force, so that after six months had passed, the LC's became null and void.

29.     During the time period of the attempted coup, probably the most vocal anti-Chavez, pro-PDVSA United States spokesman was Ambassador Otto Reich, with whom Harry maintained a relationship and significant contact. And Harry, by his own words to Sargeant family members, worked against the interests of Chavez for nearly two years. Following the failed coup, those persons or companies that Chavez believed plotted against him or were aligned with those who did, were blacklisted from doing business with PDVSA. Given Harry's relationship with Otto Reich, the blacklisting included Sargeant Marine and Trigeant.

9

**HARRY'S NON PAYMENT TO PDVSA FOR ASPHALT**
**LEADS TO HIS FAILED TRIGEANT EP DEAL**

30.     Meanwhile, Trigeant had taken possession of the seven cargos of crude oil, and it then refined and sold the resulting asphalt. However, although the LC's had expired, instead of paying PDVSA directly, and notwithstanding the objections of Harry Sr. and Dan, in June 2003, Harry used the proceeds from the PDVSA crude oil sales to purchase another refinery and distribution operation in the Southeastern United States from Coastal Refining and Marketing, Inc. ("Coastal") for approximately $38 million, commonly known as "Trigeant EP."  Harry rationalized to Harry Sr. and Dan that he could buy the Coastal refinery and still procure all of Trigeant's oil supply requirements from PDVSA, notwithstanding everything that had happened politically in Venezuela concerning PDVSA, Otto Reich and the failed Chavez coup.

31.     From its inception, Trigeant EP hemorrhaged money, losing about $2 million per month.  However, despite protests from Harry Sr. and Dan, Harry refused to stop throwing good money after bad and to shut down Trigeant EP, until finally, two years later, Trigeant lost about $30 million.  Additionally, as Manager of Trigeant, Harry had express unilateral authority to execute transactions up to $10 million, which he violated by spending $30 million of Trigeant funds on the Trigeant EP transaction.

32.     Harry was guilty of a gross abuse of business judgment in buying and then sustaining Trigeant EP for five reasons: (i) by using the money owed PDVSA for the seven cargos of oil to purchase the Coastal refinery, instead of paying PDVSA; (ii) for purchasing the Coastal refinery knowing of the then existing detrimental political issues in Venezuela and with PDVSA that directly threated both Trigeant's Refinery and Trigeant EP's oil supply to operate the refinery; (iii) by proceeding with the Trigeant EP acquisition without conducting an appropriate due diligence, (iv) by not closing the Coastal refinery quickly, once it was clear that

10

it was a financial disaster, and instead, running up the losses to Trigeant, Ltd. of $30 million, and (v) by exceeding his authority by $20 million in purchasing the Coastal refinery.

33.     Further, contemporaneous with Harry causing Trigeant to buy Coastal, Trigeant EP assumed a transportation contract with CSX Transportation, Inc. ("CSX").  By late March 2005, once Trigeant EP had lost the $30 million, Harry then sold the Trigeant EP assets to Tripso, LLC, which changed its name to Gulf Atlantic Operations ("GAO").  Tripso/GAO assumed the CSX contract, but Harry never requested, and thus, never received a release in favor of Trigeant EP from CSX.  Not long afterwards, GAO breached the CSX contract, then filed a Chapter 7 bankruptcy.  CSX then obtained a judgment against Trigeant EP in February 2011 in the amount of $593,678.37.  This event establishes Harry's gross abuse of business judgment both in failing to conduct a proper due diligence on Tripsco/GAO, but also in not structuring the assignment of the CSX agreement so as to receive a release for Trigeant EP.

## HARRY AND MUSTAFA'S JET FUEL CONTRACT AND RESULTING FRAUD

34.     The summer of 2003 was also the first time that Harry told Harry Sr. and Dan about the Defense Energy Support Center ("DESC"), an entity within the jurisdiction of the U.S. Department of Defense, and the opportunity for Trigeant to supply jet fuel to U.S. military bases in Iraq, by shipment across Jordan during the Iraq War (the "Jet Fuel Contracts").  Initially, Harry, who was the Manager of Trigeant, arranged for the first Jet Fuel Contract to be placed with Trigeant, which lost approximately $7 million on the contract.

35.     After that failure, in April 2004, Harry approached Harry Sr. and Dan indicating he wanted to personally go in a different business direction and continue on with the Jet Fuel Contracts by himself.  Harry Sr. and Dan spoke with Harry at great length about the future prospects for the Jet Fuel Contracts, given that the first contract in Trigeant Ltd.'s name suffered

11

a loss. Harry misrepresented his true then existing knowledge and plans about the future success of the business and its viability to Harry Sr. and Dan. Harry told Harry Sr. and Dan that he had a low expectation of financial profitability and downplayed the scope of the Jet Fuel Contracts, and reiterated that he needed to do something different and on his own. Harry also failed to disclose that Mustafa was going to be his new partner in IOTC and that they were already plotting to transfer Trigeant's rights under the Jet Fuel Contracts to IOTC.

36. Harry failed to disclose to Harry Sr. and Dan that the Jet Fuel Contracts were guaranteed to become financially significant when a related IOTC entity, IOTC Jordan obtained an exclusive right of passage through Jordan. This was arranged by Harry and Mustafa's other one-third partner, Mohammad Al-Saleh ("Al Saleh"), the brother-in-law of Jordan's King Abdullah II, who was instrumental in securing a letter of authorization granting this monopolistic right. Harry knew that obtaining this letter was critical to locking up the Jet Fuel Contracts, and at no time prior to Mustafa surreptitiously assigning the rights from Trigeant to IOTC, did Harry accurately disclose anything to Harry Sr. or Dan about Al-Saleh, the authorization letter, or his business strategies in Jordan regarding the Jet Fuel Contracts.

37. Notwithstanding Harry's misrepresentations and omissions about the Jet Fuel Contracts above, Harry represented to Harry Sr. and Dan his commitment to pay Trigeant back the $7 million it lost on the first Jet Fuel Contract, before he or his business would take any profit. Harry further represented to Harry Sr. and Dan his commitment to also pay Trigeant $11.00 per ton for any fuel sold, irrespective of whether his new business made money or not (the "Jet Fuel Payment Inducements"). These promises were material to Trigeant giving its permission to Harry to engage in the Jet Fuel Contract business. In fact, on July 25, 2011, Harry testified at the trial on the Al-Saleh Fraud Case at page 2531 that the Jet Fuel Payment

12

Inducements described above were owed to Trigeant, and were to be paid before any profits were distributed.

38.     Thus, under the circumstances of (i) Trigeant experiencing financial uncertainty given the events in Venezuela, (ii) experiencing losses in Trigeant EP, (iii) having no expectation that Harry would lie to them about the financial viability of the Jet Fuel Contracts, and (iv) the inducement of Trigeant being repaid its lost $7 million, plus receiving future payments of $11.00 a ton per jet fuel sold, before any profits were paid to IOTC, Harry Sr. and Dan acquiesced to and were fraudulently induced by Harry into allowing him to take over the Jet Fuel Contracts on his own.

39.     Unbeknownst to Trigeant, however, on information and belief, at Harry's direction, Mustafa signed a letter on Trigeant letterhead to DESC, indicating that he was an officer of Trigeant (although he never was), transferring the rights to all future Jet Fuel Contracts to IOTC.  And as it turned out, all of Harry's representations to Harry Sr. and Dan about the lack of financial viability of the Jet Fuel Contracts were false and known to be false at the time they were made.  This is established by, among other reasons, (i) their having Al-Saleh as their partner along with the right of passage authorization letter he secured; and (ii) related to Harry's misrepresentation to make the Additional Payment Inducements to Trigeant, Ltd., proven by the fact that IOTC started making significant profits quickly and never made a single payment to Trigeant whatsoever.  Thus, with respect to the Jet Fuel Contracts, Harry both defrauded Trigeant and usurped a business opportunity intended for, and breached a fiduciary duty to Trigeant.  Mustafa aided and abetted and conspired with Harry to commit these torts, and this conspiracy was later joined by Kevin when he started in the employ of Harry.

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

40.     Kirkeide became employed by an entity that Harry owned and controlled in 2006, the name of which Plaintiffs do not know.  On information and belief, Kirkeide's technical employer may have changed from time to time, though at all times, regardless of the formal name of the employer, Kirkeide worked directly for Harry as his right hand and most trusted employee, doing whatever was needed in any of Harry's businesses, including IOTC.  Kirkeide, a Certified Public Accountant by trade, often served in a Chief Financial Officer or Chief Operating Officer function, even if he didn't formally hold those titles.  Kirkeide has always had senior management responsibility and has reported solely to Harry, particularly as it pertains to both IOTC and BTB.

41.     Defendant IOTC has been indirectly owned by Harry and Mustafa through their equal ownership of International Oil Trading FZCO, a United Arab Emirates Free Zone Company ("IOTC Dubai"), which on or about March 5, 2008 changed its corporate structure to become International Oil Trading Company, Ltd., a Bahamian corporation ("IOTC Ltd.").  On information and belief, Kirkeide participated in creating IOTC Ltd.  In all material respects, both IOTC and IOTC Dubai are dominated by and are the alter egos of Harry and Mustafa.  These legal entities are a sham as they were created and in fact used for the purpose of misleading creditors and to perpetrate a fraud upon them, including but not limited to: (a) Al-Saleh, who as established by res judicata, was defrauded by Harry and Mustafa through IOTC, and (b) Trigeant, Ltd.

42.     At some point well into the Jet Fuel Contracts, Al-Saleh learned that Harry and Mustafa created a new entity, IOTC USA, to siphon off payments from DESC, thereby stealing Al-Saleh's 1/3 share of profits earned from the Jet Fuel Contracts.  Thereafter, Al-Saleh filed a lawsuit in the Circuit Court of Palm Beach County, Florida, entitled, <u>Mohammad Anwar Farid</u>

14

Al-Saleh v. Harry Sargeant, III, Mustafa Abu-Naba'a and International Oil Trading Company, LLC, Case No. 08 CA 010187, (the "Al-Saleh Fraud Case"). On July 27, 2011, Harry and Mustafa were found guilty by a jury of committing fraud against Al-Saleh, and a final judgment was then entered against them and IOTC in the amount of $28.8 million.

43. During that widely publicized trial, Al-Saleh testified that Harry caused one of his employees to pay bribes to Jordanian officials to assure that IOTC could have a monopoly on the fuel supply lines through Jordan. As to three of IOTC's Jet Fuel Contracts, a Pentagon audit found that the U.S. government overpaid IOTC (and thereby, Harry and Mustafa), between $160 million to $204 million more for fuel than could be supported by price or cost analysis. Also, Congressman Henry Waxman, Chairman of the House Committee on Oversight and Government Reform wrote Defense Secretary Robert M. Gates on October 16, 2008, advising that Harry, Mustafa and IOTC were awarded the Jet Fuel Contracts despite having the highest bid, and accusing them of price gouging and engaging in war profiteering. This letter is now a part of the Congressional Record. Ultimately, at the end of IOTC's involvement in the Jet Fuel Contracts, the Government refused to make a payment of about $70 million to IOTC, which funds were badly needed to support and prop up other of Harry and Mustafa's non-Jet Fuel Contract ventures.

44. The foregoing facts were revealed during the Al-Saleh fraud trial and which became publicly disseminated through the media, directly impacted and damaged the business and reputation of Trigeant and Sargeant Trading worldwide. Trigeant also suffered actual damages related to the Jet Fuel Contracts by reason of Harry committing fraud in the inducement and usurping a corporate opportunity in transferring those contracts to IOTC, with Mustafa and then Kevin's co-conspirator and aiding and abetting assistance after his employ began in 2006.

15

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

These facts, combined with Harry's usurping a corporate opportunity, constituted a breach of fiduciary duty to Trigeant, as Harry was the Manager of the General Partnership that owned 100% of Trigeant.

45.     Although IOTC directly and Harry and Mustafa indirectly earned approximately $212 million from the Jet Fuel Contracts, the judgment in the Al-Saleh Fraud Case remains almost entirely unsatisfied in the present approximate amount of $32 million, plus accrued interest, despite effort by Al-Saleh to collect on same.  Moreover and worse, no Jet Fuel Payment Inducements were ever paid to Trigeant, Ltd.  This is proof that IOTC was utilized for an improper purpose, as its accounts were gutted by Harry and Mustafa, with the substantial and knowing assistance of Kevin.  Further, Harry's windfall profits allowed Harry to spend an extraordinary sum of money on an exhorbitant lifestyle, and to shelter and fraudulently transfer Jet Fuel Contract profits from his and IOTC victim creditors, including Al-Saleh, Trigeant and Sargeant Trading.

46.     Notably, once Harry became involved in the Jet Fuel Contracts, he focused mostly on his personal business interests and not those of the Sargeant family, excepting Trigeant (which he controlled), and Harry then became mostly secretive about his personal business dealings.  Thus, Harry Sr. and Dan did not know what Harry was really doing with respect to the Jet Fuel Contracts or in any of his other business activities with Mustafa and Kevin.

47.     As it turned out, Harry, with the substantial aiding and abetting assistance of Kevin (from 2006 on), spent more than eight years engaged in a consistent and continuing pattern of involvement in an ongoing fraudulent scheme, hidden from all of the Plaintiffs and other Sargeant family members.  This continuing fraud commenced with the misrepresentations regarding the Jet Fuel Contracts and the non-payment of the Jet Fuel Payment Inducements as

BERGER SINGERMAN
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

well as other tortious conduct described below, including, but not limited to breach of fiduciary duties and failure to act in good faith duties directed against Trigeant, Sargeant Trading and LAIL. Harry's modus operandi was to keep or convert as much money and as many business opportunities for himself as possible, at the expense of his family members and certain of their businesses, including Trigeant, Sargeant Trading and LAIL. This may be best evidenced by Harry's actions respecting IOTC with the non-payment of the Jet Fuel Contract Payment Inducements, and his subsequent formation of BTB using Jet Fuel Contract profits, also with the substantial aiding and abetting assistance of Kevin.

### THE TWO PDVSA ARBITRATION JUDGMENTS AND THE TARCO THEFT

48.     Going back to the seven PDVSA cargos, when Harry directed Trigeant to not pay PDVSA, that resulted in two arbitration awards being entered against Trigeant. PDVSA obtained a $17 million arbitration award against Trigeant on March 10, 2006, for its damage under the Supply Contract ("First Arbitration Award"). However, during that arbitration, in an attempt to procedurally outmaneuver PDVSA, Harry authorized Trigeant's attorneys to file a jurisdiction based motion that resulted in PDVSA's claims related to the spot market purchases being dismissed from that case.

49.     PDVSA then filed a second arbitration proceeding against Trigeant on August 29, 2007, which resulted in a second arbitration award of $35 million, entered on August 24, 2008. This second award carried at least double penalty charges amounting to millions of dollars that would not have been assessed against Trigeant, had Harry not recklessly approved the spot market claims being dismissed from the first PDVSA arbitration. As a result, by April 2012, Trigeant owed PDVSA $47 million on the "Second Arbitration Award" on an obligation that could and should have been paid by Harry from the proceeds of the sale of the seven cargos of

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

crude oil he initially bought from PDVSA, but instead, was spent on the failed Trigeant EP deal. These facts alone prove Harry's gross mismanagement well beyond the business judgment rule, as well as his breach of fiduciary duty to Trigeant.

50.     Moreover, had Harry not defrauded Trigeant and usurped Trigeant's corporate opportunity in the Jet Fuel Contracts, with Kirkeide's aiding and abetting assistance, Trigeant would have received profits of at least $40 million, based on the Jet Fuel Payment Inducement structure that Harry testified to at trial during the Al-Saleh Fraud Case.   Thus, Trigeant would have been able to pay PDVSA for the seven cargos, without ever having to be involved in all of the resulting litigation caused by Harry's machinations, including non-payment to PDVSA and using the sale proceeds instead to buy Trigeant EP.

### THE TARCO CONTRACT AND
### HARRY DEFRAUDS SARGEANT TRADING

51.     Additionally, two months after the First Arbitration Award was entered, on May 19, 2006, Harry caused Trigeant to enter into a Processing Agreement with Texas Asphalt Refining Company ("TARCO").  This agreement provided for TARCO to pay Trigeant for a fixed per barrel rate of crude oil with minimum mandatory quotas that guaranteed Trigeant a minimum of $21.6 million in annual revenue.  However, by the fall of 2007, TARCO advised Harry that it was not renewing the Processing Agreement, because, among other things, (a) Harry had tried to change the agreement to include payment for certain capital improvements at the Refinery, and (b) TARCO was having financial difficulties and needed concessions from Trigeant, which Harry refused to even discuss.  As a result of the Processing Agreement being terminated, Trigeant lost $21.6 million per year in revenue.

52.     Simultaneously, Oldcastle, Inc., was the 60% majority owner of TARCO, which by 2007 was winding down its asphalt refinery operations.  At that time, TARCO sold $8 million

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

of asphalt to one of Harry and Mustafa's jointly owned entities, Sargeant Marine, SA ("SMSA"), a Dominican Republic company. Harry and Mustafa then sold the $8 million of TARCO's product and except for making a $1 million payment to TARCO; SMSA, Harry and Mustafa failed to pay TARCO the $7 million balance owed. Unfortunately, Harry structured the initial TARCO asphalt purchase transaction by SMSA so that Trigeant was the registered seller of record for the asphalt. Thus, Trigeant was responsible for sending out invoices for TARCO and collecting the balance that should have been paid by SMSA. Then, when SMSA intentionally failed to pay TARCO for its asphalt, which was effectively converted to the benefit of SMSA, and indirectly Harry and Mustafa who are the alter egos of SMSA; TARCO held Trigeant financially accountable for SMSA's remaining $7 million debt. This transaction reflects another instance of Harry and Mustafa's continuing fraud directed against Trigeant.

53. To make matters worse, at around this same time, in late 2007, on a then existing belief by Harry Sr. and Dan that Harry could be trusted, Sargeant Trading paid $4.9 million of the SMSA asphalt debt to TARCO on the express agreement and representation by Harry to Dan and Harry Sr. that Sargeant Trading's payment to TARCO was to be treated as a loan made to SMSA that would be promptly repaid by Harry or SMSA to Sargeant Trading. Unfortunately, Harry misrepresented to Harry Sr. and Dan his statement that SMSA would promptly repay Sargeant Trading the $4.9 million it advanced to TARCO, evidenced by the fact that neither he nor SMSA repaid the money then, or at any time thereafter. This transaction is another instance of Harry's continuing fraud.

54. Further, because TARCO was still owed $2.1 million on its original $8 million balance (less the $1 million paid by SMSA and the $4.9 million paid by Sargeant Trading), TARCO then sued Trigeant for the balance. Harry then completely failed to interpose defenses

19

for Trigeant to the litigation or otherwise settle the case, even though: (a) his alter-ego company, SMSA, received the asphalt from TARCO, and (b) Harry and Mustafa had enough cash on hand to pay the TARCO bill, given their IOTC profits on the Jet Fuel Contracts, which, in fact, were Trigeant's stolen profits. As a result, given a financially severe contractual penalty clause in the TARCO agreement, a $4.1 million judgment was entered against Trigeant in August 15, 2012.

55.     Harry Sr. and Dan were unhappy with Harry's handling of the entire TARCO situation, but they did not understand or yet have reason to know that Harry was defrauding Trigeant and Sargeant Trading. In fact, Harry put on a facade that he was always watching out for Sargeant family interests and he continuously falsely represented and promised Harry Sr. and Dan that Sargeant Trading and Trigeant would be repaid their $9 million in losses on the TARCO transaction. To recap, those fraudulently incurred losses included: (a) $4.9 million of actual cash lost by Sargeant Trading when it was defrauded by Harry's misrepresentation about repaying Trigeant for the loan, and (b) the $4.1 million judgment entered against Trigeant by TARCO for asphalt it did not take control of, sell on its own account or receive any benefit. Harry made all of these foregoing misrepresentations with scienter, because he had the wherewithal to make the payments back to Trigeant and Sargeant Trading from the converted profits on the Jet Fuel Contracts, and he simply refused to do so.

## HARRY'S FRAUDULENT TRANSFER PERPETRATED AGAINST PDVSA

56.     Meanwhile, back in December 2006, after PDVSA's First Arbitration Award was entered, Harry caused Trigeant to borrow $22 million from American Capital Financial Services, Inc. ("AmCap") in exchange for a first lien on all of Trigeant's assets, including its Refinery. The principal purpose of the loan was to pay the First Arbitration Award.

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

57.     Then, Trigeant fell into default on its loan obligations to AmCap, resulting from Harry converting TARCO's asphalt to SMSA's benefit and to Trigeant's detriment, combined with Trigeant losing the TARCO Processing Agreement, which extinguished Trigeant's cash flow. By December 2007, AmCap was proceeding to a mortgage foreclosure sale of the Refinery. In an effort to stave off the otherwise inevitable loss of the Refinery to AmCap, Harry took stolen Jet Fuel Contract profits from IOTC that were owed to Trigeant, and on December 10, 2007 Harry formed defendant BTB Refining LLC ("BTB") as the acquisition vehicle for the Refinery. Harry, with the aiding and abetting assistance of Kevin, immediately orchestrated a fraudulent transfer that re-titled ownership of the Refinery from Trigeant to BTB, which was established as a Florida LLC.

58.     Harry effected this fraudulent transfer to: (a) prevent a legitimate independent third party from showing up at any foreclosure sale and buying the Refinery, (b) prevent PDVSA from executing and levying on the Refinery in post-arbitration award collection proceedings, (c) eliminate it as an asset for post-judgment collection by Al-Saleh, (d) to assure that a company owned by Harry, being BTB, had access to or owned a Refinery, as a condition to IOTC keeping its Jet Fuel Contracts active, and (e) most important, to strategically set up a fraudulent transaction intended to wrest control of the Refinery away from Trigeant and his Sargeant family members. Indeed, had Harry, IOTC or BTB, another alter ego company of Harry's paid Trigeant the money it was owed under the Jet Fuel contracts, the AmCap loan would not have gone into default.

59.     BTB is a sham and alter ego of Harry and Mustafa. It was initially formed as a Florida LLC, and then was transferred into being a Texas LLC to prevent creditors from attaching its assets. BTB was capitalized with Jet Fuel Contract profits taken from IOTC. BTB

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

was created and in fact used for the purpose of misleading creditors and to perpetrate a fraud upon them, including but not limited to: (a) Al-Saleh, who as established by res judicata, was defrauded by Harry and Mustafa through IOTC, and (b) Trigeant, Ltd.

60.     With no resolution of the Second Arbitration Award, PDVSA filed <u>PDVSA Petroleo S.A. v. Trigeant, Ltd., BTB Refining, LLC and Harry Sargeant III</u>, Case No. 09-cv-00038, pending in the United States District Court for the Southern District of Texas (the "Fraudulent Transfer Case"). On August 7, 2012, the Court in the Fraudulent Transfer Case filed its 22 page Findings of Fact and Conclusions of Law establishing that Harry, with actual intent to defraud and with ultimate managerial responsibility over Trigeant, orchestrated the foregoing referenced fraudulent transfer of the Refinery from Trigeant to Harry's company, BTB. A copy of these judicial findings are attached as Exhibit A. The factual findings made with respect to BTB and Harry stand; as an appeal by BTB to the United States Fifth Circuit Court of Appeal was dismissed in June 2014.

61.     To sum up, by the end of December 2007, Harry, with Mustafa and Kevin (after his employ began), acting as aiders and abetters and in conspiracy with Harry:

(a)     misrepresented and failed to disclose material facts to Trigeant (through Harry Sr. and Dan) about the nature and extent of the Jet Fuel Contracts, so as to induce Trigeant to abandon those contracts to Harry and Mustafa, acting through and as alter egos of IOTC;

(b)     defrauded Trigeant out of $7 million in Jet Fuel Contracts, plus another $11.00 per ton of jet fuel sold, converting these sums to the benefit of IOTC, BTB and Harry and Mustafa individually;

(c)     defrauded Al-Saleh out of $28.8 million as his share of profits from the Jet Fuel Contracts;

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

(d)     effectively stole multi-millions of dollars in asphalt from PDVSA, leading to entry of PDVSA's First Arbitration Award in the amount of $17 million;

(e)     sold the aforementioned PDVSA asphalt and instead of paying PDVSA, invested the proceeds from the sale of the asphalt into Trigeant EP, which then lost $30 million and caused a $600,000 judgment to be entered against Trigeant EP in favor of CSX;

(f)     fully mortgaged Trigeant's Refinery by obtaining a loan from AmCap to pay off the PDVSA First Arbitration Award, which led to a radically increased $35 million Second Arbitration Award against Trigeant;

(g)     defrauded Sargeant Trading out of $4.9 million on Trigeant's asphalt purchase from TARCO, and using some of the TARCO asphalt proceeds to buy the Trigeant loan documents from AmCap covering the Refinery, thus setting in motion Harry's subsequent fraudulent transfer of the Refinery to keep it from PDVSA, and hence, committing two frauds in one transaction;

(h)     allowed a $4.1 million judgment to be entered against Trigeant arising out of the same TARCO transaction;

(i)     lost the TARCO contract, which resulted in extinguishing Trigeant's cash flow that could and would have been used to pay either PDVSA or AmCap;

(j)     made no effort to resolve the PDVSA Second Arbitration Award, evidenced by the fact he paid none of it down with proceeds generated from the TARCO contract, or from other sources, including their substantial stolen profits from the IOTC Jet Fuel Contracts;

(k)     fraudulently transferred title of the Corpus Christi Refinery from Trigeant to BTB, with actual intent to defraud.

23

62.    Thus, in the space of 18 months, by August 2012, two fraud-based judgments were entered against Harry involving approximately $60 million in claims.  As each of those cases were reduced to judgment, and resolved against Harry with finality on appeal, including the severe findings that Harry had committed fraud, they illuminated to Harry Sr. and Dan (and therefore, to Sargeant Trading and Trigeant), that they too had been defrauded by Harry as described above, and as it turned out, in other matters that occurred more recently.

63.    As to the entire PDVSA fiasco, as referenced above, Harry was the Manager of Trigeant, vested with unfettered authority to act on its behalf.  Moreover, at all times material hereto, A.J. Brass was a 25% owner of Trigeant, was close to Harry, and in order to remove Harry as Trigeant's Manager, Harry Sr., Dan and Jim would have needed a 70% vote of the members, which they did not have.

64.    A.J. Brass sold his interest in Trigeant in 2008 that led to a redistribution of Trigeant stock among Sargeant family members. Then, shortly after the two above-referenced fraud judgments were entered against Harry, which led Harry Sr., Dan and Jim to the inescapable conclusion that they too had been defrauded by Harry, they removed him from his Manager and Director positions in Trigeant and all other Sargeant family businesses.

### THE RESULT OF HARRY'S LARGESS

65.    The first domino that set into motion Harry's continuing breach of fiduciary duty and fraudulent conduct as described above, were his misrepresentations regarding the Jet Fuel Contracts.  Had Harry, acting through his alter ego IOTC, not committed fraud and converted the Jet Fuel Contracts and Trigeant's share of profits to IOTC, thereby with Harry also usurping a corporate opportunity, then Trigeant would have realized the profits under those contracts and accordingly, would have had the financial ability to pay PDVSA for its asphalt.  Instead, Harry's

24

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

actions caused the arbitration judgments to be entered against Trigeant, followed by Harry's (a) subsequent fraudulent transfer of the Refinery from Trigeant to BTB, which was overturned on appeal, and (b) Harry's fraudulent transfer of IOTC assets to BTB.

66.     Harry's fraud respecting the Jet Fuel Contracts, enabled him to reap a financial windfall from those contracts, including orchestrating the BTB fraudulent transfer and the AmCap transaction as part of his continuing fraud.   Second, Harry then began to spend extraordinary sums of money on very expensive, cash intensive real and personal properties including a mansion in Delray Beach, a home in Aspen and at least three other condominiums, plus ownership of at least one 100 foot yacht while building a 140 foot long yacht, three private aircraft, football skyboxes for the Miami Dolphins and Florida State Seminoles, numerous exotic cars and a fire truck. The cost of maintaining all of these properties on a monthly basis was and remains significant, and caused Harry personal cash flow problems which directly led him to commit his ongoing and continuing fraud against Trigeant and other torts described below.

67.     Additionally, Harry spent tens of millions of dollars on business ventures with Mustafa that were converted from the Jet Fuel Contracts' profits, and which failed, further depleting Harry's cash reserves.   One such example is Harry's totally lost investment of approximately $70 million in building a plant and buying ethanol from Brazil, then removing the water from it and subsequently transporting the ethanol to the United States.

68.     The combination of the Jet Fuel Contracts being terminated in 2010, Harry's other businesses failing and not producing income, being obligated to pay massive personal lifestyle cash flow based expenses, and having the unsatisfied Al-Saleh fraud judgment entered against him, rendered Harry insolvent by either definition of insolvency, being (a) liabilities exceeding assets, or (b) inability to pay his debts as they come due.   Moreover, these financial pressures

**BERGER SINGERMAN**
attorneys at law                    *Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

caused Harry to engage in other more recent torts, in bad faith against the interests of Trigeant, Sargeant Trading, LAIL and even personally against Sargeant family members.

## HARRY STEALS FROM SARGEANT TRADING

69.    At all times relevant hereto, Harry was the Manager of Sargeant Trading. However, at no time relevant hereto, was Harry ever a shareholder of Sargeant Trading. Nevertheless, while serving as Sargeant Trading's Manager, Harry more recently engaged in breaches of fiduciary duty and fraudulent conduct directed against Sargeant Trading.

70.    Asphalt is transported out of a refinery by either ship, rail or truck, known as a "truck rack."  Going back to at least 2008, Sargeant Trading contracted with BTB to use the Refinery to produce asphalt, with arms-length payments made between the parties for the right of use, using industry standard pricing and invoicing.  Part of this arrangement included Sargeant Trading also selling asphalt to BTB at the Refinery's truck rack for BTB's resale in conjunction with a joint venture partner, NuStar.

71.    However, in the spring through fall of 2010, Harry, with Kevin's aider and abetter assistance, defrauded Sargent Trading and breached fiduciary duties owed to it by manipulating a series of transactions whereby BTB, took possession of $5.2 million of Sargeant Trading's asphalt, with no intention of paying for it.  Indeed, BTB then sold the asphalt, but never tendered any proceeds from the sale to Sargeant Trading, just as Harry had done to PDVSA in 2003 and TARCO in 2007 when he managed and controlled Trigeant.  This transaction evidenced Harry's continuing pattern of fraud by his overt intention to fraudulently convert the Sargeant Trading asphalt and resulting proceeds to BTB's exclusive benefit and control.  At the trial on the Fraudulent Transfer Case, Kevin admitted under oath that BTB owed Sargeant Trading the $5.2 million.

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

### HARRY STEALS FROM LAIL

72.      Harry also served as the Managing Director of LAIL, another Sargeant family owned business.  From May 2008 through September 2008, as part of his continuing scheme to defraud Sargeant family owned businesses, Harry caused LAIL to transfer approximately $4.8 million to Trigeant Holdings, LLC ("Holdings"), the parent company of Trigeant.  At that time, Harry also served as the Manager of Holdings and directed that the LAIL transfer be recorded on Holdings' books as an intercompany loan from LAIL.  But literally the next day, Harry diverted the funds to his personal use, sending (a) $2.5 million as a down payment on a Bombardier jet, which he subsequently walked away from, losing the money, (b) $1.4 million, which he put into his foregoing referenced failed ethanol business, and (c) $900,000 to IOTC FZCO.  These transfers provided no benefit to LAIL or Holdings and constituted a conversion of LAIL's funds, as well as a breach of fiduciary duties owed by Harry to both LAIL and Holdings.

### HARRY STEALS FROM HIS BROTHER DAN

73.      Harry also defrauded Dan in the sale of IOTC Asphalt, LLC located in Puerto Rico.  IOTC Asphalt, LLC was owned 2/3 by IOTC Ltd. (which was owned equally by Harry and Mustafa) and 1/3 by Dan.  On December 21, 2011, after the Al-Saleh Fraud Case judgment was entered, well into the pendency of the PDVSA Fraudulent Transfer Case, and at a point where Harry was already facing the serious personal cash flow crisis described above, Harry negotiated and caused to be executed an *Indicative Term Sheet for the Acquisition of all the BTB Corporation Stock Owned by IOTC Asphalt, LLC.*  This "Term Sheet" identified that the purchasing company would pay IOTC Asphalt, LLC approximately $19 million for all of its outstanding stock, an amount for saleable inventory, and with IOTC Asphalt, LLC retaining the right to recover its then existing unpaid accounts receivables.

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

74.     Dan repeatedly told Harry and counsel for the transaction that he would not sign papers to close the transaction, because the approximate $19 million sale price was far too little money for the IOTC Asphalt, LLC stock and was not reflective of its fair market value, which was worth about $50 million, given past sales price and other market data.  As important, Sargeant Trading needed access to the asphalt terminal being sold because it was strategic to its short and long term business objectives.   Nevertheless, Harry proceeded to closing the transaction, because he needed the money, and in so doing, he damaged Dan and Sargeant Trading.  Although total consideration paid in this transaction amounted to about $29 million, Dan never received any payment whatsoever from Harry or the company lawyers for his share of the funds.

75.     Dan filed a lawsuit against Harry and other parties for the acts complained of above, which is presently pending in this Court and has asserted that Harry effectively stole Dan's funds by diverting them for his own use and benefit.  The allegations related to this IOTC Asphalt, LLC are asserted herein, solely for consideration as to a punitive damage award against Harry.

## THE FALL OUT FROM HARRY'S CONDUCT

76.     For many years, Sargeant Trading maintained a strong banking relationship with established working lines of credit at ABN Amro Bank ("ABN"), located in the Netherlands.   At about the time when Harry and Mustafa began the Jet Fuel Contract venture, riding on the strength of both the Sargeant family name and the Sargeant Trading relationship with ABN, Harry obtained his own line of credit for IOTC.  Sargeant Trading was not involved, directly or indirectly in that process or the IOTC loan facility.   However, once the U.S. Government terminated the Jet Fuel Contracts in 2010, IOTC defaulted on its $55 million loan with ABN.

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

The bank eventually realized that its security for the loan, being a $70 million receivable due to IOTC from the U.S. Government was questionable, if not completely uncollectable, because the Government made it clear it was not going to pay IOTC, presumably because of the Jet Fuel Contract overcharges described above. And to this day, the Government has not paid that receivable.

77. Harry and Mustafa could have paid the ABN debt, however, they simply refused to do so. Notwithstanding that Sargeant Trading was neither a borrower nor guarantor on the IOTC loan, ABN nevertheless demanded that Sargeant Trading pay the IOTC debt, because it viewed IOTC and Sargeant Trading to be related family businesses, even though that was not the case. When Sargeant Trading declined to pay the outstanding balance on IOTC's loan, ABN then terminated the Sargeant Trading banking relationship. Harry intended and knew that his refusal to pay ABN would cause it to terminate its banking relationship with Sargeant Trading, which caused damage to Sargeant Trading.

78. Harry also owns a Bahamian company, International Oil Shipping Company, Inc. ("IOSC"), which contracted in March 2008 to charter two ships from Odfjell Tankers ("Odfjell") to transport ethanol. IOSC breached that contract, and Odfjell responded by suing Sargeant Marine, Sargent Trading and Trigeant (along with Harry, IOSC and BTB) in federal court in Texas, even though Sargeant Marine, Sargeant Trading and Trigeant had nothing to do with the transaction or IOSC. Just as bad as Sargeant Marine, Sargeant Trading and Trigeant getting dragged into another one of Harry's legal problems is that the prominent shipping trade journal, TradeWinds, wrote a lengthy article on the lawsuit which even covered the PDVSA arbitration judgments and the related fraudulent transfer judgment. Harry knew that his breach of the

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

Odfjell contract by IOSC would cause damage to the reputation of Sargeant Marine, Sargeant Trading and Trigeant.

79.    Worldwide, companies in the asphalt industry and banks who did business with the Sargeant family, whether through Sargeant Trading, Sargeant Marine, Sargeant Bulktainers or Trigeant, either did not know about or did not believe that Harry had been terminated from all Sargeant family businesses.  Certain businesses and lenders severed relationships with Sargeant Trading because of Harry's reputation and others refused to do business with it. Harry intended and knew that his tortious acts established by the (Mohammed Fraud Judgment and Fraudulent Transfer Case Judgment) would cause damage to the reputation of Sargeant Trading and Trigeant.  At no time pertinent hereto did Sargeant Trading know about or be in a position to control any of Harry's aforedescribed fraudulent conduct.

80.    It was not only the two fraud judgments that stained Harry's reputation and which spilled over to damage the Sargeant family name and business interests.  It is well-documented that Harry became active as a political fundraising "bundler" and in 2008, he served as State Finance Chair for the Republican Party of Florida.   Numerous tawdry allegations were repeatedly printed in the media tying Harry to (i) illegal political contributions that resulted in John McCain returning some money to contributors, (ii) lending his airplanes for use by well-heeled donors and politicians travel to the Bahamas, where they openly cavorted with prostitutes in golf carts, and (iii) arranging free-spending junkets for state Republican legislators.

81.    Given the facts pled above in paragraphs 76 through 80, Sargeant Trading found that despite having an exemplary banking record and never having suffered a default on a loan facility with any bank, Sargeant Trading suddenly could not find a new bank after being asked to leave ABN.  Indeed, while every bank that Sargeant Trading visited to start a new banking

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

relationship with knew of the company, they also knew of Harry's above pled exploits, and the potential lenders expressed concerns about his reputation and involvement in Sargeant family owned businesses. Indeed, much like ABN linked Sargeant Trading to Harry, since his last name was Sargeant, so did numerous other potential lenders who declined to do business with Sargeant Trading. Inasmuch as the acts complained above occurred while Harry served in a managerial capacity for Trigeant and or Sargeant Trading, they are relevant to the issues of breach of fiduciary duty and damages.

## HARRY'S TORTIOUS INTERFERENCE WITH SARGEANT FAMILY BUSINESSES

82.     Finally, in order to secure a renewal of a banking relationship with BNP Paribas, Sargeant Trading was told that as an express condition precedent of maintaining a relationship, it had to distance itself from Harry completely and that he and his name could not be associated in any respect with the business. BNP Paribas made it clear - - it was willing to do business with Harry Sr., Dan and Jim, but not Harry. Thus, in order to continue its banking relationship with BNP Paribas, a world reknown financial institution, and to mitigate the damage caused to Sargeant Trading by Harry and Mustafa, and to protect their interests, Harry Sr., Dan and Jim formed a new entity, Global Asphalt Logistics and Trading, SAGL ("GALT").

83.     Harry responded badly to learning of his being terminated from all positions of responsibility in Sargeant family businesses, the formation of GALT and being sued by Dan on the Puerto Rico asphalt deal. He retaliated by filing numerous lawsuits against Sargeant family owned entities (including Trigeant and Sargeant Trading) and Sargeant family members, including naming as defendants his parents, Harry Sr. and Janet Sargeant, and his brothers, Dan and Jim. Harry Sr. has been in business for himself (and his family) since 1984 and has never once been sued personally, until now when he was sued was by his son, Harry. Moreover, Harry

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

has specifically told even family members that he will do whatever it takes to destroy any and all Sargeant family businesses and wants his parents to know before they die that he was responsible for doing so.

84.     Ironically, the basis for Harry's alleged Florida based shareholder claims filed in this court is that his family improperly formed GALT to the detriment of Sargeant Trading and that he was improperly removed as a Manager from Sargeant Trading.  This is a frivolous position given that: (a) Harry never became a stockholder of Sargeant Trading after its stock was reissued in 2010, (b) he never claimed ownership of a Sargeant Trading stock certificate, (c) by his own pled words, he was not involved in the Sargeant Trading business, (d) Sargeant Trading was moved out of Trigeant Holdings because it had financing and banking problems resulting from the Fraudulent Transfer Judgment and other related negative issues with Trigeant, all of which were caused by Harry, and (e) Harry couldn't claim ownership of the Sargeant Trading stock because he knew it would be levied upon by Al-Saleh to satisfy his outstanding judgment.

85.     In addition to filing unmeritorious lawsuits, Harry also immediately engaged in other aggressive tactics to actively disrupt the affairs of every Sargeant family owned business, including Trigeant, Sargeant Trading and GALT; which actions constitute tortious interference with advantageous business relations, defamation and trade libel.  For instance, Harry perpetrated the following acts which include, but are not limited to:

(a)     Sending copies of his new aforementioned Palm Beach County lawsuits to BNP in an effort to cause the bank to cease doing business with GALT and to not fund letter of credit transactions that were in process.   BNP then expressed concern that Harry would somehow sequester cargo off of GALT ships and seize assets and funds that comprised the

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

BNP's collateral, thus making GALT a high-risk client. For a short time, Harry's actions prevented GALT from opening a letter of credit, costing it in excess of $150,000.

(b)     Sending a defamatory letter to Santander Bank that enclosed copies of his new lawsuits in an effort to get the bank to cease doing business with Sargeant Trading and to prevent Santindar Bank from funding a letter of credit for a transaction that was in process. In fact, for a short period of time, Harry's actions worked and it cost Sargeant Trading $75,000 in delay related costs.

(c)     Sending a defamatory letter to DVB Bank that also enclosed copies of his lawsuits in an effort to disrupt a pending transaction regarding GALT's Asphalt Carrier ship to terminate funding letter of credit transactions that were in process, which resulted in and proximately caused Sargeant Trading $250,000 in extra bank charges.

(d)     Sending a defamatory letter and/or telephoning various attorneys that Sargeant family members and their businesses had utilized, including at least: (i) Blank Rome and (ii) Clyde & Co. in London, also enclosing copies of his lawsuits with the intent of providing innuendo that the Sargeants were fraudulent actors.

(e)      Falsely advising public officials in the Dominican Republic that that their competition, named Tribeca, who at the time was conducting business with Sargeant Trading and that SMSA and Sargeant Trading were related companies, all with the intent of preventing Sargeant Trading from entering the asphalt market in the Dominican Republic.

(f)     In an effort to prevent a transaction involving the Asphalt Carrier ship, Harry disrupted the transaction by frivolously seeking an injunction in the Isle of Man to stop the transaction, he then withdrew motion.

33

## HARRY, KEVIN AND BTB'S OTHER EFFORTS TO DAMAGE TRIGEANT

86.     As a result of actions directed by Harry and Kevin through BTB against Trigeant, any financial obligations that BTB asserts are owed to it by Trigeant related to the AmCap transaction, as reflected by both the findings in the Fraudulent Transfer Case and the allegations pled herein, should legally cause such obligations to be declared null and void and unenforceable, as a matter of law.

87.     Prior to and during the pendency of the appeal in the Fraudulent Transfer Case and during a recent Chapter 11 bankruptcy proceeding filed by Trigeant which has since been dismissed; Harry, Kevin and BTB engaged in a systematic, bad faith course of conduct deliberately intended to permanently damage and destroy Trigeant, consistent with Harry's overt pledge to do just that as pled at paragraph 83 above.  During this time period, BTB was a tenant of Trigeant's at the Refinery, given that Trigeant was (and dispositively still is) owner of the Refinery.   Further, technically, BTB also was a lender to Trigeant.  Accordingly, both of these relationships imposed duties upon BTB to act in good faith towards Trigeant, notwithstanding the fiduciary duties imposed upon Harry as Manager of Trigeant, until his involuntary removal from that position.

88.     Harry, Kevin and BTB engaged in numerous bad faith acts intended to damage Trigeant by destroying the value of the Refinery and Trigeant's ability to operate the Refinery. These acts include, but are not limited to:

(a)     Failing to conduct routine maintenance at the Refinery, allowing it to fall into great disrepair, diminishing the Refinery's value and creating a large expense for Trigeant to perform necessary repairs.

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

(b)     Intentionally failing to pay BTB trade creditors who believed that Trigeant and BTB were effectively one and the same party, thus making it difficult to reestablish trade creditor business connections.

(c)     Landing the roofs on the asphalt tanks, contrary to standard practice in the oil industry, knowing that doing so would create for Trigeant both an environmental problem and a material cost issue related to subsequent cleaning and refilling of the tanks.

(d)     Converting proceeds from an agreement with Freepoint, in violation of a federal court order, and then not only failing to pay required Refinery obligations with those proceeds, but also leaving Trigeant without its funds to pay these expenses.

(e)     Notwithstanding certain BTB lien rights, BTB removed all mechanical type personalty from the Refinery to prevent Trigeant from using or renting such property, although BTB had absolutely no use for the personalty, and indeed never did use it after its removal from the Refinery.

(f)     Notwithstanding certain BTB lien rights, BTB removed all Refinery related industry, regulatory and environmental records to prevent Trigeant from using or having access to such records, although BTB had absolutely no use for the records and could never use them for any business purpose outside of Refinery operations.

(g)     Intentionally leaving behind at the Refinery hazardous waste sludge, so that Trigeant would have to deal with its clean up.

(h)     After BTB vacated the Refinery, it prohibited Trigeant from utilizing the dock at the premises, which was necessary and essential for the conduct of Trigeant business, including BTB using intimidation by hiring armed guards who threatened Trigeant employees.

BERGER SINGERMAN
attorneys at law

Boca Raton    Fort Lauderdale    Miami    Tallahassee

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

(i)      Attempting to sabotage transactions Trigeant was working on by going directly to parties that Trigeant was developing relationships with.

(j)      Refusing to sign perfunctory permits and applications to enable Trigeant to operate the Refinery.

89.     The proof that the foregoing acts were committed in bad faith is established by BTB being an alleged lender to Trigeant.   Lenders acting in good faith have a goal of getting their debt paid and maintaining the value of their collateral.  Commercially reasonable lenders do not take measures that impede a borrower's ability to pay the outstanding debt, or to diminish the value of their collateral, yet every step taken by BTB, as described above, was expressly intended to damage Trigeant.

90.     All of the foregoing facts, including Harry's overt statements about ruining the Sargeant family related businesses and his ongoing and continuing pattern of detrimental conduct against Sargeant family interests and Plaintiffs herein, are foundational to the legal claims pled below asserting Harry's self-dealing, breaches of fiduciary duty and other tort based causes of action.

91.     Further, upon his employ by some company owned and controlled by Harry, Kevin was at all times relevant hereto, a willing co-conspirator and aider and abettor with Harry, personally carrying out Harry's directions with the intent to harm Plaintiffs and other Sargeant family businesses interests and cause them financial damage.

92.     All of the torts alleged below are continuing, successive, synergistic and cumulative.  The tortious acts alleged herein were and continue to be part of an ongoing pattern and practice by Harry and Kevin to cause damage to the plaintiffs that started with Harry's

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

misrepresentations about the Jet Fuel Contracts and grew and continued from there to present day.

93.     All conditions precedent to bringing this action have been performed or are otherwise excused.

<div align="center">

**COUNT I**
**CLAIM BY TRIGEANT AGAINST HARRY AND IOTC**
**FOR FRAUD RELATED TO JET FUEL CONTRACTS**

</div>

94.     Plaintiff realleges and incorporates paragraphs 1-45 above into this paragraph 94, as if fully stated herein.

95.     At all times pertinent to entry into and performance of the Jet Fuel Contracts, Harry was the Manager of the General Partnership that owned (and still owns) Trigeant. Accordingly, by reason of this position, Harry had both superior knowledge and unfettered control over all business, financial and legal matters related to Trigeant, including all matters related to the Jet Fuel Contracts.

96.     Harry's position as Manager of Trigeant, as well as his direct and exclusive involvement in handling the Jet Fuel Contracts, provided him with a full understanding of the scope, extent and potential profitability of the Jet Fuel Contracts that Harry Sr., Dan and Jim did not have.

97.     After Trigeant lost money on the first Jet Fuel Contract, Harry represented to Harry Sr. and Dan that he wanted to branch off away from the family business into the jet fuel business.  Harry described to his father and brother the general nature of the Jet Fuel Contracts and that they involved dangerous work, and specifically represented that they had a limited range of profitability.  Harry stated that he wanted to try something new in business and while it was a

<div align="center">37</div>

gamble, he could make some profit in the jet fuel business. Harry's representations about the expected limited profitability of the Jet Fuel Contracts were false.

98.     Harry failed to disclose the truth to Harry Sr. and Dan, that he had learned much from working on the first Jet Fuel Contract, as to how to make the business profitable and that he had a plan to do so. Harry also failed to disclose that he and Mustafa understood that profits from future Jet Fuel Contracts would be enormous, especially since they were bringing Al-Saleh into the business to not only arrange with the Jordanian government the passage route guarantees needed to assure the approval of the DESC contract, but that this arrangement would virtually monopolize the Jet Fuel Contract business. Further, Harry did not disclose that he had directed Mustafa to sign the aforementioned letter to DESC that transferred all of Trigeant's interest in the Jet Fuel Contracts to IOTC.

99.     Further, Harry did not disclose then, or at any other time that he and Mustafa were scheming to create IOTC USA as a mechanism to defraud their partner, Al-Saleh.

100.     Notwithstanding Harry's misrepresentations and omissions about the Jet Fuel Contracts above, Harry affirmatively represented to Harry Sr. and Dan his commitment to pay Trigeant back the $7 million it lost on the first Jet Fuel Contract, before he or his business would take any profit. Harry further represented to Harry Sr. and Dan his commitment to also pay Trigeant $11.00 per ton Jet Fuel Payment Inducement for any fuel sold, irrespective of whether his new business made money or not.

101.     Harry intended that Trigeant rely on his misrepresentations. Had Harry not misrepresented to Harry Sr. and Dan (as representatives of Trigeant), the actual scope and his expectations of financial profitability of the Jet Fuel Contracts, or otherwise, had Harry disclosed

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

the foregoing material omissions of fact, Trigeant would have continued with the Jet Fuel Contracts, but would have handled them in a lawful manner.

102.    Harry had superior knowledge of the facts about the Jet Fuel Contracts which he gained while in serving in a fiduciary capacity to Trigeant as its Manager, including Harry having an understanding of the enormous profits to be gained by the Jet Fuel Contracts.

103.    Harry acted with scienter at all times relevant hereto in making his foregoing misrepresentations and omissions of material fact.

104.    At all times pertinent hereto, although Harry was serving in a fiduciary capacity as Manager of Trigeant, he was also acting with authority as Manager and on behalf of Harry and Mustafa's company; IOTC, which is therefore liable for the fraud committed upon Trigeant under principles of agency law and respondeat superior.

105.    Trigeant did not learn and could not have known about the true facts and omissions about the Jet Fuel Contracts complained of above, until the trial in the Al-Saleh fraud case in July 2011, and further, in the exercise of due diligence, Trigeant could not have learned of them sooner.

106.    As a result of Harry's fraud, Trigeant abandoned pursuing its continued involvement with the Jet Fuel Contracts.

107.    In the course of performing the Jet Fuel Contracts, IOTC made profits of $212 million.  At a minimum, by Harry's under oath admissions in the Al-Saleh Fraud Case trial, Trigeant is entitled to $7 million for its loss on the first Jet Fuel Contract, plus the $11.00 per ton for any jet fuel sold.   Further, had Trigeant performed the Jet Fuel Contracts, and had Harry and Mustafa conducted themselves lawfully by not defrauding al-Saleh, Trigeant would have

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

received 2/3 of this $212 million profit (with Al-Saleh receiving the other 1/3 share), being approximately $141 million, which sum Trigeant pleads as lost profits and special damages.

108.    Harry's conduct was at all times willful and wanton, demonstrated by the broad scope of the events pled above demonstrating his fraud committed upon Trigeant, combined with the multi-year period in which he committed this ongoing fraud and overtly hid it from Trigeant and his family members.  Trigeant reserves the right to amend this claim to bring a count for punitive damages against Harry and IOTC for the conduct as pled herein.

WHEREFORE, Plaintiff Trigeant, Ltd. prays for judgment in its favor and against the defendants Harry Sargeant III and IOTC for damages of $7 million plus $11.00 per ton of jet fuel sold, lost profit special damages of approximately $141 million, costs of suit and all such other relief as the Court deems just and appropriate.

## COUNT II
## CLAIM BY TRIGEANT AGAINST MUSTAFA AND IOTC
## FOR AIDING AND ABETTING FRAUD RELATED TO JET FUEL CONTRACTS

109.    Plaintiff realleges and incorporates paragraphs 1-45 above into this paragraph 109, as if fully stated herein.

110.    At all times pertinent hereto, Mustafa knew that: (a) the initial DESC Jet Fuel Contract was placed with and in the name of Trigeant, (b) Trigeant had already performed the first Jet Fuel Contract, (c) Harry was the Manager of Trigeant and as such, owed it fiduciary duties, and (d) Harry was misrepresenting facts about the Jet Fuel Contracts to Harry Sr. and Dan to defraud Trigeant and move the Jet Fuel Contracts to Harry and Mustafa's jointly owned entity, IOTC.

111.    Mustafa rendered substantial assistance and encouragement to Harry in committing fraud upon Trigeant by working with Harry to develop the plan to have IOTC take

40

the Jet Fuel Contracts from Trigeant, exemplified by his executing a letter transferring Trigeant's interest in the Jet Fuel Contracts to IOTC.

112.    Mustafa knew that his substantial assistance and active participation in this scheme was expressly intended to defraud Trigeant into not pursuing further its continued involvement with the Jet Fuel Contracts.

113.    Mustafa also knew that his actions would deprive Trigeant of substantial revenue it would have otherwise earned under the Jet Fuel Contracts had Harry not begun his pattern of abrogating his fiduciary duties and common law obligations to Trigeant, for his and Mustafa's own benefit, that would inure to them as the alter egos of IOTC.

114.    Mustafa's substantial assistance provided individually and sheltered through and to the benefit of IOTC, proximately caused Trigeant's damages resulting from this fraud.

115.    In the course of performing the Jet Fuel Contracts, IOTC made profits of $212 million, which was directly filtered to Harry and Mustafa, as the alter ego of IOTC. At a minimum, by Harry's under oath admissions in the Al-Saleh Fraud Case trial, Trigeant is entitled to $7 million for its loss on the first Jet Fuel Contract, plus the $11.00 per ton for any jet fuel sold. Had Trigeant performed the Jet Fuel Contracts, and had Harry and Mustafa conducted themselves lawfully by not defrauding al-Saleh, Trigeant would have received 2/3 of this amount, being approximately $141 million, which sum Trigeant pleads as lost profits and special damages.

116.    Mustafa's conduct was at all times willful and wanton, demonstrated by the scope of the events pled above demonstrating the fraud committed upon Trigeant, and his aiding and abetting conduct in assisting Harry, combined with the multi-year period in which he committed this ongoing fraud and overtly hid it from Trigeant and its family members.  Trigeant reserves

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

the right to amend this claim to bring a count for punitive damages against Mustafa and IOTC for the conduct as pled herein.

WHEREFORE, Plaintiff Trigeant, Ltd. prays for judgment in its favor and against the defendants Mustafa Abu-Naba'a and IOTC for damages, lost profit special damages of approximately $141 million, costs of suit and all such other relief as the Court deems just and appropriate.

## COUNT III
## CLAIM BY TRIGEANT AGAINST HARRY, MUSTAFA AND IOTC
## FOR TORTIOUS INTERFERENCE WITH JET FUEL CONTRACTS

117.    Plaintiff realleges and incorporates paragraphs 1-45 above into this paragraph 118, as if fully stated herein.

118.    The Jet Fuel Contracts, which were in the name of Trigeant, established the existence of a business relationship between Trigeant and DESC.

119.    Harry and Mustafa each knew of the existence of the Jet Fuel Contracts and that they were in the name of Trigeant.

120.    Harry and Mustafa intentionally and unjustifiably interfered with the Jet Fuel Contracts by committing the following acts, all of which were intended to cause Trigeant to abandon the Jet Fuel Contracts:

(a)     Harry misrepresented to Harry Sr. and Dan, and therefore, to Trigeant, the general nature of the Jet Fuel Contracts and that they had a limited range of profitability, which Harry knew to be false.

(b)     Harry failed to disclose the truth to Harry Sr. and Dan, that he had learned much from working on the first Jet Fuel Contract, as to how to make the business profitable and that he and Mustafa had a plan to do so.

42

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

(c)     Harry failed to disclose that he and Mustafa understood the profits from the future Jet Fuel Contracts would be enormous, especially since they were bringing Al-Saleh into the business to not only arrange with the Jordanian government the passage route guarantees needed to assure the approval of the DESC contract, but that this arrangement would virtually monopolize the Jet Fuel Contract business.

(d)     Harry did not disclose that he had directed Mustafa to sign a letter to DESC that transferred all of Trigeant's interest in the Jet Fuel Contracts to IOTC.

(e)     Mustafa knew that the initial DESC Jet Fuel Contract was placed with and in the name of Trigeant, who had already performed the first Jet Fuel Contract and that Harry, as Trigeant's Manager, was misrepresenting facts about the Jet Fuel Contracts to Harry Sr. and Dan in order to defraud Trigeant and move the contracts to Harry and Mustafa's jointly owned entity, IOTC.

(f)     Mustafa plotted with Harry to develop the plan to have IOTC convert and move the Jet Fuel Contracts from Trigeant, exemplified by his executing a letter transferring Trigeant's interest in the Jet Fuel Contracts to IOTC.

121.    Harry and Mustafa were duly authorized agents and sole owners of IOTC, acting in the scope of their authority for IOTC, and thus, IOTC is responsible for their actions under principles of agency law and respondeat superior.

122.    Further, Harry and Mustafa are the mere instrumentalities and alter ego of IOTC, which was organized and employed to mislead and defraud creditors.

123.    Harry and Mustafa knew their actions would deprive Trigeant of substantial revenue it would have otherwise earned under the Jet Fuel Contracts.

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

124.    Harry and Mustafa's actions proximately caused Trigeant's damages resulting from this tortious interference with contract.

125.    In the course of performing the Jet Fuel Contracts, IOTC made profits of $212 million.  At a minimum, by Harry's under oath admissions in the Al-Saleh Fraud Case trial, Trigeant is entitled to $7 million for its loss on the first Jet Fuel Contract, plus the $11.00 per ton for any jet fuel sold.  Had Trigeant performed the Jet Fuel Contracts, and had Harry and Mustafa conducted themselves lawfully by not defrauding al-Saleh, Trigeant would have received 2/3 of this amount, being approximately $141 million, which sum Trigeant pleads as lost profits and special damages.

126.    Harry and Mustafa's conduct was at all times willful and wanton, demonstrated by the scope of the events pled above demonstrating the fraud committed upon Trigeant and their conduct, combined with the multi-year period in which they committed this ongoing fraud and overtly hid it from Trigeant and its family members.  Trigeant reserves the right to amend this claim to bring a count for punitive damages against Harry, Mustafa and IOTC for the conduct as pled herein.

WHEREFORE, Plaintiff Trigeant, Ltd. prays for judgment in its favor, jointly and severally against the defendants Harry Sargeant III, Mustafa Abu-Naba'a and IOTC for damages, lost profit special damages of approximately $141 million, costs of suit and all such other relief as the Court deems just and appropriate.

## COUNT IV
## CLAIM BY TRIGEANT AGAINST HARRY FOR BREACH OF FIDUCIARY DUTY

127.    Plaintiff realleges and incorporates paragraphs 1-62 and 86-93 above into this paragraph 127, as if fully stated herein.

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

128.     As Manager of Trigeant, Harry owed it common law fiduciary duties of good faith, fair dealing, full disclosure and loyalty.

129.     Harry breached his fiduciary duty to Trigeant by engaging in certain systematic and continuing self-serving actions, conflicts of interest, deliberate and malicious conduct and usurpation of corporate opportunities, all of which were intended to and did benefit himself and business entities such as IOTC of which he was the alter ego, all of such conduct was directly contrary to the interests of Trigeant.  Harry's breaches of fiduciary duty include, but are not limited to:

(a)     Misrepresenting or failing to disclose to Harry Sr. and Dan, critical facts about the Jet Fuel Contracts, including but not limited to: (i) that he had learned much from working on the first Jet Fuel Contract, as to how to make the business profitable and that he had a plan to do so, (ii) that he and Mustafa understood the profits from the future Jet Fuel Contracts would be enormous, especially since they were bringing Al-Saleh into the business to not only arrange with the Jordanian government the passage route guarantees needed to assure the approval of the DESC contract, but that this arrangement would virtually monopolize the Jet Fuel Contract business, (iii) that he had directed Mustafa to sign the aforementioned letter to DESC that transferred all of Trigeant's interest in the Jet Fuel Contracts to IOTC, and (iv) his promise to pay Trigeant its $7 million loss on the first Jet Fuel Contract, plus the $11.00 per ton of jet fuel sold, prior to BTB taking any profits.

(b)     effectively stealing multi-millions of dollars in asphalt from PDVSA leading to entry of PDVSA's First Arbitration Award against Trigeant in the amount of $17 million;

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

(c)      selling the aforementioned PDVSA asphalt and instead of paying PDVSA, investing the proceeds from the sale of the asphalt into Trigeant EP in the face of the then existing political turmoil in Venezuela surrounding PDVSA, which then lost $30 million and caused a $600,000 judgment to be entered against Trigeant EP and in favor of CSX;

(d)      fully mortgaging Trigeant's Corpus Christi property by obtaining a loan from AmCap to pay off the grossly mismanaged PDVSA First Arbitration Award, which led to a radically increased $35 million Second Arbitration Award against Trigeant;

(e)      refusing to negotiate in good faith a modification to the TARCO processing Agreement, which resulted in TARCO terminating the agreement and Trigeant losing all of its $21.6 million a year cash flow from the contract, which funds could and would have been used to pay either PDVSA or AmCap;

(f)      defrauding Sargeant Trading out of $4.9 million on Trigeant's asphalt purchase from TARCO;

(g)      fraudulently transferring the Corpus Christi refinery;

(h)      allowing a $4.1 million judgment to be entered against Trigeant, arising mostly out of the same TARCO transaction;

(i)      making no effort to resolve the PDVSA Second Arbitration Award, evidenced by the fact Harry paid none of it down with proceeds generated from the TARCO contract, or from other sources, including the substantial profits from the IOTC Jet Fuel Contracts;

(j)      in the time frame of 18 months after having engaged in fraud based conduct, having two fraud-based judgments entered against Harry that establishes a lack of moral

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

character and is violation of Harry's duty of good faith and fair dealing, involving approximately $60 million in claims.

(k)    By personally directing all of the actions complained of above in paragraphs 85 (a) through (k) and 86 through 89.

130.    The foregoing breaches of fiduciary duty were a systematic, continuing tort by Harry directed against Trigeant, which started with his aforementioned fraudulent conduct regarding the Jet Fuel Contracts, and were elucidated by and culminated in the Al-Saleh fraud judgment and the Fraudulent Transfer Judgment, and then continued non-stop and systematically to this day;

131.    As each of those cases were reduced to judgment, including the severe findings that Harry had committed fraud, they served to illuminate Harry Sr. and Dan (and therefore, Sargeant Trading and Trigeant), that Trigeant also had been victimized by Harry as described above.

132.    As a result of Harry's breaches of fiduciary duties, Trigeant has been damaged in the approximate amount of $200 million, comprising lost profits and other special damages such as reputational damage resulting from the extreme negative publicity suffered by Trigeant after the two judgments were entered.  At a minimum, by Harry's under oath admissions in the Al-Saleh Fraud Case trial, Trigeant is entitled to $7 million for its loss on the first Jet Fuel Contract, plus the $11.00 per ton for any jet fuel sold.  Further, Trigeant seeks a presently undetermined amount of other consequential damages to be determined from an accounting of other Trigeant profits earned but never paid to its members, including a reassessment of all funds paid or transferred by Trigeant to any source since its inception.

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

133.    Harry's conduct was at all times willful and wanton, demonstrated by the scope of the events pled above demonstrating his fraud committed upon Trigeant, combined with the multi-year period in which he committed this ongoing fraud and overtly hid it from Trigeant and Harry's family members.  Trigeant reserves the right to amend this claim to bring a count for punitive damages against Harry for the conduct as pled herein.

WHEREFORE, Plaintiff Trigeant, Ltd. prays for judgment in his favor and against the defendant Harry Sargeant III, for damages, costs of suit and all such other relief as the Court deems just and appropriate.

### COUNT V
### CLAIM BY TRIGEANT AGAINST MUSTAFA FOR
### <u>AIDING AND ABETTING BREACH OF FIDUCIARY</u>

134.    Plaintiff realleges and incorporates paragraphs 1-62 above into this paragraph 134, as if fully stated herein.

135.    At all times pertinent hereto, Mustafa knew that Harry was the Manager of Trigeant and that Harry owed Trigeant fiduciary duties.

136.    At all times pertinent hereto, Mustafa knew that: (a) the initial DESC Jet Fuel Contract was placed with and in the name of Trigeant, (b) Harry was misrepresenting facts about the Jet Fuel Contracts to Harry Sr. and Dan to defraud Trigeant and move and convert the Jet Fuel Contracts to Harry and Mustafa's jointly owned entity, IOTC.

137.    Mustafa rendered substantial assistance and encouragement to Harry in breaching his fiduciary duty owed to Trigeant by working with Harry to develop the plan to have IOTC take the Jet Fuel Contracts from Trigeant, exemplified by his executing a letter transferring Trigeant's interest in the Jet Fuel Contracts to IOTC.   Further, on information and belief,

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

Mustafa had actual knowledge and discussed with Harry and approved each of the items pled in paragraph 129(a) - (k).

138.    Mustafa knew that his substantial assistance and active participation in this scheme was expressly intended to assist Harry in breaching his fiduciary duty to Trigeant into not pursuing further its continued involvement with the Jet Fuel Contracts.

139.    Mustafa also knew that his actions would deprive Trigeant of substantial revenue it would have otherwise earned under the Jet Fuel Contracts had Harry not begun his pattern of abrogating his fiduciary duties to Trigeant for his and Mustafa's own benefit, that would inure to them as the alter egos of IOTC.

140.    Mustafa's substantial assistance provided individually and submitted through and to the benefit of IOTC, proximately caused Trigeant's damages resulting from this breach of fiduciary duty.

141.    In the course of performing the Jet Fuel Contracts, IOTC made profits of $212 million, which was filtered to Harry and Mustafa, as the alter egos of IOTC.  At a minimum, by Harry's under oath admissions in the Al-Saleh Fraud Case trial, Trigeant is entitled to $7 million for its loss on the first Jet Fuel Contract, plus the $11.00 per ton for any jet fuel sold.  Had Trigeant performed the Jet Fuel Contracts, and had Harry and Mustafa conducted themselves lawfully by not defrauding al-Saleh, Trigeant would have received 2/3 of this amount, being approximately $141 million, which sum Trigeant pleads as lost profits and special damages.

142.    Mustafa's conduct was at all times willful and wanton, demonstrated by the scope of the events pled above demonstrating the breach of fiduciary duty committed upon Trigeant, and his aiding and abetting conduct in assisting Harry.  Trigeant reserves the right to amend this claim to bring a count for punitive damages against Mustafa for the conduct as pled herein.

49

WHEREFORE, Plaintiff Trigeant Ltd. prays for judgment in his favor and against the defendant Mustafa Abu-Naba'a for damages, lost profit special damages of approximately $141 million, costs of suit and all such other relief as the Court deems just and appropriate.

<div align="center">

**COUNT VI**
**CLAIM BY TRIGEANT AGAINST KEVIN FOR**
**AIDING AND ABETTING BREACH OF FIDUCIARY**

</div>

143.    Plaintiff realleges and incorporates paragraphs 1-62 and 86-89 above into this paragraph 143, as if fully stated herein.

144.    Kevin is a Certified Public Accountant by trade, formerly employed by a well-known and respected South Florida based accounting firm. From the inception of his employment by a company or companies owned and controlled by Harry, Kevin served in a capacity as Harry's "right hand man" in numerous, if not all of Harry's business interests, but especially those dealing with the distribution or sale of asphalt, including the Refinery. Given this experience, Kevin typically performed the functions of a Chief Financial Officer or Chief Operating Officer.

145.    From the time of his hiring in 2006, Kevin knew that Harry was the Manager of Trigeant and that Harry owed Trigeant fiduciary duties. Indeed, Kevin worked specifically on Trigeant matters, including the Refinery, under Harry's direction.

146.    Kevin also knew that Harry was Manager of Sargeant Trading and that Harry owed Sargeant Trading fiduciary duties. Kevin worked on Sargeant Trading matters under Harry's direction.

147.    Further, from the time of his hiring, Kevin also knew that: (a) the initial DESC Jet Fuel Contract was placed with and in the name of Trigeant, (b) Harry had misrepresented facts about the Jet Fuel Contracts to Harry Sr. and Dan to defraud Trigeant, and (c) that Harry had

<div align="center">50</div>

promised to pay the $7 million and $11.00 per ton Jet Fuel Payment Inducements. Notwithstanding these facts, Kevin provided substantial assistance in moving and converting the Jet Fuel Contracts to Harry and Mustafa's jointly owned entity, IOTC.

148.    Moreover, Kevin was also responsible for moving IOTC funds to different entities owned or controlled by Harry, including but not limited to BTB. Kevin further directed or assisted in creating new entities for Harry, including but not limited to BTB, the capitalization of which originated either from IOTC funds, or from ventures that Harry remained involved in with other Sargeant family members.

149.    Kevin rendered substantial assistance and encouragement to Harry in breaching his fiduciary duty owed to Trigeant by working with Harry to develop the plan to have IOTC convert the Jet Fuel Contracts from Trigeant, and further, since Kevin handled IOTC's finances, by not making Jet Fuel Payment Inducements to Trigeant.

150.    From the commencement of his employ, Kevin knew that his substantial assistance and active participation in this scheme was expressly enabling Harry to breach his fiduciary duty to Trigeant, with respect to the Jet Fuel Contracts and all other actions Harry took to damage Trigeant as pled herein.

151.    Kevin also knew that his actions would deprive Trigeant of substantial revenue it would have otherwise earned under the Jet Fuel Contracts had Harry not begun his pattern of abrogating his fiduciary duties to Trigeant for his own benefit.

152.    Kevin's substantial assistance to Harry, provided both personally and through his defacto position(s) with and for the benefit of IOTC, proximately caused Trigeant's damages resulting from Harry's breach of fiduciary duty.

BERGER SINGERMAN
attorneys at law

Boca Raton    Fort Lauderdale    Miami    Tallahassee

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

153. Kevin also substantially assisted Harry in the acts giving rise to the Fraudulent Transfer Case, which led to the alleged liability that Trigeant owes BTB for the debt related to the AmCap transaction. As pled above, that transaction occurred only because Harry, Mustafa and Kevin all participated in converting the Jet Fuel Contracts from Trigeant to IOTC, followed by IOTC further not paying the Jet Fuel Payment Inducements, then later resulting in both BTB's formation and AmCap's debt being paid off with Jet Fuel Contract payment funds, all of which should have been paid to Trigeant, had the original fraud in the inducement against Trigeant not occurred.

154. Further, Kevin was directly involved in orchestrating numerous failed transactions also pled above, that caused damage to either Trigeant or Sargeant Trading, including (a) defrauding Sargeant Trading out of $4.9 million on Trigeant's asphalt purchase from TARCO; (b) fraudulently transferring the Corpus Christi refinery; (c) allowing a $4.1 million judgment to be entered against Trigeant, arising mostly out of the same TARCO transaction.

155. In the course of performing the Jet Fuel Contracts, IOTC made profits of $212 million, which was filtered to Harry and Mustafa, as the alter egos of IOTC. At a minimum, by Harry's under oath admissions in the Al-Saleh Fraud Case trial, Trigeant is entitled to $7 million for its loss on the first Jet Fuel Contract, plus the $11.00 per ton for any jet fuel sold. Had Trigeant performed the Jet Fuel Contracts, and had Harry and Mustafa conducted themselves lawfully by not defrauding al-Saleh, Trigeant would have received 2/3 of this amount, being approximately $141 million, which sum Trigeant pleads as lost profits and special damages. This damage is exclusive of the Jet Fuel Payment Inducements.

156. Kevin's conduct was at all times willful and wanton, demonstrated by the scope of the events pled above demonstrating the breach of fiduciary duty committed upon Trigeant,

BERGER SINGERMAN
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

and his aiding and abetting conduct in assisting Harry. Trigeant reserves the right to amend this claim to bring a count for punitive damages against Kirkeide for the conduct as pled herein.

WHEREFORE, Plaintiff Trigeant Ltd. prays for judgment in his favor and against the defendant Kevin Kirkeide for damages, lost profit special damages of approximately $141 million, costs of suit and all such other relief as the Court deems just and appropriate.

<div align="center">

**COUNT VII**
**CLAIM BY TRIGEANT ENTITIES FOR DECLARATORY RELIEF**
**AGAINST BTB TO NULLIFY AMCAP AND BTB LOAN DOCUMENTS**

</div>

157.    Plaintiff realleges and incorporates paragraphs 1-50, 56-64 and 82-93 above into this paragraph 157, as if fully stated herein.

158.    In conjunction with Trigeant borrowing the $22 million from AmCap, it along with Trigeant Holdings, LLC and Trigeant Holdings, Ltd. executed various agreements in addition to a Promissory Note, a Deed of Trust on the Refinery, and various pledges of stock or interests in the foregoing Trigeant entities (collectively, the "AmCap Loan Agreements.")

159.    By early December 2007, after Trigeant was in default on its loan obligations to AmCap and Harry had formed BTB, Harry brought the idea of a note purchase to AmCap. BTB requested that the foreclosure sale be held on January 1, 2008 because Harry believed there would be less chance of bidders that day. AmCap was only concerned about recouping its investment. It had no interest in maximizing the sale of the Refinery and because it had a guaranteed buyer, AmCap agreed to hold the sale on January 1, 2008.

160.    Given the possibility that AmCap might be outbid at the public auction, BTB's strategy changed from purchasing the Refinery, to purchasing the loan and lien from AmCap. By substituting itself as the foreclosing creditor, BTB believed it would have more control over the foreclosure process and the outcome of the sale. In early December 2007, BTB brought the

<div align="center">53</div>

idea of a note purchase to AmCap. AmCap felt that this was the cleanest way for it to get paid, so it agreed to the change in plan.  BTB and AmCap then negotiated an Assignment and Acceptance Agreement through which AmCap would transfer the loan and lien to BTB.  On December 28, 2007, BTB and AmCap executed an Assignment and Acceptance Agreement and BTB paid AmCap $21,828,446.65, which represented the outstanding balance on the note.

161.   BTB was formed only weeks before it purchased the AmCap debt and at the time of formation, BTB had no pre-existing capital, ongoing business, banking relationships or any other legitimate source of funds.  Given these circumstances, Harry, who was the alter ego of both IOTC and BTB, took $21,828,446.65 of IOTC funds, which were profits directly gained from the IOTC Jet Fuel Contract, to buy the AmCap debt. Thus, given Harry's foregoing stated trial admissions in the Al-Saleh Fraud Case about the Jet Fuel Payment Inducements owed to Trigeant, the funds used to pay off AmCap were undeniably owed to and stolen from Trigeant, as directed by Harry, with the assistance of Kevin, and came directly from Jet Fuel Contract profits. In other words, Trigeant's money was converted by Harry and BTB to buy the AmCap Loan Agreements.

162.   In December 2007 and January 2008, however, Harry, Sr., Dan and Trigeant did not understand that to be the case.   Instead, they believed that Trigeant was tied into two arms-length transactions, being: (i) Harry's handling of the Trigeant/AmCap default and purchase of the AmCap Loan Agreements by BTB, and (ii)  a new set of loan documents executed between BTB and Trigeant, since BTB's purchase of all AmCap Loan Documents made BTB the lender to Trigeant  ("BTB Loan Agreements").  Or, in other words again, IOTC, Harry and BTB stole Trigeant's Jet Fuel Profits to buy the AmCap Loan Agreements for the benefit of BTB, who then became Trigeant's lender on its own stolen money.

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

163.    Further, among the AmCap Loan Agreements and BTB Loan Agreements are a series of Pledge Agreements that provide for the transfer of stock holding interests of Sargeant family members in all of the plaintiff Trigeant entities, to the holder of the BTB Loan Agreements, upon the event of a default on the underlying note.  Indeed, there was a default under the note, which is, of course, what gave rise to BTB buying the AmCap Loan Agreements and then the resulting Fraudulent Transfer Case judgment.   Yet again, in other words, BTB, the bad faith and knowing participant in and beneficiary of Trigeant's stolen funds, who gave no consideration to IOTC for the $21,828,446.65 it used to pay off and acquire the AmCap debt now stands to: (a) collect on a fraudulently obtained note, (b) foreclose on the Refinery, which has already once been conclusively deemed the subject of a fraudulent transfer, (c) take over Trigeant by reason of potential exercise of its stock pledge rights, and (d) attempt to take all of this action notwithstanding Harry's under oath admissions in the Al-Saleh fraud trial that he owes Trigeant the $11.00 per ton Jet Fuel Payment Inducements, which alone exceed the amount that BTB and Harry claim Trigeant owes for payment on the AmCap debt.

164.    Predicated upon the foregoing facts, it would be inequitable for any of the AmCap Loan Agreements or BTB Loan Agreements to be presently enforceable, and indeed, ultimately, after a full trial on the merits, they should all be declared null and void because:

(a)    All such agreements were procured as a result of now *two* fraudulent conveyances by BTB, made possible only because Harry, through his two alter ego entities IOTC and BTB, stole Trigeant's share of the Jet Fuel Contract profits;

(b)    Harry was Manager of Trigeant and Trigeant Holdings LLC at the time of the default with AmCap, which he created and controlled in order to illegally take over the Refinery for his own purposes;

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

(c)     As described herein, Trigeant has affirmative damage claims against BTB, IOTC and Harry, each of which far exceed the approximate $22 million in debt BTB asserts is owed to it by Trigeant;

(d)     Notwithstanding, the present fair market value of the Refinery far exceeds the debt on the outstanding note;

(e)     Even if BTB was to prevail on the merits of its claims against Trigeant at trial, BTB is in a first lien position on the Refinery and would get paid in full including its accrued interest, at that point in time; and

(f)     Finally, it would be inequitable to enforce the foregoing agreements against any of the Trigeant plaintiffs since Harry, by his admission, agreed that Trigeant was to be paid its $7 million plus the $11.00 per ton of jet fuel before BTB would take any profits, which was effectively a subordination of Jet Fuel Contract payment rights by BTB in favor of Trigeant.

165.    The proof that the foregoing acts were committed in bad faith is established by BTB alleged status whereby it claims to be a lender to Trigeant.   Lenders acting in good faith have a goal of getting their debt paid and maintaining the value of their collateral.  Commercially reasonable lenders do not take measures that impede a borrower's ability to pay the outstanding debt, or to diminish the value of their collateral.  Every act taken by BTB in paragraph 164 was not commercially reasonable and was expressly intended by BTB to damage Trigeant.

166.    Harry's overt statements about ruining the Sargeant family related businesses including Trigeant, and his ongoing and continuing pattern of detrimental conduct against Sargeant family interests including Trigeant, are relevant to this Count brought in equity, as they demonstrate lack of clean hands by Harry and BTB.

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

167.     There is a bona fide, actual, present practical need for declaration as to the present controversy as to the matters pled herein related to enforcement of the AmCap Loan Documents and BTB Loan Documents.  The rights of all Trigeant plaintiffs are dependent upon the facts as alleged and related law.  The Trigeant plaintiffs have an actual interest in this matter and BTB is adverse to that interest and both parties are properly before this Court.  The Trigeant plaintiffs are not seeking relief in the form of legal advice.

WHEREFORE, Trigeant, Ltd., Trigeant Holdings, LLC and Trigeant Holdings, Ltd. seek (a) a declaratory judgment deeming the AmCap Loan Documents and the BTB Loan Documents null and void, and/or (b) that prior to attempted enforcement by BTB of the AmCap Loan Documents and the BTB Loan Documents, that Trigeant be entitled to establish its set off rights for damages suffered by Trigeant as pled above, and (c) granting all such other relief as the Court deems just and appropriate.

### COUNT VIII
### CLAIM BY TRIGEANT AGAINST BTB FOR BREACH OF DUTY OF GOOD FAITH

168.     Trigeant realleges and incorporates paragraphs 1-50, 56-64 and 82-93 above into this paragraph 168, as if fully stated herein.

169.     As pled in Count VII above, Trigeant seeks declaratory relief against BTB for its illegal actions to nullify the AmCap and BTB loan obligations.  This Count seeks damages against BTB for its conduct which occurred while BTB was (a) allegedly a lender to Trigeant arising out of the AmCap transaction and (b) a tenant of Trigeant's at the Refinery.

170.     Indeed, prior to and during the pendency of the appeal in the Fraudulent Transfer Case and during a recent Chapter 11 bankruptcy proceeding filed by Trigeant which has since been dismissed; Harry, Kirkeide and BTB engaged in a systematic, bad faith course of conduct deliberately intended to permanently damage and destroy Trigeant, consistent with Harry's

57

openly stated pledge to do just that.  During this time period, BTB was a tenant of Trigeant's at the Refinery, given that Trigeant was (and dispositively still is) owner of the Refinery.   Further, technically, BTB also was a lender to Trigeant.   Accordingly, both of these relationships imposed duties upon BTB to act in good faith towards Trigeant, notwithstanding the fiduciary duties imposed upon Harry as Manager of Trigeant, until his involuntary removal from that position.

171.   Harry and Kirkeide, acting on behalf of BTB, engaged in numerous bad faith acts intended to damage Trigeant by both destroying the value of the Refinery and Trigeant's ability to operate the Refinery, the result of which was to assure Trigeant's inability to service the alleged debt owed to BTB arising out of the AmCap transaction.  These acts include, but are not limited to:

(a)   Failing to conduct routine maintenance at the Refinery, allowing it to fall into great disrepair, diminishing the Refinery's value and creating a large expense for Trigeant to perform necessary repairs.

(b)   Intentionally failing to pay BTB trade creditors who believed that Trigeant and BTB were effectively one and the same party, thus making it difficult to reestablish trade creditor business connections.

(c)   Landing the roofs on the asphalt tanks, contrary to standard practice in the oil industry, knowing that doing so would create for Trigeant both an environmental problem and a material cost issue related to subsequent cleaning and refilling of the tanks.

(d)   Converting proceeds from an agreement with Freepoint, in violation of a federal court order, and then not only failing to pay required Refinery obligations with those proceeds, but also leaving Trigeant without its funds to pay these expenses.

BERGER SINGERMAN
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

(e)     Notwithstanding certain BTB lien rights, BTB removed all mechanical type personalty from the Refinery to prevent Trigeant from using or renting such property, although BTB had absolutely no use for the personalty, and indeed never did use it after its removal from the Refinery.

(f)     Notwithstanding certain BTB lien rights, BTB removed all Refinery related industry, regulatory and environmental records to prevent Trigeant from using or having access to such records, although BTB had absolutely no use for the records and could never use them for any business purpose outside of Refinery operations.

(g)     Intentionally leaving behind at the Refinery hazardous waste sludge, so that Trigeant would have to deal with its clean up.

(h)     After BTB vacated the Refinery, it prohibited Trigeant from utilizing the dock at the premises, which was necessary and essential for the conduct of Trigeant business, including BTB using intimidation by hiring armed guards who threatened Trigeant employees.

(i)      Attempting to sabotage transactions Trigeant was working on by going directly to parties that Trigeant was developing relationships with.

(j)     Refusing to sign perfunctory permits and applications to enable Trigeant to operate the Refinery.

172.    The proof that the foregoing acts were committed in bad faith is established by BTB alleged status whereby it claims to be a lender to Trigeant.   Lenders acting in good faith have a goal of getting their debt paid and maintaining the value of their collateral.  Commercially reasonable lenders do not take measures that impede a borrower's ability to pay the outstanding debt, or to diminish the value of their collateral.  Every act taken by BTB in paragraph 169 was not commercially reasonable and was expressly intended by BTB to damage Trigeant.

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

173.    Harry's overt statements about ruining the Sargeant family related businesses and his ongoing and continuing pattern of detrimental conduct against Sargeant family interests including Trigeant, are relevant to a punitive damage award against BTB, given that at all relevant times, Harry was the alter ego of BTB and Kirkeide was BTB's authorized agent. Trigeant reserves the right to amend this complaint to bring a punitive damage claim.

174.    Further, on information and belief, BTB has already transferred assets to new entities to keep them out of reach from Trigeant and other creditors.  Trigeant reserves the right to pursue all such fraudulent transfer claims against all culpable parties.

WHEREFORE, Plaintiff Trigeant Ltd. prays for judgment in his favor and against the defendant BTB Corp for damages, lost profit special damages, costs of suit and all such other relief as the Court deems just and appropriate.

## COUNT IX
## CLAIM BY TRIGEANT FOR EQUITABLE LIEN ON IOTC AND BTB ASSETS, AND HARRY'S AND MUSTAFA'S OWNERSHIP INTEREST IN BTB

175.    Trigeant realleges and incorporates paragraphs 1-50, 56-64 and 82-93 above above into this paragraph 175, as if fully stated herein.

176.    IOTC was formed solely for the purpose of defrauding Trigeant, as pled in detail above.

177.    BTB was formed and capitalized by profits obtained through the Jet Fuel Contracts, a significant portion of which were clearly specially earmarked and designated funds for the benefit of Trigeant.

178.    In conspiracy, Harry and Mustafa orchestrated the foregoing fraud against Trigeant on the Jet Fuel Contracts, and became LLC owner/members of IOTC through the commission of their fraud, and as a result, they profited greatly to the detriment of Trigeant.

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

179.     Subsequently, when Harry formed BTB with Mustafa, proceeds directly traceable from IOTC and the Jet Fuel Contracts were used to pay off the AmCap loans.

180.     Neither IOTC nor BTB had any business derived legally, and both entities existed purely due to the illegal acts of Harry and Mustafa.  The fraudulently induced Jet Fuel Contracts were IOTC's source of revenue and business operation.  The organization of BTB and its intended operation of the Refinery, was funded directly from the proceeds IOTC derived from the Jet Fuel Contracts and was formed specifically to orchestrate a fraudulent transfer, as a matter of law.   BTB had no other business.

181.     Given that there is a clear tracing of Trigeant money that caused the creation and existence of both IOTC and BTB, Trigeant should be granted an equitable lien on all assets of IOTC and BTB.

182.     Further, given that Harry and Mustafa in conspiracy orchestrated the fraud against Trigeant as to the Jet Fuel Contracts that gave rise to IOTC and BTB, Trigeant also asserts an equitable lien on any ownership interests that Harry and Mustafa may each own in IOTC and BTB.

WHEREFORE, Trigeant prays this Court grant it an equitable lien (i) on all assets of IOTC and BTB and (ii) on any ownership interests that Harry and Mustafa may each own in IOTC and BTB, and (iii) all such other relief as this court deems just and appropriate.

## COUNT X
## CLAIM BY SARGEANT TRADING AGAINST
## HARRY FOR TORTIOUS INTERFERENCE WITH
## ADVANTAGEOUS BUSINESS RELATIONSHIPS

183.     Trigeant realleges and incorporates paragraphs 1-29, 51-56, 69-71, 76-85 above into this paragraph 183, as if fully stated herein.

61

184.    As a former Manager of Sargeant Trading Harry had actual knowledge of numerous business relationships established in favor of and with Sargeant Trading.

185.    Harry intentionally and unjustifiably interfered with the following business relationships by committing the following acts, all of which were intended to cause damage to Sargeant Trading:

(a)    In the spring through fall of 2010, Harry solely and exclusively manipulated a transaction using his alter ego entity, BTB, to take possession of $5.2 million of Sargeant Trading's asphalt, with no intention of paying for it.  Indeed, BTB or another entity controlled by Harry then sold the asphalt, but never tendered any proceeds from the sale to Sargeant Trading (just as they had done to PDVSA and TARCO), evidencing Harry's pattern and intent to fraudulently convert the Sargeant Trading asphalt and resulting proceeds to their exclusive benefit and control.  At the trial on the Fraudulent Transfer Case, Harry's right hand employee, Kevin Kirkeide, even admitted under oath that BTB owed Sargeant Trading the $5.2 million.

(b)    As to the above referenced IOTC Asphalt, LLC and BTB transaction located in Puerto Rico, at a point where Harry was already facing his serious personal cash flow crisis, Harry closed the transaction selling IOTC's stock knowing that Sargeant Trading had significant business relationships in the Caribbean, and having access to the terminal sold was critical to Sargeant Trading's business plan.

(c)    By not only failing to cause IOTC to pay ABN its substantial loan, but directly advising ABN that he would not pay it, knowing the importance of Sargeant Trading's banking relationship with ABN, and that his failure to pay the IOTC loan would cause repercussions to Sargeant Trading, including termination of its banking relationship.

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

(d)    Breaching the Odfjell contract, either having actual knowledge or reason to know that Sargent Trading would be sued, and that adverse publicity to Sargeant Trading would result, even though the liability to Odjfell arose solely from his own misconduct.

(e)    Sending to Santander Bank copies of his new lawsuits in an effort to get the bank to cease doing business with Sargeant Trading and to not fund a letter of credit for a transaction that was in process.  In fact, for a short period of time, Harry's ploy worked and it cost Sargeant Trading $150,000 in related costs.

(f)    Sending a defamatory letter and/or telephoning numerous attorneys that Sargeant Trading had utilized, including at least: (i) Blank Rome, (ii) Random and (iii) Clyde & Co. in London, also enclosing copies of his lawsuits or describing those lawsuits with the intent of providing innuendo that the Sargeant Trading was involved in fraudulent conduct.

186.    Harry knew that his actions would damage Sargeant Trading. Harry's actions described above proximately caused Sargeant Trading's damages resulting from this tortious interference.

187.    Sargeant Trading asserts that it suffered lost profits that it claims as special damages related to Harry's misconduct, cited above.

188.    Harry's conduct was at all times willful and wanton, demonstrated by the scope of the events pled above. Sargeant Trading reserves the right to amend this claim to bring a count for punitive damages against Harry for the conduct as pled herein.

WHEREFORE, Plaintiff Sargeant Trading prays for judgment in his favor and against the defendant Harry Sargeant III for damages, lost profit special damages, costs of suit and all such other relief as the Court deems just and appropriate.

63

## COUNT XI
## CLAIM BY SARGEANT TRADING AGAINST HARRY
## FOR BREACH OF FIDUCIARY DUTY

189.    Plaintiff realleges and incorporates paragraphs 1-29, 51-56, 69-71, 76-85 above above into this paragraph 189, as if fully stated herein.

190.    As its Manager, Harry owed Sargeant Trading common law fiduciary duties of good faith, fair dealing, full disclosure and loyalty.

191.    Harry breached his fiduciary duty to Sargeant Trading by engaging in certain systematic and continuing self-serving actions, conflicts of interest, deliberate and malicious conduct and usurpation of corporate opportunities, all of which were intended to and did benefit himself and business entities such as IOTC, of which he was the alter ego, and were directly contrary to the interests of Sargeant Trading.  Harry's breaches of fiduciary duty include, but are not limited to:

(a) In the spring through fall of 2010, Harry solely and exclusively manipulated a transaction using his alter ego entity, BTB, to take possession of $5.2 million of Sargeant Trading's asphalt, with no intention of paying for it.  Indeed, BTB or another entity controlled by Harry then sold the asphalt, but never tendered any proceeds from the sale to Sargeant Trading (just as they had done to PDVSA and TARCO), evidencing Harry's pattern and intent to fraudulently convert the Sargeant Trading asphalt and resulting proceeds to their exclusive benefit and control.  At the trial on the Fraudulent Transfer Case, Harry's right hand employee, Kevin Kirkeide, even admitted under oath that BTB owed Sargeant Trading the $5.2 million.

(b)    As to the above referenced IOTC Asphalt, LLC and BTB transaction located in Puerto Rico, at a point where Harry was already facing his serious personal cash flow crisis, Harry closed the transaction selling IOTC's stock knowing that Sargeant Trading had significant

64

business relationships in the Caribbean, and having access to the terminal sold was critical to Sargeant Trading's business plan.

(c)     By not only failing to cause IOTC to pay ABN its substantial loan, but directly advising ABN that he would not pay it, knowing the importance of Sargeant Trading's banking relationship with ABN, and that his failure to pay the IOTC loan would cause repercussions to Sargeant Trading, including termination of its banking relationship.

(d)     Breaching the Odfjell contract, either having actual knowledge or reason to know that Sargent Trading would be sued and that adverse publicity to Sargeant Trading would result, even though the liability to Odjfell arose solely from his own misconduct.

(e)     Sending a defamatory letter to Santander Bank with copies of his new lawsuits in an effort to get the bank to cease doing business with Sargeant Trading and to not fund a letter of credit for a transaction that was in process.  In fact, for a short period of time, Harry's ploy worked and it cost Sargeant Trading $150,000 in related costs.

(f)     Sending a defamatory letter and/or telephoning numerous attorneys that Sargeant Trading had utilized, including at least: (i) Blank Rome, (ii) Random and (iii) Clyde & Co. in London, also enclosing copies of his lawsuits or describing those lawsuits with the intent of providing innuendo that the Sargeant Trading was involved in fraudulent conduct.

(g)     Engaging in the conduct that led to entry of the Al-Saleh Judgment and the Fraudulent Transfer Judgment while serving as Manager of Sargeant Trading, which also led to extreme adverse publicity to Sargeant Trading that damaged its reputation.

192.     The foregoing breaches of fiduciary duty were a systematic, continuing tort by Harry directed against Sargeant Trading.

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

193.     As a result of Harry's breaches of fiduciary duties, Sargeant Trading has suffered actual damage in addition to special damages, comprising lost profits and other special damages such as reputational damage resulting from the extreme negative publicity suffered by Sargeant Trading.

194.     Harry's conduct was at all times willful and wanton, demonstrated by the scope of the events pled above committed against Sargeant Trading, combined with the multi-year period in which he committed this ongoing pattern of tortious conduct.  Sargeant Trading reserves the right to amend this claim to bring a count for punitive damages against Harry for the conduct as pled herein.

WHEREFORE, Plaintiff Sargeant Trading Ltd. prays for judgment in its favor and against the defendant Harry Sargeant III, for damages, special damages, costs of suit and all such other relief as the Court deems just and appropriate.

## COUNT XII
## CLAIM BY LAIL AGAINST HARRY
## FOR BREACH OF FIDUCIARY DUTY

195.     Plaintiff realleges and incorporates paragraphs 1-29, 51-56, 69-71, 76-85 above into this paragraph 141, as if fully stated herein.

196.     As Managing Director of LAIL, Harry owed it common law fiduciary duties of good faith, fair dealing, full disclosure and loyalty.

197.     As Shareholder of LAIL, Harry owed it common law fiduciary duties of good faith, fair dealing, full disclosure and loyalty.

198.     Harry breached his fiduciary duties to LAIL by engaging in certain systematic and continuing self-serving actions, conflicts of interest, deliberate and malicious conduct and usurpation of corporate opportunities, all of which were intended to and did benefit himself and

BERGER SINGERMAN
attorneys at law

Boca Raton    Fort Lauderdale    Miami    Tallahassee

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

were directly contrary to the interests of LAIL. Harry's breaches of fiduciary duty include, but are not limited to:

(a) Causing LAIL to transfer approximately $4 million out of its bank account to the bank account of another Sargeant family owned business, Trigeant Holdings, LLC ("Holdings"), the parent company of Trigeant. Harry also served as the Manager of Holdings and caused the LAIL transfer to be recorded on the books of Holdings as an intercompany loan from LAIL. However, literally, the next day, Harry diverted the funds, sending (a) $2.5 million as a down payment on a Bombardier jet, which he subsequently walked away from, losing the money, and (b) $1.5 million which he put into his foregoing referenced failed ethanol business.

(b) In an effort to prevent a sale and finance transaction regarding the Asphalt Carrier ship owned by LAIL, and notwithstanding that Harry previously knew about and approved the structure of the transaction, Harry attempted to disrupt the deal first by sending to DVB Bank copies of his Palm Beach County lawsuits. Second, when that effort appeared to fail, Harry filed a lawsuit against LAIL that sought an injunction in the Isle of Man. Ultimately, at the hearing on the motion for injunctive relief, he withdrew the motion and dismissed the case when the Court openly criticized Harry's tactics. Harry's efforts, however, did impact the funding of letter of credit transactions that were in process, which resulted in and proximately caused Sargeant Trading $150,000 in extra bank charges.

199. As a result of Harry's breaches of fiduciary duties, LAIL has suffered actual damage in addition to special damages, such as reputational damage resulting from the extreme negative publicity suffered by LAIL related to Harry's improper conduct.

200. Harry's conduct was at all times willful and wanton, demonstrated by the scope of the events pled above, combined with the multi-year period in which he committed this ongoing

**BERGER SINGERMAN**
attorneys at law

*Boca Raton    Fort Lauderdale    Miami    Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301  Telephone 954-525-9900  Facsimile 954-523-2872

pattern of tortious conduct. LAIL reserves the right to amend this claim to bring a count for

punitive damages against Harry for the conduct as pled herein.

      WHEREFORE, Plaintiff LAIL prays for judgment in its favor and against the defendant

Harry Sargeant III, for damages, special damages, costs of suit and all such other relief as the

Court deems just and appropriate.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL CAUSES OF ACTION.**

Dated this 15th day of July, 2014.

                              BERGER SINGERMAN LLP
                              Attorneys for Plaintiff
                              350 East Las Olas Boulevard, 10th Floor
                              Fort Lauderdale, Florida 33301
                              Main: (954) 525-9900
                              Facsimile: (954) 523-2872

                              By:    s/ Charles H. Lichtman
                                    Charles H. Lichtman
                                    Florida Bar No. 501050
                                    Direct Line (954) 712-5138
                                    CLichtman@bergersingerman.com
                                    Jeffrey S. Wertman
                                    Florida Bar No. 0003093
                                    Direct Line (954) 712-5137
                                    jwertman@bergersingerman.com
                                    Isaac M. Marcushamer
                                    Florida Bar No. 60373
                                    Direct Line (305) 714-4376
                                    imarcushamer@bergersingerman.com

5774810-1

**BERGER SINGERMAN**
attorneys at law

*Boca Raton   Fort Lauderdale   Miami   Tallahassee*

350 East Las Olas Boulevard, Suite 1000 Fort Lauderdale, Florida 33301 Telephone 954-525-9900 Facsimile 954-523-2872

# **EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| PDVSA PETROLEO S.A., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-09-38 |
| | § | |
| TRIGEANT, LTD., *et al*, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This suit arose out of the transfer of an asphalt refinery located in Corpus Christi, Texas from Defendant Trigeant, Ltd. to Defendant BTB Refining, LLC. (BTB) through a foreclosure sale on March 4, 2008. Plaintiff alleges that the transfer was constructively and actually fraudulent under the Texas Uniform Fraudulent Transfer Act (TUFTA). This cause proceeded to a bench trial, which concluded on May 21, 2012. Pursuant to FED. R. CIV. P. 52(a), after hearing all the evidence, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### A.   Parties

1.   Plaintiff PDVSA Petroleo S.A. is a business entity formed and existing under the laws of the Bolivarian Republic of Venezuela, with its principal place of business in Caracas, Venezuela. Its principal business activities include producing, supplying, and selling crude oil and other petroleum products around the world.

2.   Trigeant, Ltd. is a limited partnership. It has a single general partner, Trigeant, LLC. Steve Roos served as the manager of Trigeant, LLC and was also in charge of operations at Trigeant, Ltd.'s Corpus Christi refinery.

3.    From March 6, 2007 through April 13, 2008, Trigeant Holdings, Ltd. owned 98.9% of Trigeant, LLC. Trigeant Holdings, Ltd. was 99% owned by Harry Sargeant, III, James Sargeant, Daniel Sargeant, and Harry Sargeant, II.

4.    Trigeant Holdings, LLC was the general partner of, and therefore, in control of Trigeant Holdings, Ltd. Harry Sargeant, III was the manager of Trigeant Holdings, LLC.

5.    From March 6, 2007 through April 13, 2008, Harry Sargeant, III, Daniel Sargeant, and Harry Sargeant, II each owned 29.25% of Trigeant Holdings, LLC and James Sargeant owned 12.25%.

6.    BTB was formed on December 10, 2007. Harry Sargeant, III is the 100% owner and sole member of BTB. Harry Sargeant, III exercises exclusive control over BTB.

**B.    First and Second Arbitration Proceedings**

7.    In December 2002, Plaintiff and Trigeant, Ltd. entered into a Supply Agreement for the supply of crude oil to Trigeant, Ltd.'s Corpus Christi refinery.

8.    Soon after, the Supply Agreement was suspended when a strike in Venezuela caused Plaintiff to invoke the agreement's force majeure clause.

9.    During the period of time when the Supply Agreement's force majeure clause was invoked, Plaintiff sold Trigeant, Ltd. three shipments of crude oil on the spot market. In other words, the shipments of crude were not purchased pursuant to the Supply Agreement, but through an open commodities exchange.

10.    In April 2003, a dispute arose between the parties over the price to be paid for shipments of crude purchased under the Supply Agreement.

11.    On September 10, 2004, Plaintiff initiated arbitration proceedings against Trigeant, Ltd. (First Arbitration Proceedings) pursuant to the terms of the Supply Agreement.

12.    On March 10, 2006, Plaintiff obtained an arbitration award (First Arbitration Award) against Trigeant, Ltd. for approximately $17 million. This First Arbitration Award resolved the parties' dispute with regard to the shipments of crude purchased pursuant to the Supply Agreement.

13.    Disputes remained, however, with regard to the three shipments of crude oil

purchased from Plaintiff on the spot market. Plaintiff demanded payment for the shipments, and Trigeant, Ltd. claimed Plaintiff had committed antitrust violations.

14. On August 29, 2007, Plaintiff initiated the Second Arbitration Proceedings against Trigeant, Ltd.

15. On August 24, 2008, Plaintiff obtained a Second Arbitration Award against Trigeant, Ltd. for approximately $35 million. (P47.) As of April 2012, the total amount owed by Trigeant, Ltd. on the Second Arbitration Award, including interest and costs, was approximately $47 million.

## C.   AmCap Loan

16. In the Fall of 2006, Trigeant, Ltd. utilized a mortgage broker, Blossom Street Capital, to find potential financing sources for an asset-backed loan which could be secured by a mortgage on its refinery.

17. In December 2006, American Capital Financial Services, Inc. (AmCap) agreed to loan Trigeant, Ltd. $22 million in exchange for a lien on substantially all of Trigeant Ltd.'s assets, including a deed of trust on the refinery. (D12.)

18. The refinery constituted Trigeant Ltd.'s primary asset.

19. At this time, AmCap determined that the refinery alone had a liquidation value of $30 million. AmCap believed the refinery and its assets were worth considerably more if properly marketed and sold at fair market value; however, if the refinery had to be foreclosed upon and sold at public auction, as a whole or in pieces, AmCap felt it could easily obtain $30 million.

20. On December 15, 2006, Trigeant, Ltd. and AmCap signed a Credit Agreement memorializing the terms of the loan. (D13.)

21. Trigeant, Ltd. was solvent at the time it executed the Credit Agreement, and the Credit Agreement did not cause it to become insolvent.

22. The AmCap lien and deed of trust on the refinery was effective against the holder of any judicial lien subsequently obtained against Trigeant, Ltd.

23. The proceeds from the loan helped Trigeant, Ltd. finance its payment of the First Arbitration Award, and on December 29, 2006, Trigeant, Ltd. paid Plaintiff $17,204,573 in full satisfaction of the First Arbitration Award.

24. Trigeant, Ltd. and Plaintiff signed a Release and Satisfaction with regard to the First Arbitration Award. (D25.)

**D. Trigeant, Ltd.'s Default on the AmCap Loan**

25. On May 19, 2006, prior to entering into the AmCap loan agreement, Trigeant, Ltd. executed a Processing Agreement with Texas Asphalt Refining Company (TARCO).

26. The Processing Agreement required that TARCO pay a fixed per barrel rate for processing crude at the refinery, and it required a minimum monthly quota which had to be paid regardless of whether any crude oil was processed. This "take or pay" arrangement guaranteed Trigeant, Ltd. minimum annual revenue of $21.6 million.

27. The TARCO Processing Agreement expired in May 2007.

28. Trigeant, Ltd. continued to process crude for TARCO pursuant to the Processing Agreement and sought an extension of the agreement. However, in the Fall of 2007, TARCO indicated that it would not renew the Processing Agreement because market forces had driven down profit margins to unacceptable levels. There were also allegations that Trigeant, Ltd. soured the relationship by attempting to charge TARCO for capital improvements at the refinery. At this point, Trigeant, Ltd. no longer had a secured revenue stream.

29. As of result, Trigeant, Ltd. breached one of its financial covenants with AmCap. This breach constituted an "event of default" under the Credit Agreement.

30. By the third quarter of 2007, Trigeant, Ltd.'s financial picture had become unacceptable to AmCap.

31. Steve Roos negotiated a cure to Trigeant, Ltd.'s loan default, but Trigeant Ltd.'s equity holders were unwilling to invest additional money in the business. Therefore, Trigeant, Ltd. was unable to meet AmCap's requirements for the proposed debt restructuring.

32. On October 9, 2007, AmCap formally notified Trigeant, Ltd. that the loan was in default and threatened foreclosure. (D35.)

33. On November 8, 2007, AmCap formally notified Trigeant, Ltd. that it would accelerate the debt under the terms of the Credit Agreement. (D39.)

34. On November 20, 2007, AmCap gave Trigeant, Ltd. notice that it intended to foreclose on the refinery. (D40.)

E. **BTB's Purchase of the AmCap Loan and Lien**

35. Following AmCap's notice of default in October 2007, Harry Sargeant, III approached the other Trigeant, Ltd. equity holders (James Sargeant, Dan Sargeant, and Harry Sargeant, II) to request permission to put together a deal on his own to take control of the refinery. The equity holders granted Harry Sargeant, III permission to do so.

36. Harry Sargeant, III approached his longtime business associate, Mustafa Abu Naba, about financing a NewCo to serve as an acquisition vehicle to purchase the refinery out of foreclosure.

37. Mr. Abu Naba was a dominant purveyor of asphalt throughout the Caribbean, and the refinery would enhance the vertical integration of his businesses. His businesses relied on third-party suppliers of asphalt, and he desired a preferred business relationship with an asphalt refinery on the Texas Gulf Coast.

38. The refinery also provided vertical integration for Harry Sargeant, III's asphalt and crude oil shipping businesses which could increase profits.

39. Control over the refinery permitted Harry Sargeant, III and his affiliated entities to obtain a preferred price from third-party asphalt suppliers. With the ability to turn the refinery on and off, Harry Sargeant, III and his affiliated entities could influence market prices. Asphalt suppliers would be willing to supply them with asphalt at a reduced price if they agreed not to produce.

40. In October 2007, Harry Sargeant, III met with Myung Yi of AmCap to discuss the possibility of purchasing the refinery (after foreclosure by AmCap) through an entity either wholly or partially owned by Harry Sargeant, III.

41. Kevin Kirkeide, who Harry Sargeant, III selected to manage the NewCo, also attended the meeting with Myung Yi.

42. By November 19, 2007, the parties had reached a tentative agreement on the sale of the refinery. The plan was for an entity controlled by Harry Sargeant, III to purchase the refinery from AmCap for the total outstanding balance of the loan following a publicly held foreclosure sale at which AmCap would enter a credit bid equal to all amounts due and owing under the loan at that time. (P82.)

43.  On December 10, 2007, BTB was formed to serve as the acquisition vehicle for the refinery purchase. Harry Sargeant, III was named the sole owner and member and had full control over the company's operations.

44.  That same day, AmCap and BTB executed an Agreement Regarding Sale of Property and BTB deposited $8 million into an escrow account as a deposit on the refinery. (P99.)

45.  Pursuant to the Agreement Regarding Sale of Property, AmCap agreed to foreclose on the property and enter a credit bid at the foreclosure sale. If AmCap's credit bid constituted the highest bid at the foreclosure sale, AmCap agreed to designate BTB as the entity to take title to the refinery at closing.

46.  BTB requested that the foreclosure sale be held on January 1, 2008 because it believed there would be less chance of other bidders on that day.

47.  AmCap was only concerned about recouping its investment. It had no interest in maximizing the sale price of the refinery. Because it had a guaranteed buyer, AmCap agreed to hold the sale on January 1, 2008.

48.  AmCap no longer viewed Trigeant, Ltd. as a going concern because of the expiration of the TARCO agreement. Nevertheless, AmCap still considered the refinery's liquidation value to be between $27.6 and $30 million. AmCap believed it could obtain this amount through a forced sale of the refinery, either as a whole or broken up and sold off in its component pieces. AmCap was confident that it could recoup the outstanding loan balance of approximately $22 million, with or without BTB. (P7.)

49.  In the event that AmCap was not the highest bidder on January 1, 2008, the Agreement Regarding Sale of Property required AmCap to return the $8 million deposit to BTB.

50.  Given the possibility that AmCap might be outbid at the public auction, BTB's strategy changed from purchasing the refinery to purchasing the loan and lien from AmCap. By substituting itself as the foreclosing creditor, BTB would have more control over the foreclosure process and the outcome.

51.  In early December 2007, BTB brought the idea of a note purchase to AmCap. AmCap felt that this was the cleanest way for it to get paid so it agreed to the change in plan.

52.  BTB and AmCap negotiated an Assignment and Acceptance Agreement through which AmCap would transfer the loan and lien to BTB.

6 / 22

53. In exchange for AmCap's assignment of its rights and obligations under the Credit Agreement and Deed of Trust, BTB agreed to pay AmCap the outstanding loan balance ($22,364,562.06), less the amount of any interest payments made by Trigeant, Ltd. (P100.)

54. On December 23, 2007, Harry Sargeant, III gave the go ahead for the note purchase. (P8, D129.)

55. On December 27, 2007, Steve Roos of Trigeant, Ltd. made an interest payment to AmCap in the amount of $521,143.41. (P86.) This resulted in a direct reduction of the purchase price of the AmCap loan for BTB.

56. On December 28, 2007, BTB and AmCap executed the Assignment and Acceptance Agreement (P100), which superseded the Agreement Regarding Sale of Property, and BTB paid AmCap $21,828,446.65, which represented the outstanding balance on the note.

57. BTB then cancelled the previously scheduled January 1, 2008 foreclosure sale.

**F.   BTB's Foreclosure on the Refinery**

58. Following the sale of the AmCap loan and lien to BTB, Trigeant, Ltd. continued in default under the Credit Agreement.

59. BTB did not offer Trigeant, Ltd. an opportunity to cure the default, nor did Trigeant, Ltd. propose any cure.

60. There were never any discussions or negotiations between BTB and Trigeant, Ltd. regarding a rehabilitation plan.

61. BTB never planned to rehabilitate Trigeant, Ltd.; rather, it intended to take control of the refinery through foreclosure.

62. Harry Sargeant, III believed that once the TARCO processing agreement expired, Trigeant, Ltd. was essentially dead.

63. Harry Sargeant, III and the other Trigeant, Ltd. equity holders were not interested in putting more money into Trigeant, Ltd.

64. BTB initially rescheduled the foreclosure sale for February 5, 2008, the first Tuesday in February. (D190, D200.)

65. BTB then rescheduled the foreclosure sale for March 4, 2008, the first Tuesday in March. (D193, D201.)

66. On February 12, 2008, Skip Henkel, the substitute trustee, gave written notice to Trigeant, Ltd. that a non-judicial foreclosure sale would be conducted on March 4, 2008. (D193.)

67. Notice of the public foreclosure sale was posted at the Nueces County Courthouse. (D207.)

68. Notice of the foreclosure sale was published in the Coastal Bend Daily Legal & Business News on February 15, 2008. (D201.)

69. Trigeant, Ltd. made no effort to maximize the sale price of the refinery: it did not retain a broker, it did not contact other interested buyers, and it did not advertise the sale.

70. It was not in BTB's interest to publicize the sale because it wished to buy the refinery at the lowest possible price.

71. On March 4, 2008, the substitute trustee conducted a public auction on the steps of the Nueces County Courthouse.

72. BTB was the only bidder present at the sale.

73. BTB placed a credit bid of $22,565,193.55, equal to all amounts due and owing under the loan at that time.

74. The foreclosure sale was conducted in accordance with the provisions of the Texas Property Code, Section 51.002.

75. Plaintiff did not learn about the foreclosure sale until after it occurred.

76. BTB, Trigeant, Ltd., and Harry Sargeant, III initially concealed the foreclosure sale and the relationship between BTB and Harry Sargeant, III.

77. The Port Authority of Corpus Christi did not learn of the sale until November 2008, when it received notice from U.S. Customs and Border Control.

78. The neighboring Citgo refinery (a subsidiary of Plaintiff), which leased storage tanks from Trigeant, Ltd., did not learn about the change in ownership until January 2009 when there was an issue with its employees' access badges for the Trigeant, Ltd. refinery.

8 / 22

79. On May 26, 2008, at the Second Arbitration Proceedings before the International Court of Arbitration, Harry Sargeant, III testified that he did not have any interest in, control over, or connection to BTB, either directly or indirectly. (P90.)

80. At the time of the transfer of the refinery, Trigeant, Ltd. was insolvent, meaning that the sum of its debts was greater than all of its assets at a fair valuation.

## G. The Transition Agreement

81. After BTB's purchase of the refinery on March 4, 2008, Trigeant, Ltd. and BTB negotiated a Transition Agreement by which Trigeant, Ltd. operated the refinery on behalf of BTB for an administrative fee equal to 10% of the cost of the employees' compensation and benefits. (D58, D59, D60, D62, D64, D65, D69, D72, P162.)  BTB was also required to reimburse Trigeant, Ltd. for any expenditures incurred to maintain, improve, lease, and insure the land. (P162.)

82. Trigeant, Ltd. maintained its same employees, and there was little or no change in the management and operation of the refinery.

83. Trigeant, Ltd. refined its own petroleum stocks at the refinery during the transition period and fulfilled its existing contracts. (D45, D45a.)

84. BTB's Kevin Kirkeide managed any new contracts and new business.

85. The Transition Agreement expired on June 30, 2008, but Trigeant, Ltd. continued operating the refinery for BTB until September 8, 2008, when BTB foreclosed on all of Trigeant, Ltd.'s remaining property at the refinery.

86. After September 8, 2008, Trigeant, Ltd.'s employees were offered employment with BTB.  Steve Roos continued to serve as the manager of Trigeant, LLC, but was no longer in charge of the refinery's operations.

## H. BTB's Foreclosure on Trigeant's Remaining Assets

87. On February 7, 2008 (before the foreclosure on the refinery), Trigeant, Ltd. and BTB entered into an amendment to the Credit Agreement that granted Trigeant, Ltd. a $16 million line of credit secured by the same Trigeant, Ltd. assets as in the original Credit Agreement. (D48, D49.)

88. BTB loaned Trigeant, Ltd. $3,950,000 for operating expenses and capital improvements at the refinery.

89. The capital improvements at the refinery included the installation of a new gas meter, the completion of a railcar unloading rack, and ongoing work on a truck loading rack. (P40.)

90. After the March 4, 2008 foreclosure sale, Trigeant, Ltd. continued to own personal property located at the refinery, including equipment, accounts, contracts and the permits necessary to operate the refinery.

91. On June 25, 2008, BTB proposed that Trigeant, Ltd. turn over all its remaining personal property and intangibles secured by the Amended Credit Agreement in full satisfaction of Trigeant Ltd.'s remaining debts and obligations to BTB. (D63, D66, D67.)

92. Trigeant, Ltd. failed to respond to BTB's proposal.

93. BTB gave Trigeant, Ltd. notice of its intent to foreclose on Trigeant Ltd.'s remaining assets. (D68, D73.)

94. On September 8, 2008, BTB held a public auction at which it entered a credit bid for all of Trigeant, Ltd.'s remaining personal property and intangibles at the refinery. (D71.)

## I. Value of the Refinery at the Time of the Transfer

95. The Court received evidence of a wide range of values for the refinery.

96. As a going concern and assuming the completion of certain capital improvements that were under way at the time of the transfer, the refinery was potentially worth $160 million.

97. In 2006, Trigeant, Ltd. estimated the fair market value of the refinery at $68 million.

98. On December 10, 2007, AmCap's Blacktop Report placed the break-up/liquidation value of the refinery at $27.6 million; the orderly liquidation value of the refinery at $30–40 million, depending on market conditions; the fair market value at $45 million; and the replacement cost at $74.6 million.

99. The considerable variations in the estimates of the refinery's value are due to the variability of the factors considered—such as current market conditions, the time of the year, whether the refinery was being marketed as a going concern, whether the sale was voluntary or involuntary, and whether the refinery was intact and operational or shuttered and being sold off in pieces.

100.  The Court finds the testimony of AmCap's corporate representative, Myung Yi, and the AmCap Blacktop Report credible and persuasive with regard to valuation. AmCap's decision to loan Trigeant, Ltd. $22 million was based primarily on its ability to recover its investment, if needed, through a forced sale of the refinery. In other words, AmCap had a strong incentive to provide an accurate, albeit conservative, valuation of the refinery.

101.  Because Trigeant, Ltd. was in default on its loan and the refinery was in foreclosure, the Court finds that the proper valuation of the refinery at the time of the transfer was its liquidation value, not its fair market value.

102.  The Court finds that, at the time of the transfer, the refinery had a value in excess of the lien.

## J.   Insider Status

103.  Harry Sargeant, III holds a 29.5% ownership interest in Trigeant Holdings, LLC.

104.  Harry Sargeant, III's immediate family members (James Sargeant - brother, Daniel Sargeant - brother, and Harry Sargeant, II - father) hold the remaining ownership interest in Trigeant Holdings, LLC.

105.  At the time of the transfer of the refinery, Harry Sargeant, III served as the manager of Trigeant Holdings, LLC. (D22.)

106.  Trigeant Holdings, LLC is the general partner of and exerts full control over Trigeant Holdings, Ltd.

107.  At the time of the transfer, Trigeant Holdings, Ltd. was 99% owned by Harry Sargeant, III and his immediate family members (James Sargeant, Daniel Sargeant, and Harry Sargeant, II).

108.  At the time of the transfer, Trigeant Holdings, Ltd. owned 98.9% of Trigeant, LLC. Accordingly, Trigeant Holdings, Ltd. controlled Trigeant, LLC.

109.  Trigeant, LLC is the general partner of Trigeant, Ltd. Accordingly, Trigeant, LLC exercised 100% control over Trigeant, Ltd.

110.  In sum, Trigeant Holdings, LLC exerted control over Trigeant Holdings, Ltd., which in turn controlled Trigeant, LLC, which in turn controlled Trigeant, Ltd.

111.  The Trigeant, Ltd. equity holders, which consisted of Harry Sargeant, III, James
      Sargeant, Daniel Sargeant, and Harry Sargeant, II, were related, shared the same
      small office, and worked very closely together.

112.  The other Trigeant, Ltd. equity holders deferred to Harry Sargeant, III on issues
      regarding Trigeant, Ltd.'s management.  They had little interest in the operations
      of Trigeant, Ltd. and were not active in its management.

113.  Harry Sargeant, III had ultimate managerial responsibility for Trigeant, Ltd.'s
      operations and thus exerted control over Trigeant, Ltd. (P49.)

114.  Harry Sargeant, III possessed intimate knowledge of Trigeant, Ltd.'s business and
      financial affairs.

115.  Harry Sargeant, III was the 100% owner and sole member of BTB.

116.  Kevin Kirkeide served as BTB's manager and handled the company's day-to-day
      operations; however, Harry Sargeant, III had ultimate managerial control over
      BTB and directed Mr. Kirkeide with regard to BTB's important business
      decisions.

117.  Harry Sargeant, III sat on both sides of the transaction involving the transfer of the
      refinery from Trigeant, Ltd. to BTB.

## CONCLUSIONS OF LAW

**A.    The Court Has Personal Jurisdiction over Harry Sargeant, III**

1.    The Court concludes that it has specific jurisdiction over Harry Sargeant, III.

2.    In determining whether it may exercise personal jurisdiction over a defendant, a Court must consider (1) whether the defendant has sufficient minimum contacts with the forum state, and (2) whether the exercise of jurisdiction would offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945); *see also Alpine View Co. Ltd v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000).

3.    For specific jurisdiction, minimum contacts may be established by demonstrating that the defendant purposefully directed his activities at the forum state and the plaintiff's cause of action arises out of these activities. *See Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 413–14 (1984); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

4.    Harry Sargeant, III purposefully directed his activities at Texas, and this litigation results from damages that arise out of those activities:  he came up with the plan to purchase the Texas refinery after a foreclosure sale by AmCap (FF 35, 36, 40, 42, 44, 45); he formed BTB to purchase the refinery (FF 43); he then negotiated and ordered the purchase of the loan and lien from AmCap (FF 50, 51-54); and he controlled the foreclosure on the refinery through BTB (FF 58-65, 71-73).  The transfer of the refinery to BTB prevented Plaintiff from collecting on its Second Arbitration Award against Trigeant, Ltd.  Accordingly, Plaintiff has demonstrated that Harry Sargeant, III has sufficient minimum contacts with Texas. *See Trigeant Holdings, Ltd. v. Jones*, 183 S.W.3d 717, 728 (Tex. App. Houston [1st Dist.] 2005).

5.    Once a plaintiff establishes minimum contacts, the burden shifts to the nonresident defendant to show that asserting jurisdiction would not offend traditional notions of fair play and substantial justice. *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.,* 517 F.3d 235, 245 (5th Cir. 2008); *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999).  "In conducting the fairness inquiry, [courts] examine (1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies." *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 473 (5th Cir. 2006); *Wien Air Alaska*, 195 F.3d at 215.

6.    Texas has a significant interest in the subject matter of the litigation (the refinery), and bringing all defendants together in one action leads to a more efficient resolution of the controversies. There is a burden on Harry Sargeant, III to litigate in Texas; however, the balance of interests favors this Court's exercise of jurisdiction over Harry Sargeant, III.

7.    The fiduciary shield doctrine does not apply in this case. The Fifth Circuit has concluded that when an individual exerts such domination and control over a company that in reality they are the same, the exercise of jurisdiction over the individual is appropriate. *See Stuart v. Spademan*, 772 F.2d 1185, 1198 (5th Cir. 1985). Additionally, where an individual acts in his own self-interest, rather than that of the corporation, he is not entitled to the protection of the fiduciary shield doctrine. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 902–03 (2d Cir. 1981). Harry Sargeant, III was the 100% owner and sole member of BTB. He had full control over BTB's operations and directed and controlled its decisions. Additionally, he acted in his own interest in facilitating and directing the transfer of the refinery to BTB (FF 6, 39-40, 42-46, 50-56, 114, 116).

8.    Accordingly Harry Sargeant, III's Motion for Judgment on Partial Findings (D.E. 232) is DENIED.

**B.    The March 4, 2008 Foreclosure Sale Constituted a Transfer of an Asset**

9.    TUFTA Section 24.002 provides definitions for several statutory terms which are relevant to the Court's inquiry into whether the March 4, 2008 foreclosure sale constituted a transfer of an asset.

> <u>Transfer</u>: "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance. § 24.002(12)
> <u>Asset</u>: "property of a debtor, but the term does not include . . . property to the extent it is    encumbered by a valid lien . . . ." § 24.002 (2).
> <u>Valid Lien</u>: "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." § 24.002(13)

10.    An alleged fraudulent transfer of property is exempt from TUFTA "to the extent that such property is encumbered by a security interest that would be effective against a subsequent judicial lien." *Mullins v. Testamerica, Inc.*, 564 F.3d 386, 414 (5th Cir. 2009).

11.   When only part of a property's value is encumbered by a valid lien, the value the debtor maintains in the encumbered property in excess of the encumbering lien (the debtor's equity) constitutes an asset subject to TUFTA's anti-fraud provisions. *Telephone Equipment Network, Inc. v. TAS/Westchase Place, Ltd.*, 80 S.W.3d 601, 610, n.6 (Tex. Ct. App. 2002) (collecting cases).

12.   In determining whether property constitutes an asset, the Court considers the property's value at the time of the transfer. *See, e.g., United States ex. rel. Small Business Admin. v. Comm. Tech., Inc.*, 354 F.3d 378, 387 (5th Cir. 2003).

13.   Because the refinery was in foreclosure at the time of the transfer, in determining its value, the Court considers the property's liquidation value, not its fair market value.

14.   The Court found that, at the time of the transfer, the refinery had a liquidation value in excess of the lien (FF 102). Therefore, the entire value of the refinery was not encumbered by a valid lien.

15.   The Court does not need to determine whether the debtor received less than reasonably equivalent value for the asset, as the TUFTA definitions of "transfer" and "asset" do not include the term reasonably equivalent value. §§ 24.002(2)&(12).

16.   The omission of reasonably equivalent value from the definitions of "transfer" and "asset" cannot be considered an accident. *See Chicago v. Envtl. Defense Fund*, 511 U.S. 328, 338 (1994) ("it is generally presumed that [a legislature] acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another" (quotations omitted)); *Laidlaw Waste Systems (Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 659 (Tex. 1995) ("It is a rule of statutory construction that every word of a statute must be presumed to have been used for a purpose. Likewise, we believe every word excluded from a statute must also be presumed to have been excluded for a purpose." (quotations and citations omitted)).

17.   The Court concludes that the foreclosure sale constituted a transfer of an asset.

## C.   Section 24.006(b): Constructive Fraud - Insider Preference

18.   TUFTA Section 24.006(b) prohibits a category of fraudulent transfers known as "insider preferences."

19.  To establish a claim for constructive fraud under Section 24.006(b), a creditor must demonstrate the following elements:

      (1)    a transfer;
      (2)    to an insider;
      (3)    for an antecedent debt;
      (4)    insolvency of the debtor at the time of the transfer; and
      (5)    insider had reasonable cause to believe that the debtor was insolvent.

20.  For Plaintiff to establish a claim for constructive fraud under Section 24.006(b), it must demonstrate that BTB was an insider of Trigeant, Ltd.

21.  The test for determining insider status is to look at (1) the closeness of the relationship between the transferee (BTB) and debtor (Trigeant, Ltd.), and (2) whether the transfer constituted an arm's length transaction. *In re Holloway*, 955 F.2d 1008, 1010 (5th Cir. 1992); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 25 (Tex. App. – Tyler 2000, no pet.).

22.  The Court first considers Harry Sargeant, III's relationship with Trigeant, Ltd. A person who exercises control over the debtor is always considered an insider. § 24.002(7)(C)(v). Harry Sargeant, III exercised control over Trigeant, Ltd. (FF 103-114).

23.  A person's intimate knowledge of a partnership's business affairs is highly probative of an insider relationship. *See In re Wren Alexander Investments, LLC*, No. 08-52914-RBK, 2011 WL 748131, at *9–10 (Bankr. W.D. Tex. Feb. 23, 2011) (citing *Putman v. Stephenson*, 805 S.W.2d 16, 19 (Tex. App. Dallas 1991)). Harry Sargeant, III had intimate knowledge of Trigeant, Ltd.'s business and financial affairs (FF 114).

24.  Another indicator of an insider relationship is when a person is a relative of the general partner or other person in control of the debtor. § 24.002(7)(C)(ii). In the case at hand, the Sargeant family owned Trigeant, Ltd. Harry Sargeant, III was not only an equity partner and in control of Trigeant, Ltd., but he was related to the other equity partners.

25.  An arm's length transaction is a transaction between two unrelated and unaffiliated parties. *Black's Law Dictionary* 1635 (9th ed. 2009). In this case, Harry Sargeant, III sat on both sides of the transaction (FF 118) so the transfer of the refinery was between related and affiliated parties and thus not at arm's length.

26.  Therefore, the Court concludes that Harry Sargeant, III was an insider of Trigeant, Ltd.

16 / 22

27.     The Court next considers BTB's relationship with Trigeant, Ltd.  BTB had a close
        relationship with Trigeant, Ltd. because its 100% owner and sole member was an
        insider of Trigeant, Ltd.  Harry Sargeant, III was in control of both BTB and
        Trigeant, Ltd. (FF 113-116).  BTB thus had intimate knowledge of Trigeant Ltd.'s
        business and financial affairs.  As stated above, the transfer of the refinery was not
        at arm's length.  Accordingly, the Court concludes that BTB was an insider of
        Trigeant, Ltd.

28.     The other constructive fraud factors—that the transfer was for an antecedent debt,
        that the debtor was insolvent at the time of the transfer, and that the insider had
        reasonable cause to believe the debtor was insolvent—were uncontested by
        Defendants.

29.     Plaintiff established by a preponderance of the evidence all the elements for a
        claim of constructive fraud under TUFTA Section 24.006(b).

**D.      Section 24.010(a)(3): One-Year Statute of Limitations for Insider Preference**

30.     Under TUFTA, an action for constructive fraud under Section 24.006(b)
        "is extinguished unless action is brought . . . within one year after the transfer was
        made." § 24.010(a)(3).

31.     The foreclosure sale occurred on March 4, 2008.  Plaintiff did not file its Third
        Amended Complaint naming Harry Sargeant, III as a Defendant until July 23,
        2010 (D.E. 120).  Thus, Plaintiff's constructive fraud claim against Harry
        Sargeant, III under Section 24.006(b) is untimely, unless Plaintiff can show that it
        relates back to the Original Complaint.

32.     Under FED. R. CIV. P. 15(c)(1)(C), a plaintiff who files suit within the limitations
        period may amend the complaint to change a defendant's name or substitute a
        correctly named defendant for one named by mistake, so long as (1) the amended
        complaint asserts a claim or defense arising out of the same conduct, transaction,
        or occurrence set out—or attempted to be set out—in the original complaint; (2)
        the newly named defendant had notice of the suit during the period for service of
        process under FED. R. CIV. P. 4(m); and (3) the newly named defendant knew or
        should have known that, but for a mistake, he would have been named within the
        applicable limitations period. *Krupski v. Costa Crociere S. p. A.*, --- U.S. ----, 130
        S.Ct. 2485, 2496 (2010); *Jacobsen v. Osborne*, 133 F.3d 315, 319 (5th Cir. 1998).

33.     Plaintiff cannot satisfy the third element.  "Rule 15(c)(1)(C)(ii) asks what the
        prospective *defendant* knew or should have known during the Rule 4(m) period,
        not what the *plaintiff* knew or should have known at the time of filing [its] original

complaint." *Krupski*, 130 S. Ct. at 2493. In the case at hand, there is no evidence that Harry Sargeant, III knew or should have known that Plaintiff was targeting him as a defendant, or that he would have been named as a defendant but for a case of mistaken identity.

34. Plaintiff's constructive fraud claim against Harry Sargeant, III under Section 24.006(b) is dismissed for failure to comply with the applicable statute of limitations.

### E.    Sections 24.005(a)(2) and 24.006(a):  Constructive Fraud

35. To establish a claim for constructive fraud under Sections 24.005(a)(2) and 24.006(a), a creditor must prove the following elements for each transaction:

        (1)      the transaction constituted a transfer;

        (2)      the debtor received less than reasonably equivalent value in exchange for the transfer; and

        (3)      one of the following:

                (i)      the debtor was insolvent at the time of the transfer or as a result of the transfer;

                (ii)     the debtor was left with unreasonably small capital after the transfer; or

                (iii)    at the time of the transfer, the debtor intended to incur debts beyond its ability to pay.

36. Under TUFTA, "a person gives reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, non-collusive foreclosure sale . . . ." § 24.004(b); *see also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545 (1994).

37. A debtor receives reasonably equivalent value for its property transferred through a foreclosure sale if the value received falls "within the range of values for which the transferor would have sold the assets in an arm's length transaction." § 24.004(d).

38. Even if the foreclosure sale was collusive, the transfer of the refinery was for a value within the range of values for which the refinery would have sold in an arm's length transaction pursuant to § 24.004(d).

39. The lowest price at which the refinery would have sold in a regularly conducted, non-collusive foreclosure sale is the outstanding loan balance of approximately $22.5 million. In the foreclosure sale context, it is not uncommon for a foreclosing creditor to enter a "credit bid" equal to the outstanding balance of the

loan. Thus, $22.5 million establishes the bottom end of the range of what would be considered a reasonably equivalent value for the refinery.

40.     Accordingly, Plaintiff's constructive fraud claim under TUFTA Sections 24.005(a)(2) and 24.006(a) fails.

**F.     Section 24.005(a)(1) and (b):  Actual Fraud**

41.     To establish actual fraud under Section 24.005(a)(1), the creditor must prove by a preponderance of the evidence that the debtor made the allegedly fraudulent transfer with the "actual intent to hinder, delay, or defraud any creditor of the debtor."

42.     Section 24.005(b) provides a list of eleven nonexclusive badges of fraud that the Court may consider in determining whether the debtor acted with actual intent to defraud:
   (1)     the transfer or obligation was to an insider;
   (2)     the debtor retained possession or control of the property transferred after the transfer;
   (3)     the transfer or obligation was concealed;
   (4)     before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
   (5)     the transfer was of substantially all the debtor's assets;
   (6)     the debtor absconded;
   (7)     the debtor removed or concealed assets;
   (8)     the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
   (9)     the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
   (10)    the transfer occurred shortly before or shortly after a substantial debt was incurred; and
   (11)    the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

43.     The existence of several badges of fraud has been found to constitute an inference of fraud, a strong case of fraud, or to even shift the burden of proof to the defendant. *See, e.g., Kelly v. Armstrong*, 141 F.3d 799, 802–03 (8th Cir. 1998) (holding that the presence of multiple badges of fraud shifts the burden to defendant to show by a preponderance of the evidence that it had a legitimate purpose in making the transfer); *Tex. Custom Pools, Inc. v. Clayton*, 293 S.W.3d 299, 313 (Tex. App. 2009) ("An individual badge of fraud is not conclusive, but a concurrence of many badges in the same case will always make out a strong case

of fraud." (internal quotations and brackets omitted)); *In re SMTC Mfg. of Texas*, 421 B.R. 251, 300 (W.D. Tex. 2009) ("Proof of four to five badges of fraud has been found sufficient in several reported cases.").

44.    In the case at hand, the evidence supports a finding of at least seven of the statutory badges of fraud: the transfer was to an insider (FF 103–118, CL 27); the debtor retained possession or control over the property after the transfer for a period of time (FF 81-86); the transfer was concealed (FF 69, 70, 72, 75-79); before the transfer was made, the debtor had been sued or threatened with suit (FF 14); the transfer of the refinery constituted substantially all of the debtor's assets (FF 18); the debtor was insolvent or became insolvent shortly after the transfer was made (FF 80); and the transfer occurred shortly before a substantial debt (the Second Arbitration Award) was incurred (FF 15).

45.    The Court concludes that the debtor, Trigeant, Ltd., acted with actual intent to hinder, delay, or defraud Plaintiff.

**G.    Section 24.009(a):  Good Faith Defense**

46.    Under Section 24.005(a)(1), a transfer is not voidable against someone who took the property in good faith and for reasonably equivalent value. *See, e.g., Phillips v. B.R. Brick and Masonry, Inc.*, 2010 WL 3564820, at *4 (Tex. App., 1st Dist. Houston, Sept. 10, 2010); *In re IFS Financial Corp.*, 417 B.R. 419, 441 (Bankr. S.D. Tex. 2009).

47.    BTB did not carry its burden with regard to the good faith element.  Consequently, BTB may not invoke the good faith defense.

**H.    TUFTA Remedies**

48.    TUFTA Section 24.008 provides the following remedies for creditors who have been defrauded under the Act:

> (1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
> (2) an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practice and Remedies Code relating to ancillary proceedings; or
> (3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure:
>> (A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other

property;
(B) appointment of a receiver to take charge of the asset
transferred or of other property of the transferee; or
(C) any other relief the circumstances may require.

49.  "TUFTA was designed to prevent a debtor from defrauding its creditors by
     moving assets out of reach. To accomplish that end, TUFTA permits a creditor,
     under certain circumstances, to set aside a debtor's fraudulent transfer of assets."
     *Wohlstein v. Aliezer*, 321 S.W.3d 765, 776 (Tex. App. Houston [14th Dist.] 2004)
     (internal citation omitted).

50.  "Setting aside a fraudulent transfer is an equitable remedy." *Jackson Law Office v.
     Chappell*, 37 S.W.3d 15, 26 (Tex. App. Tyler 2000). A district court exercising its
     equitable powers must weigh the interests of the parties and the public in
     determining whether equitable relief should be granted. *Wenner v. Texas Lottery
     Comm'n*, 123 F.3d 321, 325 (5th Cir. 1998).

51.  The Court concludes that avoidance of the transfer is the most appropriate remedy
     in this case. The Court is concerned about the effects of unwinding the transfer
     after more than four years. However, given the evidence regarding the wide range
     of values for the refinery in a foreclosure situation, it would be speculative to set a
     value on the refinery at the time of the transfer. Thus, a money judgment is not
     appropriate.

52.  The setting aside of a fraudulent transfer restores the debtor and creditor to their
     respective positions as they existed before the transfer and permits the creditor to
     enforce its legal rights against the debtor, as if no conveyance had ever been made.
     *First Nat. Bank of Detroit v. Skidmore*, 267 S.W. 1051, 1055 (Tex. App.
     Texarkana 1924). Before the transfer, BTB had a lien on the refinery. Plaintiff
     requests that BTB's lien be equitably subordinated to its claim.

53.  Equitable subordination elevates the status of the creditor against other claimants
     above what its position was at the time of the transfer. The Fifth Circuit has
     enunciated a four-prong test for determining when equitable subordination is
     appropriate:

          (1) the claimant [BTB] must have engaged in inequitable conduct;
          (2) the misconduct must have resulted in injury to the creditors of
          the bankrupt [Plaintiff] or conferred an unfair advantage on the
          claimant [BTB]; (3) equitable subordination of the claim must not be
          inconsistent with the provisions of [TUFTA]; and (4) a claim should
          be subordinated only to the extent necessary to offset the harm

which the debtor or its creditors have suffered as a result of the inequitable conduct.

*In re SI Restructuring, Inc.*, 532 F.3d 355, 360 (5th Cir. 2008); *In the Matter of Cajun Elec. Power Co-op, Inc.*, 119 F.3d 349, 357 (5th Cir. 1997); *In re Mobile Steel Corp.*, 563 F.2d 692, 700 (5th Cir. 1977) (internal citations omitted).

54. At the time BTB purchased the loan and lien from AmCap, AmCap was in the process of foreclosing on the refinery. Had BTB not purchased the loan from AmCap, AmCap would have foreclosed on the refinery and any recovery by Plaintiff on the Second Arbitration Award would have been limited to the value received by AmCap in excess of the outstanding loan balance at the time of the foreclosure sale. Because a claim should be subordinated only to the extent necessary to offset the harm which the creditor suffered, the Court concludes that Plaintiff is not entitled to the equitable subordination of BTB's lien on the refinery.

55. The Court declines to consider Plaintiff's sham to perpetrate a fraud claim, which sought to impose joint and several liability on all Defendants for the entire amount of the Second Arbitration Award, because the Court has concluded that a money judgment is not appropriate in this case.

## CONCLUSION

For the reasons stated above, the Court concludes that the transfer of Trigeant, Ltd.'s Corpus Christi refinery to BTB violated TUFTA, and Plaintiff is entitled to entry of judgment in its favor. The Court orders that the fraudulent transfer be set aside and ownership of the refinery be returned to Trigeant, Ltd. The Court will set a hearing to address attorney fees.

ORDERED this 7th day of August, 2012.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE

Filed
7/23/2014 9:44:26 AM
Patsy Perez
District Clerk
Nueces County, Texas

CAUSE NO. 2014DCV-2966-H

| | | |
|---|---|---|
| TRIGEANT, LTD., | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | 347TH JUDICIAL DISTRICT |
| | § | |
| BTB REFINING, LLC, | § | |
| | § | |
| Defendants. | § | NUECES COUNTY, TEXAS |

### PLAINTIFF TRIGEANT, LTD.'S
### FIRST AMENDED PETITION TO QUIET TITLE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff, TRIGEANT, LTD. ("Trigeant") and files this First Amended Petition naming BTB Refining, LLC ("BTB") as Defendant and seeking to quiet title to property in which Plaintiff has an interest, respectfully showing this Court the following:

### DISCOVERY CONTROL PLAN

1. Plaintiff intends to conduct discovery under a Level 2 discovery control plan because this suit is not governed by a discovery control plan under Rules 190.2 or 190.4. *See* Tex. R. Civ. P. 190.3(a).

### PARTIES AND SERVICE

2. Plaintiff, Trigeant, Ltd. is a Limited Partnership formed and organized under the laws of the state of Florida with its principal place of business in Texas.

3. Defendant, BTB Refining, LLC is a Limited Liability Company formed and organized under the laws of the state of Texas with its principal place of business in Texas. BTB engages in systematic and continuous contacts within the State of Texas,

EXHIBIT E

and regularly conducts business in the State of Texas. BTB may be served by serving its registered agent for service of process: CT Corporation System, 350 N. St. Paul St., Suite 2900, Dallas, Texas 75201-4234.

## JURISDICTION AND VENUE

4.     This District Court, as a court of general jurisdiction, has jurisdiction to hear this suit to quiet title.

5.     Venue of this case is mandatory in Nueces County, Texas because it seeks to quiet title in real property that is located only in Nueces County. *See* Tex. Civ. Prac. & Rem. Code § 15.011.

## REQUEST TO QUIET TITLE IN REAL PROPERTY

6.     This Petition to remove a cloud and quiet title is properly brought and maintained because: (1) Trigeant has a valid interest in the property at issue; (2) BTB has made a claim as to the property that purports to interfere with and/or hinder Trigeant's title; and (3) BTB's claim is invalid under Texas law. *See Sadler v. Duvall*, 815 S.W.2d 285, 293 n. 2 (Tex. App. – Texarkana 1991, writ denied); *La Fleaur v. Kinard*, 161 S.W.2d 144, 147 (Tex. Civ. App. – Beaumont 1942, writ ref'd w.o.m.).

**Trigeant's Interest in the Refinery**

7.     Trigeant is the owner of a certain tract of land located in Nueces County, Texas, as more particularly described in the Final Judgment, recorded as Document No. 201300528, in the Public Records of Nueces County, Texas ("Refinery").

8.     A true and correct copy of the Final Judgment conveying the Refinery to Trigeant is attached to this Petition as Exhibit "A" and is hereby incorporated by reference as if fully set forth in this Petition.

**BTB's Claim as Cloud on Trigeant's Title to the Refinery**

9.     On December 28, 2007, BTB accepted and caused to be recorded a Transfer of Liens, Document No. 2008006264, in the Public Records of Nueces County, Texas, and purporting to create a lien for security purposes on Trigeant's refinery.  A true and correct copy of Transfer of Liens is attached to this Petition as Exhibit "B" and is hereby incorporated by reference as if fully set forth in this Petition.

**BTB's Claim as to Trigeant's Title to the Refinery is Invalid**

10.     The Deed of Trust under which BTB asserts an interest in the Refinery, although appearing valid on its face, is in fact invalid and of no force and effect.

11.     Specifically, Trigeant will show that the underlying debt, which the liens in favor of BTB purport to secure, is barred by limitations.  Since collection of the debt is barred and Trigeant is in possession of the property, BTB cannot use the remedies provided by the liens to obtain payment of the debt.  Since the liens are unenforceable, they should be stricken as a cloud in the title of Trigeant, Ltd.

12.     In addition, Trigeant will show that the source of funds BTB used to obtain the Transfer of Liens that were provided in a Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture filing dated December 15, 2006, (*see* Exhibit "B") was money that was owned by Trigeant, Ltd.  BTB's source of funds used to pay American Capital its outstanding loan balance of $21,822,446.65, was money that

Harry Sargeant, III fraudulently withheld from Trigeant. In essence, Harry Sargeant, III, through BTB, paid the outstanding balance on the American Capital note with Trigeant, Ltd. funds. The underlying debt, therefore, has been extinguished. Collection of the debt is barred. BTB cannot use the remedies provided by the loans to obtain payment of the debt that has been fully paid, satisfied and discharged. Since the liens are unenforceable, they should be stricken as a cloud on the title of Trigeant, Ltd.

13. Harry Sargeant, III testified in a lawsuit entitled, *Mohamad Anwar Farid Al-Saleh vs. Harry Sargeant, III, Mustafa Abu-naba'a and International Oil Trading Company, LLC*, Cause No. 08-CA-010187, pending in the Circuit Court of Palm Beach County, Florida. He testified that he, Mustafa and IOTC entered into a series of contracts to provide jet fuel to the American military forces then engaged in combat operations in Iraq. During the course of the contract, IOTC made profits of $212,000,000.00. In the trial of the case referred to above, Harry Sargeant, III testified that he, Mustafa and IOTC owed Trigeant $7,000,000.00 for its loss under the jet fuel contract, plus $11.00 per ton for any jet fuel paid. Harry Sargeant, III, Mustafa and IOTC have never paid Trigeant, Ltd. directly any of the money due and owed Trigeant, Ltd. As of December 28, 2007, Harry Sargeant, III owed Trigeant more than $21,822,446.65. Instead of paying the money to Trigeant, however, Harry Sargeant, III took the money owed Trigeant and paid it to American Capital. Harry Sargeant, III transferring Trigeant funds to American Capital should have had the effect of extinguishing the debt. Instead, by fraudulently concealing the source of the funds from both American Capital and Trigeant, Harry Sargeant, III was able to have American Capital transfer and assign the right and

obligations under the Credit Agreement and Deed of Trust to BTB. Since the underlying debt obligation was paid in full by Trigeant, Ltd. funds, BTB cannot collect the debt from Trigeant, Ltd. BTB cannot use the remedies provided by the liens to obtain payment of the debt. Since the liens are unenforceable, they should be stricken as a cloud on the title of Trigeant, Ltd.

WHEREFORE, PREMISES CONSIDERED, Plaintiff, TRIGEANT, LTD., requests that BTB be cited to appear and answer and that, on final hearing, Trigeant have Judgment that: (1) declares that BTB's Deed of Trust as to the Refinery is invalid and unenforceable under Texas law; and (2) orders BTB's Deed of Trust removed from the title to the Refinery and quiets title in Trigeant as to the Refinery. Trigeant further requests such other and further relief to which it may show itself entitled in law or in equity.

Respectfully submitted,

HARTLINE DACUS BARGER DREYER LLP
800 N. Shoreline Blvd.
2000 One Shoreline Plaza, North Tower
Corpus Christi, Texas 78401
(361) 866-8000
(361) 866-8039 Facsimile
mterry@hdbdlaw.com

By:    _/s/ Michael G. Terry_____
            Michael G. Terry
            State Bar No. 19799800

**ATTORNEYS FOR PLAINTIFF,
TRIGEANT, LTD.**

**<u>TRIAL BY JURY IS DEMANDED</u>**

- 5 -

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record, by the method of service indicated below, on this the 23rd day of July, 2014.

 _/s/ Michael G. Terry_
MICHAEL G. TERRY

**VIA FACSIMILE: 512-542-7272**
Mark T. Mitchell
GARDERE WYNNE SEWELL LLP
600 Congress Avenue, Suite 3000
Austin, Texas 78701

2014DCV-2966-H

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| PDVSA PETROLEO S.A., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL CASE NO. 2:09-cv-00038 |
| | § | Doc# 2013005258 |
| TRIGEANT, LTD.; | § | # Pages 14 |
| BTB REFINING, L.L.C., and | § | 02/08/2013    4:16PM |
| HARRY SARGEANT, III, | § | Official Records of |
| | § | NUECES COUNTY |
| Defendants. | § | DIANA T. BARRERA |
| | § | COUNTY CLERK |
| | | Fees $67.00 |

---

## FINAL JUDGMENT

Following a bench trial, the Court entered Findings of Fact and Conclusions of Law. (D.E. 239.) The Court now enters final judgment in this matter.

It is ORDERED that the Substitute Trustee's Sale conducted by C. M. Henkell, III, Substitute Trustee, pursuant to the terms of the Deed of Trust on March 4, 2008 (the "Sale"), and the Substitute Trustee's Deed dated March 4, 2008, executed by C. M. Henkell, III, Substitute Trustee, in favor of BTB Refining, LLC ("Buyer") in connection with the Sale, and recorded on March 4, 2008, at Document No. 2008009957, in the Official Public Records of Nueces County, Texas (the "Deed"), conveying, among other property, the real property described on the Exhibit "A" attached to this Judgment are hereby declared to be and deemed void with the same effect as if the Sale had not occurred and the Substitute Trustee's Deed had not been executed and delivered and recorded.

It is further ORDERED that each of the following documents (collectively, the "Reinstated Documents"), including all indebtedness and obligations evidenced and/or secured

TRUE COPY I CERTIFY
ATTEST: 2-8-13  Date 13 # of pages
DAVID J. BRADLEY, Clerk of Court
By _____
Deputy Clerk

EXHIBIT
A

thereby and all rights and obligations of the parties thereto, are reinstated as of March 4, 2008, and declared to be in full force and effect as of the date of this Judgment:

(a) Senior Secured Term A Note dated December 15, 2006, executed by Trigeant, Ltd. and Swordfish Asphalt Investments, LLC (collectively, the "Borrower") and payable to American Capital Strategies, Ltd. in the original principal amount of $22,000,000, issued by the Borrower (the "Note") pursuant to the Credit Agreement (hereinafter defined) and assigned to BTB Refining, LLC pursuant to the Assignment and Acceptance (hereinafter defined);

(b) Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated December 15, 2006, executed by Trigeant, Ltd. in favor of Atwood Jeter, Trustee, for the benefit of American Capital Financial Services, Inc., as administrative and collateral agent for the lenders defined therein, recorded at Document No. 2006066626 in the Official Public Records of Nueces County, Texas (the "Deed of Trust"), covering, among other property, the real property described on Exhibit "A" attached to this Judgment, securing, among other indebtedness, the indebtedness evidenced by the Note, and assigned to BTB Refining, LLC pursuant to the Assignment and Acceptance Agreement (hereinafter defined) and the Transfer of Liens (hereinafter defined);

(c) Credit Agreement, dated December 15, 2006 by and among the Borrower, American Capital Financial Services, Inc., as administrative and collateral agent, and the lenders signatory thereto, as amended (the "Credit Agreement"), and as assigned to BTB Refining, LLC pursuant to the hereinafter defined Assignment and Acceptance;

(d) Assignment and Acceptance dated effective December 28, 2007, by and among the lenders, ACRS Business Loan Trust 2007-2 and ACS Funding Trust I, as Assignors, joined by American Capital Financial Services, Inc. as Agent, for the lenders under the Credit Agreement, and BTB Refining, LLC, as Assignee (the "Assignment and Acceptance"); and

2

(e) Transfer of Liens dated effective as of December 28, 2007 from, and executed by ACAS Business Loan Trust 2007-2, ACS Funding Trust I, American Capital Financial Services, Inc. and American Capital Strategies, Ltd. to and in favor of BTB Refining, LLC, and recorded on January 12, 2008, at Document No. 2008006264, in the Official Public Records of Nueces County, Texas (the "Transfer of Liens").

It is further ORDERED that the amount of the debt evidenced by and payable under the Note as of the date of this Judgment is $22,565,193.55 (the "Debt"), which is the amount of BTB Refining, LLC's credit bid at the March 4, 2008 foreclosure sale of the Corpus Christi refinery.

It is further ORDERED that all interest, costs, attorney fees, or other amounts due to BTB Refining, LLC under the Reinstated Documents are frozen as of March 4, 2008 and will not continue to accrue until such time as this Judgment becomes final and non-appealable or a final mandate issues from the last appellate court of record.

It is further ORDERED that BTB Refining, LLC, or any successor or assignee of BTB Refining, LLC, is enjoined from any action to foreclose on the Corpus Christi refinery pursuant to the Reinstated Documents until such time as this Judgment becomes final and non-appealable or a final mandate issues from the last appellate court of record.

It is further ORDERED that Trigeant, Ltd. is enjoined from selling, assigning, or transferring title to the Corpus Christi refinery pursuant to the Reinstated Documents until such time as this Judgment becomes final and non-appealable or a final mandate issues from the last appellate court of record.

It is further ORDERED that PDVSA Petroleo S.A. is enjoined from taking any action to enforce its judgment or judgment lien against the Corpus Christi refinery until such time as this Judgment becomes final and non-appealable or a final mandate issues from the last appellate court of record.

3

All relief not expressly granted herein is denied.

Signed this 14th day of January 2013.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE

AFTER RECORDING RETURN TO:
R. Bryan Stone
Porter, Rogers, Dahlman & Gordon, P.C.
800 N. Shoreline, Suite 800 S
Corpus Christi, Texas 78401

4

EXHIBIT A

DESCRIPTION OF PROPERTY

Being Five Fee Tracts and Five Easement Tracts out of a Berry Contracting Inc., 54.070 Acre Tract and out of the Alice Dunn 59.47 acre tract and each tract being more particularly described by metes and bounds as follows:

Tract I:

Being 10.503 acres of land, more or less, being the 10.50 acre tract recorded as Tract I in Volume 2144, Page 16, Deed Records of Nueces County, Texas, and also being Parcel "A" shown in Gunter Engineering Company survey drawing dated December 15, 1988, of the Berry Contracting, Inc., 54.070 acre tract recorded in Volume 1547, Page 373, Deed Records of Nueces County, Texas, and said 10.203 acre tract being more particularly described by metes and bounds as follows:

BEGINNING at a found 5/8 inch iron rod for the Southeast corner of this tract, said corner also being the Southeast corner of said 54.070 acre tract and lying on the North right-of-way of Up River Road;

THENCE, N 77° 15' 57" W, with the South boundary of this tract and the North right-of-way line of Up River Road, 221.64 feet, to a found 5/8 inch iron rod for the Southwest corner of this tract, said corner also being the Southeast corner of Parcel "C" of said 54.070 acre tract;

THENCE, N 20° 39' 56" W, with the common boundary between this tract and said Parcel "C", 94.65 feet, to a found 5/8 inch iron rod for a corner of this tract;

THENCE, N 36° 17' 51" E, with the common boundary of this tract and said Parcel "C", 1606.97 feet, to a found 5/8 inch iron rod set on the concrete foundation of a chain link fence post for the Northwest corner of this tract and the Southwest corner of Parcel "B" of said 54.070 acre tract;

THENCE, S 53° 42' 09" E, with the North boundary of this tract, 282.50 feet, to a found 5/8 inch iron rod for the Northeast corner of this tract;

THENCE, S 36° 17' 51" W, with the East boundary of this tract, 1570.00 feet, to the POINT OF BEGINNING and containing 10.503 acres of land, more or less.

TRACT II:

Being 5.780 acres of land, more or less, out of a 10.78 acre tract recorded as tract II in Volume 2144, Page 16, Deed Records of Nueces County, Texas, and said 10.78 acre tract being described as Parcel "B" shown in Gunter Engineering Company survey drawing dated December 15, 1988 of the Berry Contracting, Inc. 54.070 acre tract recorded in Volume 1547, Page 373, Deed

Deed of Trust

011107.0248\397020

Records of Nueces County, Texas, and said 5.780 acre tract being more particularly described by metes and bounds as follows:

BEGINNING at a found 5/8 inch iron rod for the Southwest corner of this tract being on the North right-of-way of Up River Road and the South boundary of said 54.070 acre tract, said corner also being the Southeast corner of a 5.00 acre tract recorded in Document No. 804347, Official Public Records of Nueces County, Texas, and said corner bearing N 77° 15' 57" W, 663.10 feet, from a found 5/8 inch iron rod at the Southeast corner of said 54.070 acre tract;

THENCE, N 36° 17' 51" E, with the common boundary of this tract and said 5.00 acre tract, 996.08 feet, to a found 5/8 inch iron rod for the Northwest corner of this tract and the Northeast corner of said 5.00 acre tract said corner being on the South boundary of Parcel "D" of said 54.070 acre tract;

THENCE, S 61° 40' 41" E with the common boundary of this tract and said Parcel "D", 267.90 feet, to a found 5/8 inch iron rod for the Northeast corner of this tract, said corner being on the West boundary of Parcel "C" of said 54.070 acre tract;

THENCE, S 36° 17' 51" W with the common boundary of this tract and said Parcel "C", 828.52 feet, to a found 5/8 inch iron rod for a corner of this tract;

THENCE, S 59° 24' 22" W, and still with the common boundary of this tract and said Parcel "C", 118.92 feet, to a found 5/8 inch iron rod for the Southeast corner of this tract and said 10.78 acre tract said corner being on the North right-of-way line of Up River road and the South boundary of said 54.070 acre tract;

THENCE, N 77° 15' 57" W, with the South Boundary of this tract and the North right-of-way of Up River Road, 238.52 feet, to the POINT OF BEGINNING and containing 5.780 acres of land, more or less.

TRACT III:

Being 4.564 acres of land, more or less, out of the Alice Dunn 59.47 acre Tract out of the John Dunn Home Tract in the Charles and William Ohler Survey, and being a part of the Rincon Del Oso Grant to Enrique Villarreal, Abstract No. 1, in Nueces County, Texas, and this tract being a portion of a 5.00 acre tract recorded in Volume 1368, Page 1037, Deed Records of Nueces County, Texas, and being more particularly described by metes and bounds as follows:

BEGINNING at a 5/8 inch iron rod set for Northwest corner of this tract and said 5.00 acre tract, said corner being on the South right-of-way line of Up River Road and also being the Northeast corner of a Valero Refining Company 3.7531 acre tract recorded in Document No. 803000, Official Public Records of Nueces County, Texas;

THENCE, S 77° 16' 04" E with the South right-of-way line of Up River Road and the North boundary of this tract and said 5.00 acres tract, 232.46 feet, to a set 1-inch iron pipe for the

Description Of Property - Page 2                                    Deed of Trust

011107.0248\397020

Northeast corner of this tract and said 5.00 acre tract and also the Northwest corner of a 3.65 acre tract recorded in Volume 1431, Page 105, Deed Records of Nueces County, Texas.

THENCE, S 0° 43' 40'' E with the common boundary of this tract and said 5.00 acre tract and said 3.65 acre tract, 852.26 feet, to a found 5/8 inch iron rod for the Southeast corner of this tract;

THENCE, S 89° 16' 20'' W with the South boundary of this tract, 226.08 feet, to a found 5/8 inch iron rod for the Southwest corner of this tract being on the common boundary of said 5.00 acre tract and said 3.7531 acre tract;

THENCE, N 0° 43' 40'' W with the common boundary of this tract and said 5.00 acre tract and said 3.7531 acre tract, 906.34 feet, to the POINT OF BEGINNING and containing 4.564 acres of land, more or less.

**TRACT IV (Pipeline Use Agreement Easements)**

PARCEL 1: Intentionally Deleted.

PARCEL 2:

Being a tract of land along the Southerly, Westerly and a portion of the Northerly boundary line of Parcel "F", a 6.85 acre tract out of the Berry Contracting, Inc., 54.070 acre tract described in deed of record in Volume 1547, Page 373 of the Deed Records of Nueces County, Texas, said Tract being more particularly described by metes and bounds as follows, to-wit:

BEGINNING at the Southeast corner of said Parcel "F" whence the Northeast corner of said Berry Contracting, Inc., 54.070 acre tract bears N 36° 17' 56'' E, a distance of 404.19 feet, for the Southeast corner of this tract, also being a point in the Easterly boundary line of said Berry Contracting, Inc., 54,070 acre tract;

THENCE, N 68° 23' 17'' W, along the southerly boundary line of said Parcel "F" and along the Northerly boundary line of the right-of-way of the Missouri Pacific Railroad, a distance of 321.27 feet to the beginning point of a curve to the right;

THENCE, in a Northwesterly direction, along said curve to the right having a central angle of 04° 06' 32'' a radius of 5459.94 feet and along the Southerly boundary line of said Parcel "F" and along the Northerly boundary line of the right-of-way of said Missouri Pacific Railroad, a distance of 391.55 feet to a point for the Southwest corner of this tract, also being the Southwest corner of said Parcel "F";

THENCE, N 36° 21' 20'' E, along the Northwesterly boundary line of said Parcel "F", a distance of 448.26 feet to a point for the Northwest corner of this tract, also being the Northwest corner of said Parcel "F";

THENCE, S 63° 46' 33'' E, along the Northerly boundary line of said Parcel "F", and along the Navigation District South Bulkhead Line, a distance of 35.00 feet to a point for the Northeast corner of this tract;

THENCE, S 26° 13' 27'' W, a distance of 10.0 feet to a point for a Northerly Corner of this tract;

THENCE, N 63° 46' 33'' W, parallel to and 10.0 feet from (measured at right angles) the Northerly boundary line of said Parcel "F", a distance of 31.71 feet to a point for an inside corner of this tract;

THENCE, S 36° 21' 20'' W, parallel to and 5.00 feet from (measured at right angles) the Northwesterly boundary line of said Parcel "F", a distance of 110.74 feet to a point for an inside corner of this tract;

THENCE, S 53° 38' 40'' E, a distance of 5.00 feet to a point for a corner of this tract;

THENCE, S 36° 21' 20'' W, parallel to and 10.00 feet from (measured at right angles) the Northwesterly boundary line of said Parcel "F", a distance of 320.27 feet to a point for an inside corner of this tract;

THENCE, in a Southeasterly direction, along a curve to the left whose central angle is 03° 59' 25'' and whose radius is 5453.94 feet, parallel to and 6.00 feet from (measured at right angles) the Southerly boundary line of said Parcel "F", a distance of 379.82 feet to a point for a corner of this tract;

THENCE, S 68° 23' 17'' E, Parallel to and 6.00 feet from (measured at right angles) the Southerly boundary line of said Parcel "F", a distance of 322.84 feet to a point in the Easterly boundary line of said Parcel "F" for an Easterly corner of this tract;

THENCE, S 36° 17' 56'' W, along the Easterly boundary line of said Parcel "F" and along the Easterly boundary line of said Berry Contracting, Inc., 54.070 acre tract, a distance of 6.20 feet to the POINT OF BEGINNING and containing 0.19 acres of land, more or less.

TRACT V: (Easement Agreement Easements)

EASEMENT NO. 1:

Being an easement along a portion of the Northerly boundary line and along the Westerly boundary line of parcel "F", a 6.85 acre tract out of the Berry Contracting, Inc., 54.070 acre tract described in Deed of Record in Volume 1547, Page 373 of the Deed Records of Nueces County, Texas, said easement being more particularly described by metes and bounds as follows, to-wit:

BEGINNING at the Northwest corner of Parcel "F" for the Northwest corner of this easement;

THENCE, S 63° 46' 33'' E, along the Northerly boundary line of said Parcel "F", a distance of 35.00 feet to the Northeast corner of this easement;

011107.0248\397020

THENCE, S 26° 13' 27" W, a distance of 12.0 feet to a Northeasterly corner of this easement;

THENCE, N 63° 46' 33" W, parallel to and 12 feet from the Northerly boundary line of said Parcel "F", a distance of 32.07 feet to an inside corner of this easement;

THENCE, S 36° 21' 20" W, 5 feet from and parallel to the Westerly boundary line of said Parcel "F", a distance of 108.71 feet to an inside corner of this easement;

THENCE, S 53° 38' 40" E, a distance of 5.00 feet to an Easterly corner of this easement;

THENCE, S 36° 21' 20" W, 10.0 feet from and from and parallel to the Westerly boundary line of said Parcel; "F", a distance of 328.51 feet to the Southeast corner of this Easement, also being a point in the Northerly boundary line of the right-of-way of the Missouri Pacific Railroad;

THENCE, in a Northwesterly direction, along a curve to the right with a central angle of 0° 06' 21" whose radius is 5459.94 feet and along the Northerly boundary line of the right-of-way of said Missouri Pacific Railroad, a distance of 10.09 feet to the Southwest corner of this easement, also being a point in the Westerly boundary line of said Parcel "F";

THENCE, N 36° 21' 20" E, along the Westerly boundary line of said Parcel "F", a distance of 448.26 feet to the PLACE OF BEGINNING and containing 0.10 acres of land, more or less.

EASEMENT NO. 2: Intentionally Deleted.

EASEMENT NO. 3: Intentionally Deleted.

EASEMENT NO. 4: Intentionally Deleted.

**TRACT VI (Road Use Agreement Easement): Intentionally Deleted.**

**TRACT VII (Rail Use Easement)**

Field Note description of the centerline of a Twenty foot (20') Railroad easement out of a 5.00 acre tract recorded in Volume 1368 page 1037, Deed Records, Nueces County, Texas, and a 3.65 acre tract recorded in Volume 1431, Page 1005, Deed Records, Nueces County, Texas.

COMMENCING at the common Southeast corner of said 5.00 acre tract and the Southwest corner of said 3.65 acre tract;

011107.0248\397020

THENCE, along the common boundary line of said 5.00 acre tract and 3.65 acre tract, N 00° 38' 20'' W, 19.33 feet to a point, said point being on the North line of 15.5 foot Railroad easement recorded in Volume 815, Page 348, Deed Records, Nueces County, Texas.

THENCE, along said Railroad Easement, S 53° 57' 10'' E, 48.19 feet to a point, for the POINT OF BEGINNING;

THENCE, N 44° 00' 21'' W, at 56.28 feet pass the common boundary line of said 5.00 acre tract and 3.65 acre tract, in all distance of 209.42 feet to a point;

THENCE, N 29° 59' 40'' W, 106.09 feet to a point;

THENCE, N 16° 49' 07'' W, 127.18 feet to a point;

THENCE, N 04° 06' 22'' W, 85.30 feet to a point;

THENCE, N 00° 43' 40'' W, 642.15 feet to a point, said point being on the North boundary line of said 5.00 acre tract and also being on the South right-of-way line of Up River Road and being S 77° 57' 30'' E , 28.15 feet from the Northwest corner of said 5.00 acre tract, for the POINT OF TERMINUS.

The foregoing easement being the same easement as described in that certain Easement Agreement effective as of February 3, 1995, by and among Corpus Christi Grain Co., Berry Contracting, Inc., and Trifinery, a joint venture, which easement agreement is recorded as document No. 952247, Official Records of Nueces County, Texas on March 2, 1995.

**TRACT VIII:**

Commercial Road Crossing License by and between Pacific Railroad Company and Berry Contracting, Inc., filed for record under File Clerk's No. 991455, Volume 1546, Page 86, Deed Records of Nueces County, Texas, and assigned to Trifinery by Road Use Agreement files under Clerks File No. 649993, Volume 2144, Page 23, Deed Records of Nueces County, Texas.

**TRACT IX:**

Being 21.323 acres of land, more or less, out of a Berry Contracting, Inc. 54.070 acre, tract recorded in Volume 1547, Page 373, Deed records of Nueces County, Texas, and this 21.323 acre tract being more particularly described by metes and bounds as follows:

Being an easement along the Northerly and Westerly boundary lines of Parcel "B" shown as Exhibit "A" in a Deed Recorded in Volume 2144, pages 16-153 of the Deed Records of Nueces County, Texas, and being the same easement described as Exhibit C in Document No. 1996017270, Official Public Records of Nueces County, Texas, said easement being more particularly described by metes and bounds as follows:

Deed of Trust

011107.0248\397020

Beginning at a found 5/8 inch iron rod for the most Northerly corner of said Parcel "B" for the most Northerly corner of this easement and the POINT OF BEGINNING;

THENCE, S 54° 12' 38" E, along the Northerly boundary line of said Parcel "B" a distance of 170.25 feet to a found 5/8 inch iron rod;

THENCE, S 61° 40' 41" E, along the Northerly boundary line of said Parcel "B" a distance of 81.33 feet to a set 5/8 inch iron rod for a point of division of said Parcel "B" into a 5.00 acre tract of land to the West and a 5.78 acre tract of land to the east for the most Easterly corner of this easement;

THENCE, S 36° 17' 51" W, along the division line of said 5.00 acre tract and 5.78 acre tract, a distance of 30.29 feet for the most Southerly corner of this easement;

THENCE, N 61° 40' 41" W, 30 feet from and parallel to the Northerly boundary of said Parcel "B" a distance of 79.08 feet to an angle point of this easement;

THENCE, N 54° 12' 38" W, 30 feet from and parallel to the Northerly boundary of said Parcel "B", a distance of 112.46 feet to an interior corner of this easement;

THENCE, S 36° 16' 31" W, 60 feet from and parallel to the Westerly boundary of said Parcel "B", a distance of 30.51 feet for a corner of this easement;

THENCE, N 53° 43' 29" W, a distance of 60.00 feet to a point in the Westerly boundary line of said Parcel "B" for the most Westerly corner of this easement;

THENCE, N 36° 16' 31" E, a distance of 60.00 feet along the Westerly boundary line of said Parcel "B" to the POINT OF BEGINNING and containing 0.21 acres of land, more or less.

**TRACT X:**

Being 21.323 acres of land, more or less, out of a Berry Contracting, Inc. 54.070 acre, tract recorded in Volume 1547, Page 373, Deed Records of Nueces County, Texas, and this 21.323 acre tract being more particularly described by metes and bounds as follows:

BEGINNING at a found 5/8 inch iron rod at the intersection of the Easterly boundary line of said 54.070 acre tract with the Southerly boundary line of the right-of-way of the S.A. & U.S. Railroad (Now Missouri Pacific Railroad) for the Northeast corner of this tract and the POINT OF BEGINNING of this description;

THENCE, S 36° 17' 56" W, along the Easterly boundary line of said 54.070 acre tract, a distance of 887.16 feet to a found 5/8 inch iron rod for an inside corner of said 54.070 acre tract and this tract;

THENCE, N 53° 42' 09" W, a distance to 10.00 feet to a found 5/8 inch iron rod for an Easterly corner of this tract;

011107.0248\397020

THENCE, S 36° 17' 51" W, a distance of 1606.97 feet to a found 5/8 inch iron rod for an Easterly corner of this tract;

THENCE, S 20° 39' 56" W, a distance, of 94.65 feet to a found 5/8 inch iron rod in the Northerly boundary line of the right-of-way of Up River Road and in the Southerly boundary line of said 54.070 acre tract, for the Southeast corner of this tract;

THENCE, N 77° 15' 57" W, along the Southerly boundary line of said 54.070 acre tract and along the Northerly boundary line of the right-of-way of said UP River Road, a distance of 202.94 feet to a found 5/8 inch iron rod for the Southwest corner of this tract;

THENCE, N 59° 24' 22" E, a distance of 118.92 feet to a found 5/8 inch iron rod for a Westerly corner of this tract;

THENCE, N 36° 17' 51" E, a distance of 828.52 feet to a found 5/8 inch iron rod for an inside corner of this tract;

THENCE, N 61° 40' 41" W, a distance of 349.23 feet to a found 5/8 inch iron rod for a Westerly corner of this tract;

THENCE, N 54° 12' 38" W, a distance of 170.25 feet to a found 5/8 inch iron rod in the Easterly boundary line of railroad right-of-way in the name of Missouri Pacific Railroad, for a Westerly corner of this tract;

THENCE, N 36° 16' 31" E, along the Easterly boundary of said railroad right-of-way in the name of Missouri Pacific Railroad, a distance of 898.02 feet to a set 5/8 inch iron rod at the beginning point of a curve to the right, for a westerly corner of this;

THENCE, in a Northeasterly direction, along said curve to the right with a long chord bearing on N 67° 56' 56" E and whose radius is 917.28 feet and whose central angle is 63° 19' 04" a curve distance of 1013.69 feet to a set 5/8 inch iron rod at the Southerly boundary line of another railroad, (now Missouri Pacific) for a Northerly corner of this tract;

THENCE, S 68° 23' 17" E, along the Southerly boundary line of said S.A. & U.G. Railroad right-of-way, a distance of 83.70 feet to the POINT OF BEGINNING, said containing 21.323 acre of land, more or less.

TRACT XI:

Being 2.071 acres of land, more or less, out a Berry Contracting, Inc., 54.070 acre tract recorded in Volume 1547, Page 373, Deed Records of Nueces County, Texas, and this 2.071 acre tract being more particularly described by metes and bounds as follows:

BEGINNING at a found 5/8 inch iron rod at the intersection of the Westerly boundary line of said 54.070 acre tract, with the Southerly boundary line of a right-of-way of the S.A. & U.S

Deed of Trust

011107.0248\397020

Railroad (now Missouri Pacific Railroad) for the Northwest corner of this tract and the POINT OF BEGINNING of this description;

THENCE, S 64°, 14, 43 E, along the Southerly Boundary line of the Right-of-way said S.A. & U.S. Railroad, 13.86 feet to a set 5/8 inch iron rod for a corner of this tract the beginning of a curve to the left;

THENCE, in a southerly direction along said curve whose radius is 5559.94 feet and whose central angle is 04°, 09, 34 a distance of 403.63 feet to a set 5/8 inch iron rod at the end of said curve for a corner of this tract;

THENCE, S 68°23' 17" E, along the Southerly boundary line of the right-of-way of said S.A. & U.S. Railroad, 14.62 feet to a set 5/8 inch iron rod at the intersection of another right-of-way for the Missouri Pacific Railroad, for the Northeast corner of this tract;

THENCE, Southwesterly with a curve to the left and with the Northwesterly right-of-way line of said Missouri Pacific Railroad, said curve having a radius of 977.28 feet, a central angle of 39° 06' 37", a long chord bearing of S 68° 42' 30" W, a curve length of 667.10 feet, to a set 5/8 inch iron rod for the Southeast corner of this tract;

THENCE, N 53° 38' 40" W, 71.38 feet, to a found 5/8 inch iron rod for the Southwest corner of this tract;

THENCE, N 36° 21' 20" E, 457.93 feet, to the POINT OF BEGINNING and containing 2.071 acres of land, more or less.

Deed of Trust

011107.0248\397020

2014DCV-2966-H

Doc# 2008006264
# Pages 14
02/12/2008   1:34PM
Official Records of
NUECES COUNTY
DIANA T. BARRERA
COUNTY CLERK
Fees $67.00

## TRANSFER OF LIENS

STATE OF TEXAS        §

                                §

COUNTY OF NUECES    §

       Pursuant to that Assignment and Acceptance Agreement dated December 28, 2007, ACAS BUSINESS LOAN TRUST 2007-2 and ACS FUNDING TRUST I, as legal owners and holders of the hereafter described indebtedness, joined in said Agreement by their agent, AMERICAN CAPITAL FINANCIAL SERVICES, INC., did agree to sell, assign and transfer to BTB REFINING, LLC those promissory notes executed by TRIGEANT, LTD. and SWORDFISH ASPHALT INVESTMENTS, LLC, such indebtedness being more particularly described in and secured by liens provided in a Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated December 15, 2006 recorded at Document No. 2006066626 of the Official Public Records of Nueces County, Texas covering the following property; to-wit:

                      See EXHIBIT A hereto attached.

       AMERICAN CAPITAL STRATEGIES, LTD. joins in this Transfer as the original payee and original holder of that Senior Secured Term A Note dated December 15, 2006 executed by TRIGEANT, LTD. and SWORDFISH ASPHALT INVESTMENTS, LLC and secured by said Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing.

       Concurrently herewith, the above-mentioned notes are being endorsed and delivered to BTB REFINING, LLC. For valuable consideration, ACAS BUSINESS LOAN TRUST 2007-2, ACS FUNDING TRUST I, AMERICAN CAPITAL FINANCIAL SERVICES, INC., and AMERICAN CAPITAL STRATEGIES, LTD. do hereby SELL, ASSIGN and TRANSFER unto BTB REFINING, LLC, whose address is c/o IOTC Financial Services, One North Federal Highway, Suite Five Hundred, Boca Raton, Florida 33143, its successors and assigns, the lien and other rights and powers securing the above mentioned notes, all in accordance with the terms of said Assignment and Acceptance Agreement.

       DATED EFFECTIVE the 28th day of December, 2007.

                       SIGNED BY:
                       ACAS BUSINESS LOAN TRUST 2007-2
                       ACS FUNDING TRUST I
                       AMERICAN CAPITAL FINANCIAL SERVICES, INC.
                       AMERICAN CAPITAL STRATEGIES, LTD.

                 [SEE ATTACHED SIGNATURE PAGES]



EXHIBIT

B

ACAS BUSINESS LOAN TRUST 2007-2

BY:   American Capital Strategies, Ltd.,
            as Servicer

By: _____
Name: Samuel A. Flax
Title:  Executive Vice President and
       General Counsel


STATE OF MARYLAND      )
COUNTY OF MONTGOMERY )

    This instrument was acknowledged before me on the 11th day of February, 2008, by Samuel A. Flax, the Executive Vice President of American Capital Strategies, Ltd., as Servicer of ACAS BUSINESS LOAN TRUST 2007-2, a Delaware statutory trust, on behalf of said trust.

_____
Notary Public, State of Maryland

GAIL NEYLAND
Notary Public-Maryland
Montgomery County
My Commission Expires
July 28, 2010

ACS FUNDING TRUST I

By: _____

Name: Malon Wilkus

Title: Beneficiary Trustee

STATE OF ___mD___

§
§
§

COUNTY OF ___Mmtgomery___

    This instrument was acknowledged before me on the ___11th___ day of ___FEBRUARY___, 2008, by ___Malon Wilkus___, the ___Beneficiary Trustee___ of ACS FUNDING TRUST I, a Delaware statutory trust, on behalf of said trust.

Notary Public, State of ___Maryland___

GAIL NEVLAND
Notary Public-Maryland
Montgomery County
My Commission Expires
July 28, 2010

3

AMERICAN CAPITAL FINANCIAL SERVICES, INC.

By: _____

Name: _Sam Flay_

Title: _EVP_

STATE OF _Maryland_      §
                                      §

COUNTY OF _Montgomery_    §

This instrument was acknowledged before me on the _11th_ day of _February_, 2008, by _Sam Flay_, the _E VP_ of AMERICAN CAPITAL FINANCIAL SERVICES, INC., a Delaware corporation, on behalf of said corporation.

_____
Notary Public, State of _Maryland_

GAIL NEVLAND
Notary Public-Maryland
Montgomery County
My Commission Expires
July 28, 2010

4

AMERICAN CAPITAL STRATEGIES, LTD.

By: _____
Name: _Sam Flax_
Title: _EVP_

STATE OF _Maryland_ §
§
COUNTY OF _Montgomery_ §

    This instrument was acknowledged before me on the _11th_ day of _February_, 2008, by _Sam Flax_, the _EVP_ of AMERICAN CAPITAL STRATEGIES, LTD., a Delaware limited partnership, on behalf of said partnership.

_____
Notary Public, State of _Maryland_

```
GAIL NEYLAND
Notary Public-Maryland
Montgomery County
My Commission Expires
July 28, 2010
```

**AFTER RECORDING, RETURN TO:**
Scott E. Landreth
Wood, Boykin & Wolter, PC
615 N. Upper Broadway, Suite 1100
Corpus Christi, Texas 78477

F:\21\CI\BTB Refining, LLC\tf~1.doc        5

## EXHIBIT A

## DESCRIPTION OF PROPERTY

Being Five Fee Tracts and Five Easement Tracts out of a Berry Contracting Inc., 54.070 Acre Tract and out of the Alice Dunn 59.47 acre tract and each tract being more particularly described by metes and bounds as follows:

**Tract I:**

Being 10.503 acres of land, more or less, being the 10.50 acre tract recorded as Tract I in Volume 2144, Page 16, Deed Records of Nueces County, Texas, and also being Parcel "A" shown in Gunter Engineering Company survey drawing dated December 15, 1988, of the Berry Contracting, Inc., 54.070 acre tract recorded in Volume 1547, Page 373, Deed Records of Nueces County, Texas, and said 10.203 acre tract being more particularly described by metes and bounds as follows:

BEGINNING at a found 5/8 inch iron rod for the Southeast corner of this tract, said corner also being the Southeast corner of said 54.070 acre tract and lying on the North right-of-way of Up River Road;

THENCE, N 77° 15' 57" W, with the South boundary of this tract and the North right-of-way line of Up River Road, 221.64 feet, to a found 5/8 inch iron rod for the Southwest corner of this tract, said corner also being the Southeast corner of Parcel "C" of said 54.070 acre tract;

THENCE, N 20° 39' 56" W, with the common boundary between this tract and said Parcel "C", 94.65 feet, to a found 5/8 inch iron rod for a corner of this tract;

THENCE, N 36° 17' 51" E, with the common boundary of this tract and said Parcel "C", 1606.97 feet, to a found 5/8 inch iron rod set on the concrete foundation of a chain link fence post for the Northwest corner of this tract and the Southwest corner of Parcel "E" of said 54.070 acre tract;

THENCE, S 53° 42' 09" E, with the North boundary of this tract, 282.50 feet, to a found 5/8 inch iron rod for the Northeast corner of this tract;

THENCE, S 36° 17' 51" W, with the East boundary of this tract, 1570.00 feet, to the POINT OF BEGINNING and containing 10.503 acres of land, more or less.

**TRACT II:**

Being 5.780 acres of land, more or less, out of a 10.78 acre tract recorded as tract II in Volume 2144, Page 16, Deed Records of Nueces County, Texas, and said 10.78 acre tract being described as Parcel "B" shown in Gunter Engineering Company survey drawing dated December 15, 1988 of the Berry Contracting, Inc. 54.070 acre tract recorded in Volume 1547, Page 373, Deed

011107.0248\397020      Exhibit A - Page 1      Deed of Trust

Records of Nueces County, Texas, and said 5.780 acre tract being more particularly described by metes and bounds as follows:

BEGINNING at a found 5/8 inch iron rod for the Southwest corner of this tract being on the North right-of-way of Up River Road and the South boundary of said 54.070 acre tract, said corner also being the Southeast corner of a 5.00 acre tract recorded in Document No. 804347, Official Public Records of Nueces County, Texas, and said corner bearing N 77° 15' 57" W, 663.10 feet, from a found 5/8 inch iron rod at the Southeast corner of said 54.070 acre tract;

THENCE, N 36° 17' 51" E, with the common boundary of this tract and said 5.00 acre tract, 996.08 feet, to a found 5/8 inch iron rod for the Northwest corner of this tract and the Northeast corner of said 5.00 acre tract said corner being on the South boundary of Parcel "D" of said 54.070 acre tract;

THENCE, S 61° 40' 41" E with the common boundary of this tract and said Parcel "D", 267.90 feet, to a found 5/8 inch iron rod for the Northeast corner of this tract, said corner being on the West boundary of Parcel "C" of said 54.070 acre tract;

THENCE, S 36° 17' 51" W with the common boundary of this tract and said Parcel "C", 828.52 feet, to a found 5/8 inch iron rod for a corner of this tract;

THENCE, S 59° 24' 22" W, and still with the common boundary of this tract and said Parcel "C", 118.92 feet, to a found 5/8 inch iron rod for the Southeast corner of this tract and said 10.78 acre tract said corner being on the North right-of-way line of Up River road and the South boundary of said 54.070 acre tract;

THENCE, N 77° 15' 57" W, with the South Boundary of this tract and the North right-of-way of Up River Road, 238.52 feet, to the POINT OF BEGINNING and containing 5.780 acres of land, more or less.

**TRACT III:**

Being 4.564 acres of land, more or less, out of the Alice Dunn 59.47 acre Tract out of the John Dunn Home Tract in the Charles and William Ohler Survey, and being a part of the Rincon Del Oso Grant to Enrique Villarreal, Abstract No. 1, in Nueces County, Texas, and this tract being a portion of a 5.00 acre tract recorded in Volume 1368, Page 1037, Deed Records of Nueces County, Texas, and being more particularly described by metes and bounds as follows:

BEGINNING at a 5/8 inch iron rod set for Northwest corner of this tract and said 5.00 acre tract, said corner being on the South right-of-way line of Up River Road and also being the Northeast corner of a Valero Refining Company 3.7531 acre tract recorded in Document No. 803000, Official Public Records of Nueces County, Texas;

THENCE, S 77° 16' 04" E with the South right-of-way line of Up River Road and the North boundary of this tract and said 5.00 acres tract, 232.46 feet, to a set 1-inch iron pipe for the

Northeast corner of this tract and said 5.00 acre tract and also the Northwest corner of a 3.65 acre tract recorded in Volume 1431, Page 105, Deed Records of Nueces County. Texas.

THENCE, S 0° 43' 40" E with the common boundary of this tract and said 5.00 acre tract and said 3.65 acre tract, 852.26 feet, to a found 5/8 inch iron rod for the Southeast corner of this tract;

THENCE, S 89° 16' 20" W with the South boundary of this tract, 226.08 feet, to a found 5/8 inch iron rod for the Southwest corner of this tract being on the common boundary of said 5.00 acre tract and said 3.7531 acre tract;

THENCE, N 0° 43' 40" W with the common boundary of this tract and said 5.00 acre tract and said 3.7531 acre tract, 906.34 feet, to the POINT OF BEGINNING and containing 4.564 acres of land, more or less.

**TRACT IV (Pipeline Use Agreement Easements)**

PARCEL 1:  Intentionally Deleted.

PARCEL 2:

Being a tract of land along the Southerly, Westerly and a portion of the Northerly boundary line of Parcel "F", a 6.85 acre tract out of the Berry Contracting, Inc., 54.070 acre tract described in deed of record in Volume 1547, Page 373 of the Deed Records of Nueces County, Texas, said Tract being more particularly described by metes and bounds as follows, to-wit:

BEGINNING at the Southeast corner of said Parcel "F" whence the Northeast corner of said Berry Contracting, Inc., 54.070 acre tract bears N 36° 17' 56" E, a distance of 404.19 feet, for the Southeast corner of this tract, also being a point in the Easterly boundary line of said Berry Contracting, Inc., 54.070 acre tract;

THENCE, N 68° 23' 17" W, along the southerly boundary line of said Parcel "F" and along the Northerly boundary line of the right-of-way of the Missouri Pacific Railroad, a distance of 321.27 feet to the beginning point of a curve to the right;

THENCE, in a Northwesterly direction, along said curve to the right having a central angle of 04° 06' 32" a radius of 5459.94 feet and along the Southerly boundary line of said Parcel "F" and along the Northerly boundary line of the right-of-way of said Missouri Pacific Railroad, a distance of 391.55 feet to a point for the Southwest corner of this tract, also being the Southwest corner of said Parcel "F";

THENCE, N 36° 21' 20" E, along the Northwesterly boundary line of said Parcel "F", a distance of 448.26 feet to a point for the Northwest corner of this tract, also being the Northwest corner of said Parcel "F";

THENCE, S 63° 46' 33'' E, along the Northerly boundary line of said Parcel "F", and along the Navigation District South Bulkhead Line, a distance of 35.00 feet to a point for the Northeast corner of this tract;

THENCE, S 26° 13' 27'' W, a distance of 10.0 feet to a point for a Northerly Corner of this tract;

THENCE, N 63° 46' 33'' W, parallel to and 10.0 feet from (measured at right angles) the Northerly boundary line of said Parcel "F", a distance of 31.71 feet to a point for an inside corner of this tract;

THENCE, S 36° 21' 20'' W, parallel to and 5.00 feet from (measured at right angles) the Northwesterly boundary line of said Parcel "F", a distance of 110.74 feet to a point for an inside corner of this tract;

THENCE, S 53° 38' 40'' E, a distance of 5.00 feet to a point for a corner of this tract;

THENCE, S 36° 21' 20'' W, parallel to and 10.00 feet from (measured at right angles) the Northwesterly boundary line of said Parcel "F", a distance of 320.27 feet to a point for an inside corner of this tract;

THENCE, in a Southeasterly direction, along a curve to the left whose central angle is 03° 59' 25'' and whose radius is 5453.94 feet, parallel to and 6.00 feet from (measured at right angles) the Southerly boundary line of said Parcel "F", a distance of 379.82 feet to a point for a corner of this tract;

THENCE, S 68° 23' 17'' E, Parallel to and 6.00 feet from (measured at right angles) the Southerly boundary line of said Parcel "F", a distance of 322.84 feet to a point in the Easterly boundary line of said Parcel "F" for an Easterly corner of this tract;

THENCE, S 36° 17' 56'' W, along the Easterly boundary line of said Parcel "F" and along the Easterly boundary line of said Berry Contracting, Inc., 54.070 acre tract, a distance of 6.20 feet to the POINT OF BEGINNING and containing 0.19 acres of land, more or less.

TRACT V: (Easement Agreement Easements)

EASEMENT NO. 1:

Being an easement along a portion of the Northerly boundary line and along the Westerly boundary line of parcel "F", a 6.85 acre tract out of the Berry Contracting, Inc., 54.070 acre tract described in Deed of Record in Volume 1547, Page 373 of the Deed Records of Nueces County, Texas, said easement being more particularly described by metes and bounds as follows, to-wit:

BEGINNING at the Northwest corner of Parcel "F" for the Northwest corner of this easement;

THENCE, S 63° 46' 33'' E, along the Northerly boundary line of said Parcel "F", a distance of 35.00 feet to the Northeast corner of this easement;

THENCE, S 26° 13' 27" W, a distance of 12.0 feet to a Northeasterly corner of this easement;

THENCE, N 63° 46' 33" W, parallel to and 12 feet from the Northerly boundary line of said Parcel "F", a distance of 32.07 feet to an inside corner of this easement;

THENCE, S 36° 21' 20" W, 5 feet from and parallel to the Westerly boundary line of said Parcel "F", a distance of 108.71 feet to an inside corner of this easement;

THENCE, S 53° 38' 40" E, a distance of 5.00 feet to an Easterly corner of this easement;

THENCE, S 36° 21' 20" W, 10.0 feet from and from and parallel to the Westerly boundary line of said Parcel; "F", a distance of 328.51 feet to the Southeast corner of this Easement, also being a point in the Northerly boundary line of the right-of-way of the Missouri Pacific Railroad;

THENCE, in a Northwesterly direction, along a curve to the right with a central angle of 0° 06' 21" whose radius is 5459.94 feet and along the Northerly boundary line of the right-of-way of said Missouri Pacific Railroad, a distance of 10.09 feet to the Southwest corner of this easement, also being a point in the Westerly boundary line of said Parcel "F";

THENCE, N 36° 21' 20" E, along the Westerly boundary line of said Parcel "F", a distance of 448.26 feet to the PLACE OF BEGINNING and containing 0.10 acres of land, more or less.

EASEMENT NO. 2:  Intentionally Deleted.

EASEMENT NO. 3:  Intentionally Deleted.

EASEMENT NO. 4:  Intentionally Deleted.

**TRACT VI (Road Use Agreement Easement):  Intentionally Deleted.**

**TRACT VII (Rail Use Easement)**

Field Note description of the centerline of a Twenty foot (20) Railroad easement out of a 5.00 acre tract recorded in Volume 1368 page 1037, Deed Records, Nueces County, Texas, and a 3.65 acre tract recorded in Volume 1431, Page 1005, Deed Records, Nueces County, Texas.

COMMENCING at the common Southeast corner of said 5.00 acre tract and the Southwest corner of said 3.65 acre tract;

011107.0248\397020                    Description Of Property - Page 5                    Deed of Trust

THENCE, along the common boundary line of said 5.00 acre tract and 3.65 acre tract, N 00° 38' 20'' W, 19.33 feet to a point, said point being on the North line of 15.5 foot Railroad easement recorded in Volume 815, Page 348, Deed Records, Nueces County, Texas.

THENCE, along said Railroad Easement, S 53° 57' 10'' E, 48.19 feet to a point, for the POINT OF BEGINNING;

THENCE, N 44° 00' 21'' W, at 56.28 feet pass the common boundary line of said 5.00 acre tract and 3.65 acre tract, in all distance of 209.42 feet to a point;

THENCE, N 29° 59' 40'' W, 106.09 feet to a point;

THENCE, N 16° 49' 07'' W, 127.18 feet to a point;

THENCE, N 04° 06' 22'' W, 85.30 feet to a point;

THENCE, N 00° 43' 40'' W, 642.15 feet to a point, said point being on the North boundary line of said 5.00 acre tract and also being on the South right-of-way line of Up River Road and being S 77° 57' 30'' E , 28.15 feet from the Northwest corner of said 5.00 acre tract, for the POINT OF TERMINUS.

The foregoing easement being the same easement as described in that certain Easement Agreement effective as of February 3, 1995, by and among Corpus Christi Grain Co., Berry Contracting, Inc., and Trifinery, a joint venture, which easement agreement is recorded as document No. 952247, Official Records of Nueces County, Texas on March 2, 1995.

**TRACT VIII:**

Commercial Road Crossing License by and between Pacific Railroad Company and Berry Contracting, Inc., filed for record under File Clerk's No. 991455, Volume 1546, Page 86, Deed Records of Nueces County, Texas, and assigned to Trifinery by Road Use Agreement files under Clerks File No. 649993, Volume 2144, Page 23, Deed Records of Nueces County, Texas.

**TRACT IX:**

Being 21.323 acres of land, more or less, out of a Berry Contracting, Inc. 54.070 acre, tract recorded in Volume 1547, Page 373, Deed records of Nueces County, Texas, and this 21.323 acre tract being more particularly described by metes and bounds as follows:

Being an easement along the Northerly and Westerly boundary lines of Parcel "B" shown as Exhibit "A" in a Deed Recorded in Volume 2144, pages 16-153 of the Deed Records of Nueces County, Texas, and being the same easement described as Exhibit C in Document No. 1996017270, Official Public Records of Nueces County, Texas, said easement being more particularly described by metes and bounds as follows:



Beginning at a found 5/8 inch iron rod for the most Northerly corner of said Parcel "B" for the most Northerly corner of this easement and the POINT OF BEGINNING;

THENCE, S 54° 12' 38" E, along the Northerly boundary line of said Parcel "B" a distance of 170.25 feet to a found 5/8 inch iron rod;

THENCE, S 61° 40' 41" E, along the Northerly boundary line of said Parcel "B" a distance of 81.33 feet to a set 5/8 inch iron rod for a point of division of said Parcel "B" into a 5.00 acre tract of land to the West and a 5.78 acre tract of land to the east for the most Easterly corner of this easement;

THENCE, S 36° 17' 51" W, along the division line of said 5.00 acre tract and 5.78 acre tract, a distance of 30.29 feet for the most Southerly corner of this easement;

THENCE, N 61° 40' 41" W, 30 feet from and parallel to the Northerly boundary of said Parcel "B" a distance of 79.08 feet to an angle point of this easement;

THENCE, N 54° 12' 38" W, 30 feet from and parallel to the Northerly boundary of said Parcel "B", a distance of 112.46 feet to an interior corner of this easement;

THENCE, S 36° 16' 31" W, 60 feet from and parallel to the Westerly boundary of said Parcel "B", a distance of 30.51 feet for a corner of this easement;

THENCE, N 53° 43' 29" W, a distance of 60.00 feet to a point in the Westerly boundary line of said Parcel "B" for the most Westerly corner of this easement;

THENCE, N 36° 16' 31" E, a distance of 60.00 feet along the Westerly boundary line of said Parcel "B" to the POINT OF BEGINNING and containing 0.21 acres of land, more or less.

**TRACT X:**

Being 21.323 acres of land, more or less, out of a Berry Contracting, Inc. 54.070 acre, tract recorded in Volume 1547, Page 373, Deed Records of Nueces County, Texas, and this 21.323 acre tract being more particularly described by metes and bounds as follows:

BEGINNING at a found 5/8 inch iron rod at the intersection of the Easterly boundary line of said 54.070 acre tract with the Southerly boundary line of the right-of-way of the S.A. & U.S. Railroad (Now Missouri Pacific Railroad) for the Northeast corner of this tract and the POINT OF BEGINNING of this description;

THENCE, S 36° 17' 56" W, along the Easterly boundary line of said 54.070 acre tract, a distance of 887.16 feet to a found 5/8 inch iron rod for an inside corner of said 54.070 acre tract and this tract;

THENCE, N 53° 42' 09" W, a distance to 10.00 feet to a found 5/8 inch iron rod for an Easterly corner of this tract;



011107.0248\397020               Description Of Property – Page 7                    Deed of Trust

THENCE, S 36° 17' 51" W, a distance of 1606.97 feet to a found 5/8 inch iron rod for an Easterly corner of this tract;

THENCE, S 20° 39' 56" W, a distance, of 94.65 feet to a found 5/8 inch iron rod in the Northerly boundary line of the right-of-way of Up River Road and in the Southerly boundary line of said 54.070 acre tract, for the Southeast corner of this tract;

THENCE, N 77° 15' 57" W, along the Southerly boundary line of said 54.070 acre tract and along the Northerly boundary line of the right-of-way of said UP River Road, a distance of 202.94 feet to a found 5/8 inch iron rod for the Southwest corner of this tract;

THENCE, N 59° 24' 22" E, a distance of 118.92 feet to a found 5/8 inch iron rod for a Westerly corner of this tract;

THENCE, N 36° 17' 51" E, a distance of 828.52 feet to a found 5/8 inch iron rod for an inside corner of this tract;

THENCE, N 61° 40' 41" W, a distance of 349.23 feet to a found 5/8 inch iron rod for a Westerly corner of this tract;

THENCE, N 54° 12' 38" W, a distance of 170.25 feet to a found 5/8 inch iron rod in the Easterly boundary line of railroad right-of-way in the name of Missouri Pacific Railroad, for a Westerly corner of this tract;

THENCE, N 36° 16' 31" E, along the Easterly boundary of said railroad right-of-way in the name of Missouri Pacific Railroad, a distance of 898.02 feet to a set 5/8 inch iron rod at the beginning point of a curve to the right, for a westerly corner of this;

THENCE, in a Northeasterly direction, along said curve to the right with a long chord bearing on N 67 56' 56" E and whose radius is 917.28 feet and whose central angle is 63° 19' 04" a curve distance of 1013.69 feet to a set 5/8 inch iron rod at the Southerly boundary line of another railroad, (now Missouri Pacific) for a Northerly corner of this tract;

THENCE, S 68° 23' 17" E, along the Southerly boundary line of said S.A. & U.G. Railroad right-of-way, a distance of 83.70 feet to the POINT OF BEGINNING, said containing 21.323 acre of land, more or less.

TRACT XI:

Being 2.071 acres of land, more or less, out a Berry Contracting, Inc., 54.070 acre tract recorded in Volume 1547, Page 373, Deed Records of Nueces County, Texas, and this 2.071 acre tract being more particularly described by metes and bounds as follows:

BEGINNING at a found 5/8 inch iron rod at the intersection of the Westerly boundary line of said 54.070 acre tract, with the Southerly boundary line of a right-of-way of the S.A. & U.S

011107.0248\397020          Description Of Property – Page 8                    Deed of Trust

Railroad (now Missouri Pacific Railroad) for the Northwest corner of this tract and the POINT OF BEGINNING of this description;

THENCE, S 64 °, 14 , 43  E, along the Southerly  Boundary line of the Right-of-way said S.A. & U.S. Railroad, 13.86 feet to a set 5/8 inch iron rod for a corner of this tract the beginning of a curve to the left;

THENCE, in a southerly direction along said curve whose radius is 5559.94 feet and whose central angle is 04 °, 09 , 34  a distance of 403.63 feet to a set 5/8 inch iron rod at the end of said curve for a corner of this tract;

THENCE, S 68° 23' 17" E, along the Southerly boundary line of the right-of-way of said S.A. & U.S. Railroad, 14.62 feet to a set 5/8 inch iron rod at the intersection of another right-of-way for the Missouri Pacific Railroad, for the Northeast corner of this tract;

THENCE, Southwesterly with a curve to the left and with the Northwesterly right-of-way line of said Missouri Pacific Railroad, said curve having a radius of 977.28 feet, a central angle of 39° 06' 37", a long chord bearing of S 68° 42' 30" W; a curve length of 667.10 feet, to a set 5/8 inch iron rod for the Southeast corner of this tract;

THENCE, N 53° 38' 40" W, 71.38 feet, to a found 5/8 inch iron rod for the Southwest corner of this tract;

THENCE, N 36° 21' 20" E, 457.93 feet, to the POINT OF BEGINNING and containing 2.071 acres of land, more or less.

---

011107.0248\397020

Description Of Property - Page 9

Deed of Trust

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **PDVSA PETROLEO S.A.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 2:09-CV-00038** |
| | § | |
| **TRIGEANT, LTD. and** | § | |
| **BTB REFINING, LLC.,** | § | |
| | § | |
| **Defendants.** | § | |

## ORDER DENYING PRELIMINARY AND PERMANENT INJUNCTION

BE IT REMEMBERED that on the _____ day of _____, 2014, the above-entitled and numbered cause came on for hearing on the Motion of BTB Refining, LLC for Preliminary and Permanent Injunction against Trigeant, Ltd.'s prosecution of a pending state court action. The Court, having considered the pleadings, evidence and argument of counsel, is of the opinion that the matter is more properly left to the state court as to whether res judicata based on the judgment entered in this Court bars the litigation of issues that have been raised in the state court. Accordingly, the Motion for Preliminary and Permanent Injunction against Trigeant, Ltd.'s prosecution of state court action is

DENIED.

SIGNED AND RENDERED this _____ day of _____, 2014.

_____
Judge Nelva Gonzales Ramos
United States District Judge

APPROVED AS TO FORM:

HARTLINE DACUS BARGER DREYER LLP
800 N. Shoreline Blvd.
Suite 2000-North Tower
Corpus Christi, Texas 78401
(361) 866-8000 – Telephone
(361) 866-8039 – Facsimile
mterry@hdbdlaw.com

AND

Charles H. Lichtman
Florida Bar No. 501050
BERGER SINGERMAN LLP
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, Florida  33301
(954) 525-9900
(954) 523-2872 – Facsimile
clichtman@bergersingerman.com


By:     */s/ Michael G. Terry*
        Michael G. Terry
        Attorney-in-Charge
        State Bar No. 19799800
        Federal ID No. 926

ATTORNEYS FOR DEFENDANT,
TRIGEANT, LTD.